Atkinson-Baker, a Veritext Company
www.depo.com

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   PAULINE M. VELEZ,                    **CERTIFIED COPY**

5              Plaintiff,

6        vs.                        Case No.
                                    4:20-cv-05170-KAW
7   DEPARTMENT OF VETERANS
    AFFAIRS, et al.,
8
               Defendants.
9   _____

10

11

12

13          ZOOM VIDEOCONFERENCE

14       DEPOSITION OF DAVID STOCKWELL

15            May 4, 2021

16             9:46 a.m.

17

18          Martinez, California

19

20

21
    Reported by:  QUYEN N. DO, CSR No. 12447
22

23  ATKINSON-BAKER, A Veritext Company

24  (800) 288-3376
    www.depo.com
25  FILE NO. AF028F7

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   APPEARANCES:

 2


 3        For Plaintiff:

 4             HOYER & HICKS
               RICHARD A. HOYER, ESQ.
 5             4 Embarcadero Center, Suite 1400
               San Francisco, California  94114
 6             415.766.3539
               415.276.1738 Fax
 7             rhoyer@hoyerlaw.com

 8
          For Defendant:
 9
               UNITED STATES ATTORNEY'S OFFICE
10             VALERIE E. SMITH, ESQ.
               450 Golden Gate Avenue, Floor 9
11             San Francisco, California  94102-3419
               valerie.smith2@usdoj.gov
12

13        Also Present:

14             Michael Remler

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1              INDEX TO EXAMINATION

 2

 3         WITNESS:  DAVID STOCKWELL

 4    EXAMINATION                              PAGE

 5    By Mr. Hoyer                                5

 6    Afternoon Session                          73

 7    (Resumed) By Mr. Hoyer                      74

 8
                         --oOo--
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                        INDEX TO EXHIBITS

 2                        DAVID STOCKWELL

 3      VELEZ vs. DEPARTMENT OF VETERANS AFFAIRS, et al.

 4                     Tuesday, May 4, 2021

 5                  Quyen N. Do, CSR No. 12447

 6

 7   MARKED                  DESCRIPTION                 PAGE

 8   Exhibit 1    Formal Grievance [RETAINED BY COUNSEL]  60

 9   Exhibit 2    Memo dated November 5, 2018, from
                  David Stockwell to Lorrie Strohecker
10                [RETAINED BY COUNSEL]                    69

11   Exhibit 3    December 12, 2018, memo from
                  Strohecker to David Stockwell
12                [RETAINED BY COUNSEL]                    70

13   Exhibit 4    February 1, 2019, memo from David
                  Stockwell to Dr. Velez [RETAINED BY
14                COUNSEL]                                 72

15   Exhibit 5    Written Affidavit of David Stockwell
                  [RETAINED BY COUNSEL]                    75
16
     Exhibit 6    Investigative Report In the Matter of
17                the EEO Complaint of Discrimination
                  of Pauline Velez [RETAINED BY COUNSEL]   81
18

19                        --oOo--

20

21

22

23

24

25
```

```
 1                    MARTINEZ, CALIFORNIA;

 2                 TUESDAY, MAY 4, 2021, 9:46 A.M.

 3

 4                          --oOo--

 5

 6          THE REPORTER:  Good morning.  My name is Quyen

 7   Do, a California Certified Shorthand Reporter, and this

 8   deposition is being held via videoconference equipment.

 9   The witness and reporter are not in the same room.  The

10   witness will be sworn in remotely.

11                          --oOo--

12                     DAVID STOCKWELL,

13      having been first duly sworn, was examined and

14                   testified as follows:

15

16                       EXAMINATION

17

18   BY MR. HOYER:

19      Q    Good morning, Mr. Stockwell.

20      A    Morning.

21      Q    Have you -- have you ever had your deposition

22   taken before?

23      A    Yes.

24      Q    When was the last time that you had it taken?

25      A    I don't recall the dates.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q    Okay.  Approximately how many years ago was

2  it?

3    A    Five.

4    Q    Okay.  And what kind of case was it?

5    A    It was a VA case.

6    Q    And was it a case involving an employee suing

7  the VA?

8    A    Yes.

9    Q    Okay.  And, generally, what were the

10  allegations?  Was it a discrimination case or harassment

11  case?  What sort of case was it?

12    A    I think it was a wrongful termination case.

13    Q    Okay.  And were you named as a defendant?

14    A    No.

15    Q    Okay.  Well, let me go over the ground rules

16  of the deposition just to refresh your memory about how

17  it works.

18         You see that Ms. Do is up there on the screen.

19  She's actually got a machine.  She's taking down

20  everything that's said, and for that reason, it's

21  important to remember a couple of things.  One is that

22  only one person can speak at any one time.  I know, in

23  conversation, sometimes you -- if you think you know

24  where a question is going, you'll jump in with an answer

25  just to be helpful, but that doesn't work in this

Atkinson-Baker, a Veritext Company
www.depo.com

1  context.  So, if you can endeavor to wait until I finish

2  asking a question before you start to answer, that will

3  be helpful.  That will also give your counsel an

4  opportunity to put any objections on the record she has

5  to the question.  Unless she instructs you not to

6  answer, however, you are obligated to answer the

7  questions as long as you understand the question.

8          The other about the court reporter is that she

9  cannot take down nonverbal responses, so you can't

10 respond by nodding your head or saying "uh-huh,"

11 something like that.  Everything has to be verbal, okay?

12      A    Yes.

13      Q    Now, when we're done here today, the court

14 reporter will type up everything that's said into a

15 booklet and provide it to your attorney for your review.

16 If you want to, at that point, you can make changes to

17 your testimony.  But if, during the course of today, you

18 remember that a previous answer needs to be amended or

19 changed in any way, the best practice is to just say so.

20 I'm happy to allow you to -- to -- to fix your answers.

21 If you do make changes to your deposition testimony

22 later, I can comment on the fact that you made changes

23 to the testimony to the jury if this case goes to trial,

24 okay?

25      A    Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1      Q    Now, if -- if you need to take a break at any
 2  time, I'm happy to give you a break.  It's not an
 3  endurance contest.  I would ask that you answer any
 4  pending question before you take your break, though.  We
 5  will be breaking for lunch at some point, and I don't
 6  anticipate this will go all day, but I'm not sure at
 7  this point.
 8           Do you have any questions about the process?
 9      A    No.
10      Q    Okay.  Is there any reason that you can't give
11  your fullest and best testimony today?  For example, are
12  you on any medications that may affect your memory or
13  your ability to think?
14      A    No.
15      Q    Have you reviewed any documents in preparation
16  for your testimony today?
17      A    My legal counsel gave me a -- a couple
18  documents, I believe, were from the Plaintiff.
19      Q    Which documents were those?
20      A    There's a grievance examiner appointment
21  document and a response, and I believe it's the -- an
22  EEO investigation written response that -- that I
23  replied to.  And a third document that looks like it's
24  some statements from Dr. Addagatla on the same EEO case.
25      Q    The Addagatla response down in the lower
```

Atkinson-Baker, a Veritext Company
www.depo.com

1 right-hand corner, there may be some letters and numbers

2 in -- of the pages of the documents. Can you see that?

3    A   Yes.

4    Q   Can you read those out for me?

5    A   USA005743.

6    Q   Thanks. And, now, other than your attorney --

7 and I'm never going to ask you a question asking for

8 what you said to your attorney or what your attorney

9 said to you. That's attorney-client privilege. But

10 other than your attorney, have you had any discussions

11 with anyone in preparation for your testimony today?

12    A   No.

13    Q   Okay. Now, typically, depositions are done in

14 person, but because this is over Zoom, I can't see

15 everything that's going on in your room. Are you alone

16 there in the -- in that room?

17    A   Yes.

18    Q   And have you turned off the chat function, the

19 e-mail function, texting functions? Because you're not

20 allowed to have any communication with anyone during

21 your testimony.

22    MS. SMITH: Other than he may ask to speak to

23 his attorney.

24    MR. HOYER: Yeah, but I'll hear that.

25    THE WITNESS: I have the chat open on your

Atkinson-Baker, a Veritext Company
www.depo.com

1  zoom call.  Should I turn that off?

2  BY MR. HOYER:

3      Q    That one's okay.  Don't worry about that,

4  although your attorney knows enough not to do any direct

5  chatting with you.  But you shouldn't be doing any

6  chatting with her unless you tell me that you're going

7  to have a conference with her, okay?

8      A    Yes.

9      Q    Okay.  Now, let's get a little bit about your

10 background.  Who is your employer currently?

11     A    The Department of Veterans Affairs.

12     Q    Okay.  And, now, yesterday we took the

13 deposition of Mr. Graham, who you work with, and he -- I

14 asked him if there's some abbreviation that he uses

15 regarding the division that you work with, which is --

16 the acronym is VANCHS; is that right?

17     A    It's missing one letter.  It's VANCHCS.

18     Q    I see.  And he just called it NorCal.  Is --

19 is that a good way to refer to it?

20     A    You -- it's acceptable.

21     Q    Okay.  I just want to come up with an easy way

22 to refer to it rather than going through all the -- the

23 letters and words every time I ask you a question, and

24 so if that -- if that works for you, we'll use NorCal.

25 Okay?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A      Yes.

2      Q      Now, what's your title, your job title?

3      A      I'm the medical center director for VA

4   Northern California Health Care System.

5      Q      And how long have you been -- how long have

6   you had that title?

7      A      Since October of 2013.

8      Q      Prior to that, who did you work for?

9      A      I worked for the Portland VA Medical Center as

10  the deputy medical center director.

11     Q      How long were you in that job?

12     A      Seven years.

13     Q      And can you just generally describe your job

14  duties?

15          MS. SMITH:  Objection.

16  BY MR. HOYER:

17     Q      Your current job duties.

18          MS. SMITH:  Thank you.

19          THE WITNESS:  I oversee a health care system

20  with 12 sites of care spread across 40,000 square miles

21  in Northern California for the VA health care system,

22  and my responsibilities include the overall management

23  of the organization, leading the organization,

24  overseeing all 4,500 employees, the finances, the -- the

25  responsibilities of the entire health care system.

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. HOYER:

2      Q    And have those job duties changed

3  significantly since October 2013?

4      A    No.

5      Q    Do you visit each of the 12 sites regularly?

6      A    Yes.  When it's not COVID.

7      Q    Okay.  And how many direct reports do you

8  have?

9      A    12.

10     Q    And can you just go through those by job

11  title?

12     A    The chief of staff, the chief nurse.  There's

13  two associate directors.  The chief of quality

14  management; the compliance officer; the chief planning

15  officer; the -- the research compliance officer; my

16  executive assistant; my secretary; the EEO program

17  manager; the diversity, equity, and inclusion program

18  manager; and occasionally a -- a fellow or a resident.

19     Q    And has -- have those direct reports, in terms

20  of job title, changed significantly since October 2013?

21     A    No.

22     Q    When did you first meet Dr. Velez?

23     A    In 1994.

24     Q    What were the circumstances?

25     A    We were both employees of VA northern --

Atkinson-Baker, a Veritext Company
www.depo.com

1  NorCal.

2      Q    And how did you first come into contact with

3  her in 1994?

4      A    Our corporate offices were located in Pleasant

5  Hill, California, and we were both present during

6  service leader meetings with the executive team of the

7  health care system.

8      Q    What was your job -- job title then?

9      A    I was the assistant chief of acquisition and

10  material management service.

11      Q    How long were you in that job?

12      A    For, oh, three years.

13      Q    And, after that job, what -- what did you do?

14      A    I became the chief planner for VA NorCal.

15      Q    How long were you the chief planner?

16      A    For three years.

17      Q    What did you do after that?

18      A    I was the assistant -- I mean, the associate

19  director of the Alaska VA Healthcare System.

20      Q    How long were you in that job?

21      A    For five years.

22      Q    And then did you go to Portland after that?

23      A    Yes.

24      Q    Okay.  After your contact with Dr. Velez in

25  1994, when did you next have any contact with her?

1      A    When I left to go to Alaska in 2001, I had no

2  contact with Dr. Velez at all until I returned in my

3  role in October of 2013.

4      Q    Okay.  And how is it that -- what -- what

5  circumstances led you to have contact with her on or

6  about October 2013?

7      A    I was hired as the medical center director,

8  and she's one of our employees.

9      Q    And was it in the course of just meeting with

10  various doctors that you came into contact with her

11  then?

12          MS. SMITH:  Objection.

13          You can answer.

14  BY MR. HOYER:

15      Q    You can answer, Mr. Stockwell.

16      A    Oh.  I don't remember when or -- or in what

17  specific circumstances I first interacted with Dr. Velez

18  back in 2013.

19      Q    In the course of your duties in your current

20  job, do you have occasion to meet with the site managers

21  of the various sites within the system in NorCal?

22      A    I -- I have no set meeting with anyone that

23  performs the duties of site manager.

24      Q    And do you have a -- a direct report who's --

25  one of whom's -- whose responsibility is to manage the

Atkinson-Baker, a Veritext Company
www.depo.com

1  various site managers?

2          MS. SMITH:  Objection.

3          You can answer.

4          THE WITNESS:  The two associate directors, we

5  have one for the Sacramento Valley that oversees those

6  that perform site management duties in the Sacramento

7  Valley, and in the East Bay, the associate director

8  oversees the individuals who perform those functions in

9  the East Bay.

10 BY MR. HOYER:

11      Q    And, for the Sacramento location, is there a

12 site manager apart from the associate director?

13      A    No.

14      Q    How often have you had contact with Dr. Velez

15 in the last, say, five years?

16      A    It's sporadic, and so there are instances when

17 we're -- we've been in the same location at the same

18 time or in the same meeting.  Maybe once every couple of

19 months.

20      Q    Are you aware that Dr. Velez is Hispanic in

21 race?

22      A    No.

23      Q    You have no idea of that?

24      A    No.

25      Q    Okay.  Are you aware of how many Hispanic

Atkinson-Baker, a Veritext Company
www.depo.com

1  physicians are employed in -- by NorCal?

2      A    I don't know.

3      Q    You could -- can you give me an estimate?

4           MS. SMITH:  Objection.

5  BY MR. HOYER:

6      Q    You can answer.

7      A    You want me to estimate how many Hispanic

8  physicians we have?

9      Q    Yes.

10          MS. SMITH:  Objection.  Calls for speculation.

11 BY MR. HOYER:

12     Q    You can answer.

13          MS. SMITH:  To the extent you know,

14 Mr. Stockwell, you can answer.

15          THE WITNESS:  20.

16          MS. SMITH:  Mr. Stockwell, I see you shaking

17 your head.  Are you taking a guess at this point?

18          THE WITNESS:  I -- I'm -- that was a -- a --

19 a, yes, I don't know the number.

20          MS. SMITH:  Okay.  Just for clarity purposes,

21 Mr. Hoyer, I don't mean to go over additional rules.

22          Going forward, Mr. Stockwell, do not guess.

23 Please only give us information that you know.  If you

24 don't know the answer, please tell us that you don't

25 know.

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. HOYER:

2      Q    Yeah.  I -- I think it's fair -- there's a

3  difference between guessing and giving us an estimate.

4  Now, maybe you don't know the length of your dining-room

5  table, but you could certainly give us an estimate.

6  Maybe you can't get it to the -- the exact number

7  of inches that the dining-room table is, but you can

8  give us an estimate.  But a guess would be, you know,

9  the -- the length of my dining-room table; you obviously

10  don't know that.  So, we are entitled to an estimate.

11         You said 20.  And what -- what's the

12  information that you base that estimate on?

13      A    I guessed the number based on how many

14  physicians we have in our health care system and what

15  the general population of Hispanics might be for that

16  total.  So it was -- it was purely a guess.

17      Q    When you say "the general population," you

18  mean in Northern California or in the employee pool?

19  What . . . ?

20      A    In -- in the Northern California.

21      Q    Okay.  So your guess is that you know how

22  many -- you know how many physicians there are, and you

23  know approximately what percentage of the population in

24  Northern California is Hispanic, and from that, you

25  deduced the figure of 20 as the number of Hispanic

Atkinson-Baker, a Veritext Company
www.depo.com

```
1   physicians working for NorCal.  Is that your logic?
2       A    Yes.
3       Q    Okay.  Fair enough.
4            Now, how many times have you talked directly
5   with Dr. Velez in the last five years?
6       A    I'm not sure of the number.
7       Q    Can you give me an estimate?
8       A    Four.
9       Q    And do you remember anything about what you
10  talked about with her?
11      A    I don't remember the specifics of the
12  conversations.
13      Q    Anything involving discrimination or
14  harassment?
15      A    No.
16      Q    Anything involving diversity?
17      A    No.
18      Q    Okay.  Now, have you had any conversations at
19  any time with Dr. Hundahl about Dr. Velez?
20      A    Yes.
21      Q    And how many times -- how many conversations
22  have you had with Dr. Hundahl about Dr. Velez?
23      A    One.
24      Q    And how long ago was that?
25      A    Five or six years ago.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q     And what was that conversation about?

2      A     It was about utilization of vascular surgeons

3 across VA NorCal.

4      Q     And do you remember what point, if any,

5 Dr. Hundahl made about that topic?

6      A     No.

7      Q     Did he initiate that conversation, or did you?

8            MS. SMITH:  Objection.

9            You can answer.

10           THE WITNESS:  I did.

11 BY MR. HOYER:

12     Q     And what was your purpose in talking to him

13 about that?

14     A     He is her supervisor -- was.

15     Q     And why was it that you were interested in

16 talking to him about the utilization of vascular

17 surgeons?

18     A     He's the chief of surgery.  Was.

19     Q     Yeah.  I understand that.

20           So -- but why were you interested in that

21 topic?

22     A     Dr. Velez was spending her one day a week

23 working for a different VA medical center that was not

24 reimbursing our hospital for that time, and I wanted to

25 discuss that arrangement with him.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    Okay.  Was there some resolution that came on
2  that topic?
3      A    No.
4      Q    And how is it that the fact that she was
5  spending one day a week at a different VA medical
6  center -- how did that come to your attention?
7      A    I believe Dr. Velez herself declared that to
8  me.
9      Q    And why did that -- well, approximately how
10 many physicians work for NorCal?
11     A    250.
12     Q    And why was it that how one of those
13 physicians spends one day a week was a topic worthy of
14 you having conversations with Dr. Hundahl?
15     A    It's unusual for one of our providers who's a
16 full-time provider to not be asked to do full-time work
17 during that time.
18     Q    Have you had any conversations with anyone
19 about Ms. -- Dr. Velez's title of site manager, former
20 title?
21          MS. SMITH:  Objection.  As to what point in
22 time are you talking about, Counsel?
23          MR. HOYER:  Ever.
24          THE WITNESS:  Yes.
25 BY MR. HOYER:

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    And who have you talked to about that?

2      A    Timothy Graham and David Mastalski.

3      Q    How many time -- sorry.  Anyone else?

4      A    No.

5      Q    How many times did you talk with Mr. Graham

6  about this?

7      A    A few.

8      Q    And how many times did you talk with -- is it

9  Dr. Mastalski?

10     A    He -- he's not a physician, but also a few.

11     Q    Okay.  When is the first time that you talked

12  with Mr. Graham about this?

13     A    I don't recall the exact time frame.

14     Q    Approximately.

15          MS. SMITH:  Objection.

16  BY MR. HOYER:

17     Q    You can answer.

18     A    Approximately 2017.

19     Q    And was this prior to Mr. Graham's reassigning

20  the site manager title away from her?

21          MS. SMITH:  Objection as to the

22  characterization of the action.

23  BY MR. HOYER:

24     Q    You can answer.

25     A    Yes, I believe so.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    Okay.  And what was said in that conversation?

2      A    We were discussing the need to clarify

3 responsibilities between an on-site executive and

4 someone with the title site manager.

5      Q    Now, in this case, the on-site manager was

6 Mr. Graham?

7      A    Yes.

8      Q    And somebody -- the somebody with the title of

9 site manager was Dr. Velez?

10     A    Yes.

11     Q    And you said there was a need to clarify the

12 responsibilities.  What do you mean by that?

13     A    The administrative oversight of the Martinez

14 campus, the decisions about allocating space, contract

15 oversight and management, the -- the expectations of

16 who's in charge from an emergency management perspective

17 or an on-site disaster, the reporting of support

18 individuals, there was a -- a lack of clarity between

19 the two roles.

20     Q    When you say the lack of -- sorry, I'm getting

21 a little feedback.

22          When you say that there was a lack of clarity,

23 what do you mean by that?  Was there -- strike that.

24 Let -- let me ask a -- a slightly different question.

25          Had you experienced anyone suffering from some

Atkinson-Baker, a Veritext Company
www.depo.com

1  confusion as a result of this lack of clarity?

2          MS. SMITH:  Objection.

3          You can answer.

4  BY MR. HOYER:

5      Q    You can . . .

6      A    There were many times where it was not clear

7  who was leading the campus.

8      Q    Okay.  When you say, "there were many times it

9  was not clear," do you mean it wasn't clear to you?

10     A    It wasn't clear to myself or others.

11     Q    And who -- when you say "others," who are you

12  referring to?

13     A    Other employees of VA NorCal.

14     Q    Anyone specifically come to mind?

15     A    I -- I can't recall the specific events nor

16  the specific names of the individuals.

17     Q    Can you recall the job titles?

18     A    I don't understand the question.

19     Q    Yeah, the job titles of the people that you

20  say were lacking clarity and who was leading the

21  Martinez location.

22     A    I can't recall the specific events, so I can't

23  recall the specific people or the job titles of those

24  involved, but it occurred on multiple occasions.

25     Q    Approximately how many occasions did it occur

Atkinson-Baker, a Veritext Company
www.depo.com

 1  on?

 2      A    I think I was told not to guess earlier, so I

 3  don't know.

 4      Q    Okay.  But you know there was multiple.  I'm

 5  just wondering if you have some basis to say that it was

 6  multiple rather than once.

 7      A    I can remember that it came up more than one

 8  time.

 9      Q    And did you have discussions about this issue

10  with anyone besides Mr. Graham?

11      A    I talked to --

12           MS. SMITH:  Objection.

13           THE WITNESS:  -- David Mastalski.

14           MR. HOYER:  Okay.

15           THE REPORTER:  Ms. Smith, did you object?

16           MS. SMITH:  It's fine.  The record can stand.

17  BY MR. HOYER:

18      Q    Now, you said that -- that this confusion

19  about who was overseeing several things (space

20  allocation, contracts, emergency management, support

21  staff), in any of those areas, can you remember a

22  particular problem arising as a result of this lack of

23  clarity?

24      A    Not recalling the specific events makes it

25  difficult to recall the outcomes of those events.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q     Okay.  Did you ever write anything up (notes,

2  memos, e-mails) regarding this particular issuery --

3  issue?

4      A     Not to my knowledge.

5      Q     Did you review any memos/e-mails about this

6  issue?

7             MS. SMITH:  Objection.

8             THE WITNESS:  Not that I recall.

9  BY MR. HOYER:

10     Q     Okay.  Now, how -- the -- this initial

11  discussion that happened in 2017 with Mr. Graham, did

12  you make any recommendations to him?

13            MS. SMITH:  Objection.  Whoops, sorry.

14  BY MR. HOYER:

15     Q     You can answer.

16     A     I discussed with him the need to get clarity

17  on the responsibilities of an executive on-site and the

18  title site manager.

19     Q     At that point, in 2017, how long had this been

20  a problem that was concerning you?

21            MS. SMITH:  Objection.

22  BY MR. HOYER:

23     Q     You can answer.

24     A     Four years.

25     Q     So you had been aware of this problem for four

Atkinson-Baker, a Veritext Company
www.depo.com

1  years; is that correct?

2          MS. SMITH:  Objection.

3  BY MR. HOYER:

4      Q    You can answer.

5      A    Yes.

6      Q    Do you remember how it first came up four

7  years previously?

8      A    I noticed it as a problem the moment I became

9  medical center director.

10      Q    But you don't remember the context; is that

11  correct?

12      A    I don't remember the specific instances where

13  it percolated.

14      Q    I understand you don't remember the

15  specific -- specific incidence.  I just want to make

16  sure that I've got your full testimony about the -- this

17  issue.  Do you remember anything else about this issue,

18  your observations of it, your experiences, your

19  conversations, anything else than -- other than what

20  you've already told me?

21          MS. SMITH:  Objection.

22  BY MR. HOYER:

23      Q    You can answer.

24      A    Well, I remember it was very confusing, as the

25  executive of the medical center, to appreciate who was

Atkinson-Baker, a Veritext Company
www.depo.com

1  expected in what role for things that occurred on the

2  Martinez campus, and it would come up repeatedly as a

3  lack of clarity and understanding.

4      Q    Anything else?

5      A    No.

6      Q    Okay.  So, how long was that first

7  conversation that you had with Mr. Graham in 2017, do

8  you remember?

9      A    It was a very brief conversation.

10     Q    And was that the only topic that you remember

11 in that conversation?

12     A    Yes.

13     Q    Okay.  Did you direct him to do something

14 about it?

15     A    No.

16     Q    Okay.  He is your direct report -- one of your

17 direct reports, correct?

18     A    Yes.

19     Q    Did you expect him to do something about it?

20     A    I did expect him to take some action.

21     Q    Now, the action that he took, was that the

22 action that you expected him to take?

23          MS. SMITH:  Objection.

24 BY MR. HOYER:

25     Q    You can answer.

```
 1      A    I didn't know what he was going to do.  I just
 2  wanted clarity.
 3      Q    Okay.  Did you have in mind any possible
 4  solutions to the problems you addressed with him in that
 5  conversation of 2017?
 6           MS. SMITH:  Objection.
 7  BY MR. HOYER:
 8      Q    You can answer.
 9      A    I don't recall any specific direction.  I -- I
10  think the choice that he made was rational.
11      Q    Yeah.  My question was slightly different.  I
12  appreciate your answer.  But the -- the question was,
13  Did you have in mind any alternatives as the solution to
14  this problem that you raised with him?
15           MS. SMITH:  Objection.  Confusing.
16  BY MR. HOYER:
17      Q    You can answer.  You understand the question?
18      A    You're asking if I already had an idea of what
19  I wanted him to do before I asked him to take action?
20      Q    Sort of.  I'm just wondering if you had any
21  idea of what he could do.  Like, there -- where there
22  was -- maybe you had in mind there are three ways that
23  you could solve this problem, or there are two ways or
24  five ways.  Did you have any idea of what he could do to
25  solve this problem?
```

```
1        A     No.
2        Q     Now, when he did reassign the site manager
3  title away from Dr. Velez, did you get the impression
4  that, oh, that was the wrong thing to do?
5              MS. SMITH:  Objection.
6              THE WITNESS:  No.  Whoops.
7              MS. SMITH:  It's okay.
8  BY MR. HOYER:
9        Q     Okay.  Now, you -- you describe the
10 conversation that you had in 2017 with him.  Do you
11 remember any other conversations that you had with him
12 about this issue?
13       A     I believe we did discuss it after he had
14 arrived at his pathway forward.
15       Q     Okay.  In that first conversation in 2017, do
16 you have a sense of generally -- was it early in 2017,
17 late in 2017?  The, you know, fall, winter, spring,
18 summer?  A month?
19       A     I don't know.  I only guess that it was 2017
20 based on when Mr. Graham started working at VA NorCal.
21       Q     Okay.  So then you had a conversation -- the
22 next conversation you had with him about this topic was
23 after he had taken the action, correct?
24       A     I believe so.
25       Q     And do you remember how long -- when that
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1  conversation was?  Was it immediately following the

 2  action?  Quite a ways after?

 3      A    I think it was fairly close after.

 4      Q    And what was your -- did you initiate that

 5  conversation, or did he?

 6      A    He did.

 7      Q    Okay.  And did he tell you what his purpose

 8  was in having that conversation with you?

 9           MS. SMITH:  Objection.  Leading.

10  BY MR. HOYER:

11      Q    You can answer.

12      A    He was informing me that she wasn't pleased

13  with the decision.

14      Q    Was that a surprise to you?

15      A    I did not have a -- a predisposition on how

16  she may or may not react.

17      Q    Okay.  Was it understandable to you that she

18  did not have a good reaction to it?

19           MS. SMITH:  Objection.

20           THE WITNESS:  I don't know.

21  BY MR. HOYER:

22      Q    You can answer.

23           And do you remember specifically what he said

24  about her adverse reaction to this action that he took?

25           MS. SMITH:  Objection.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. HOYER:

2      Q    You can answer.

3      A    I don't remember the details of the specifics

4  of the conversation.  I just remember that was the

5  general subject.

6      Q    Do you remember roughly how long the

7  conversation was?

8      A    Very brief.

9      Q    And was there any -- did you make any

10 suggestions in response to what he told you?

11          MS. SMITH:  Objection.

12 BY MR. HOYER:

13     Q    You can answer.

14     A    I wanted to encourage ongoing dialogue with --

15 between himself and Dr. Velez.

16     Q    Ongoing -- ongoing dialogue about what?

17     A    Her unhappiness with his decision and the

18 clarity of what it meant.

19     Q    And what did you think that ongoing dialogue

20 would do for the situation?

21     A    Well, my hope is that when employees have a

22 disagreement, that communication is often a -- a

23 stumbling block as far as understanding and -- and

24 hearing; and so my hope was that, as they dialogue, they

25 would be able to come to better understanding of each

1  other and their perspectives and how to move forward

2  effectively.

3      Q    Okay.  Do you remember any other suggestion

4  you gave him in that second conversation?

5          MS. SMITH:  Objection.

6          THE WITNESS:  No.

7  BY MR. HOYER:

8      Q    All right.  And then when -- do you remember

9  any further conversations you had with Mr. Graham about

10 this issue?

11     A    I don't recall specifically if we had any

12 other conversations.

13     Q    Do you remember generally any further

14 communications with him about this issue?

15     A    No.

16     Q    Okay.  Mr. Mastalski, you said you had a few

17 conversations about this issue with him.  When was the

18 first conversation you had with him?

19     A    Approximately 2013.

20     Q    And how did that conversation arise?

21     A    I initiated the conversation for the same

22 reason that I initiated the conversation with

23 Mr. Graham, to seek clarity on responsibilities on the

24 Martinez campus between the associate director and the

25 individual with the title site manager.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q     And do you remember what Mr. Mastalski

2  responded when you raised this issue?

3      A     He did not want to address clarifying those

4  responsibilities at that time.

5      Q     Did he say why he didn't want to?

6      A     He had other things he wanted to focus on as

7  priorities.

8      Q     Was that -- were you okay with that response

9  from him?

10      A     I would have preferred that he would have

11  taken action, which is why I resurrected the

12  conversation with Mr. Graham on his arrival.

13      Q     To me, Mastalski's response seems kind of

14  questionable, actually.  It's understandable to want to

15  focus your priorities on the most important stuff.  But

16  is this -- is this an issue that would have taken a lot

17  of time away from focusing on other priorities?  Seems

18  like a, sort of, small-time commitment, given the scope

19  of the problem as you saw.  Correct?

20           MS. SMITH:  Objection to the extent that's a

21  question.

22  BY MR. HOYER:

23      Q     You can answer.

24      A     I'm -- I actually am not sure exactly what you

25  asked me about his response.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    Well, the action that Mr. Graham eventually

2 took with respect to the site manager position, it -- it

3 didn't seem to involve a lot of distraction from other

4 priorities terms of time commitment.  Is that fair to

5 say?

6           MS. SMITH:  Objection.

7           THE WITNESS:  I think it was a pretty

8 significant undertaking to try and get that clarity.

9 BY MR. HOYER:

10     Q    Why?  Why do you think that?

11     A    Change isn't easy for an organization.

12     Q    Anything else?

13     A    No.

14     Q    So, when you say, "Change isn't easy for an

15 organization," obviously, Dr. Velez had an adverse

16 reaction to this -- this change.

17          Are you aware of anyone else in the

18 organization that had an adverse reaction to this

19 change?

20          MS. SMITH:  Objection as to the term

21 "adverse."

22 BY MR. HOYER:

23     Q    You can answer.

24     A    I recall several individuals voicing their

25 displeasure with the decision, including Dr. Remler.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q      Anyone else besides Dr. Remler?

2      A      There's a -- there's a Dr. Jon Green that --

3    that also shared that sentiment.

4      Q      Anyone besides Dr. Remler and Dr. Green?

5      A      Not that I recall specifically.

6      Q      What did Dr. Green say to you about it?

7      A      His view was that Dr. Velez had done a

8    wonderful job overseeing the Martinez campus for many,

9    many years, and that they had significant positive

10   accomplishments under her leadership, and he hated to

11   see that go.

12     Q      Was anything about what he said incorrect, in

13   your mind?

14            MS. SMITH:  Objection.

15   BY MR. HOYER:

16     Q      You can answer.

17     A      Well, it may have been overstated as far as

18   the grandeur of all things at our Martinez campus.  No.

19   I thought that he had an accurate understanding of -- of

20   progress and -- and -- and of her contributions.

21     Q      Now, you told me about the first conversation

22   you had with Mr. Mastalski about this issue.  And do you

23   remember -- but you said you had a few conversations

24   with him about it.

25            I'm just wondering, after that first

1  conversation in 2013, do you remember when was the next

2  time you talked to him about it?

3      A    I don't recall specifically.

4      Q    And do you remember the substance of that

5  conversation, that second conversation?

6      A    It would have been me prodding for, hey, we

7  haven't gotten clarity on responsibilities yet; I'd

8  still like to encourage you to pursue that.

9      Q    And what was his response?  The same as the

10  first time?

11      A    Yes.

12      Q    Okay.  So that was the second conversation you

13  had with him.

14          Do you remember whether you had a third

15  conversation or a fourth?

16      A    I don't recall, through the years, how many

17  times the subject came up, but if it ever did, it was

18  the same conversation with the same wish from my part

19  and response from his.

20      Q    Okay.  So, were there other instances that you

21  became aware of in NorCal where there was some confusion

22  about who had oversight responsibility due to the fact

23  that physicians were -- had some administrative

24  responsibilities in addition to their clinical

25  responsibilities?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. SMITH:  Objection.  Vague and confusing.

2    BY MR. HOYER:

3          Q    You can answer.

4          A    No.

5          Q    But there are other physicians that have

6    administrative responsibilities, correct?

7          A    Lots of physicians have administrative

8    responsibilities.

9          Q    Well, when I say "administrative

10   responsibilities," Mr. Graham actually made a helpful

11   distinction yesterday.  There's a difference between

12   administrative responsibilities and, you know,

13   completing the paperwork necessary for one's patients,

14   for example, that sort of administrative.  But when I'm

15   talking about administrative here, there are

16   organizational responsibilities, for example.  Do you

17   understand the distinction?

18         A    I do.  And many physicians have

19   organizational-level responsibilities that are

20   administrative.

21         Q    Okay.  But you haven't found similar confusion

22   to the issue with the site manager in Martinez in those

23   other administrative -- physician administrative

24   responsibilities, correct?

25         A    I have not.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    Now, did you ever become aware that Dr. Velez

2  has helped other employees in the VA pursue EEO

3  complaints?

4      A    No.

5      Q    And you've not been aware that Dr. Velez was

6  an advocate for antidiscrimination or diversity efforts

7  in NorCal; is that correct?

8          MS. SMITH:  Objection.

9  BY MR. HOYER:

10     Q    You can answer.

11     A    No.

12     Q    Were you aware that she had previously sued

13  the Air Force and the VA?

14     A    I had heard that as a discussion item when I

15  became the director.

16     Q    Who told you that?

17     A    I don't recall.  Perhaps Dr. Hundahl.

18     Q    Okay.  And do you remember what Dr. Hundahl

19  said about it?

20     A    The -- the general understanding that I had

21  was that she was not required to share in vascular

22  surgery responsibilities at David Grant Medical Center

23  because of a lawsuit and an outcome from years prior.

24     Q    Now, are you aware -- did Dr. Velez ever apply

25  to be chief of surgery?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A    Yes.

2      Q    And how did you become aware of that?

3      A    I interviewed all of the applicants that were

4  referred from the search commitment for the job.

5      Q    And that included interviewing Dr. Velez?

6      A    Yes.

7      Q    Okay.  And what was your impression of her in

8  the interview?

9           MS. SMITH:  Objection.

10  BY MR. HOYER:

11     Q    You can answer.

12     A    Well, that's a very broad question.  She was

13  professional, prepared, did a nice job.

14     Q    Did you actually score the applicants that you

15  interviewed in terms of their -- their interview

16  success?

17          MS. SMITH:  Objection.

18  BY MR. HOYER:

19     Q    You can answer.

20     A    I only gave verbal feedback to the selecting

21  official.

22     Q    And what was the feedback that you gave

23  regarding Dr. Velez?

24     A    I didn't give any specific feedback.  I only

25  indicated which of the three individuals I thought was

1  the strongest candidate.

2      Q     And which was that?

3      A     That was Dr. Fuller.

4      Q     And why did you think that Dr. Fuller was the

5  strongest candidate over Dr. Velez?

6      A     Well, there were more candidates than -- than

7  just the two of them, but his vision for where the

8  surgical program could go, his connections with the UC

9  Davis department of surgery, his research approach as a

10  leader of the department were all factors that I thought

11  weighed in benefit towards him.

12      Q     And I think you said you interviewed three

13  candidates; is that correct?

14      A     Yes.

15      Q     And you gave feedback on all three candidates

16  to the selection commitment?

17          MS. SMITH:  Objection.

18  BY MR. HOYER:

19      Q     Is that right?

20      A     I did not reply to the selection commitment.

21  I only verbally responded to the chief of staff, and I

22  did not give him feedback on all three specific

23  candidates.  I only gave him my opinion as to which one

24  I thought was the strongest candidate.

25      Q     Okay.  And who was the third candidate other

1  than Fuller and -- and Velez?

2      A    It was a surgeon from the Palo Alto VA.  I

3  can't recall her name.

4      Q    And did you have a sense of whether that

5  surgeon was a better candidate than Dr. Velez?

6          MS. SMITH:  Objection.

7          THE WITNESS:  I didn't render an opinion to

8  rank the candidates.  I only gave my opinion on to which

9  one I thought was the strongest.

10 BY MR. HOYER:

11     Q    I understand that you didn't give her an

12 opinion, but I'm just wondering if you formed an opinion

13 about whether the Palo Alto surgeon was a better

14 candidate than Dr. Velez.

15     A    I think they're pretty close.

16     Q    Okay.  And how was it that -- that Fuller's

17 vision -- I think you used the word "vision" -- was

18 better than Dr. Velez?

19         MS. SMITH:  Objection as to the

20 characterization.

21 BY MR. HOYER:

22     Q    You can answer.

23     A    He had a -- a -- a game plan for years moving

24 forward to try and grow the surgical program in ways

25 that I didn't hear from her a description of the same

Atkinson-Baker, a Veritext Company
www.depo.com

1   questions.

2        Q    And has that game plan been implemented?

3        A    Well, he relatively new in the role, but he is

4   growing, in spite of COVID-19, the surgical program at

5   NorCal.  So, I -- I think he's -- he's doing reasonably

6   well, given the circumstances.

7        Q    Okay.  And what was it about his research that

8   made it a more attractive candidate to you than

9   Dr. Velez?

10       A    I don't want you to misrepresent my

11  evaluation.  So, I didn't criticize one candidate over

12  the other.  I interviewed them, I gave feedback,

13  generally speaking, and he had a -- a game plan for how

14  to grow the research component.  I don't believe she

15  actually answered or articulated anything about the

16  research program in the general questions that I had.

17  So it's not a critique of one.  It's just an overall

18  impression based on a one-hour interview that I had with

19  each other candidate.

20       Q    And was there something -- you mentioned his

21  connections with UC Davis.  What about that made him a

22  more attractive candidate to you than Dr. Velez?

23       A    He had successfully brought a couple of new

24  surgical residents slots funded through the surgery

25  department in ENT already, and he was describing a

1  pathway forward that would continue to grow that

2  relationship.

3      Q    So taking a step back, can you tell me more

4  generally what was the application process for the chief

5  of surgery?  Can you walk me through it?

6      A    I was not the selecting official, so I only

7  interviewed the top candidates and gave an opinion.  So,

8  I can't walk you through the selection process, because

9  it was not my responsibility to hire the chief of

10  surgery.

11      Q    Fair enough.

12          Now, the chief of surgery reports to the chief

13  of staff; is that correct?

14      A    Yes.

15      Q    While Dr. Velez had the title of site manager,

16  did you get impressions about her performance in that

17  role?  Obviously, while you were there.

18          MS. SMITH:  Objection as to the term

19  "impressions."

20  BY MR. HOYER:

21      Q    You can answer.

22      A    I think there are always opinions that people

23  have about how well someone else is doing in a function

24  or a role.  There were times that I would hear positives

25  and negatives about her performance as a site manager.

1     Q     Okay.  Let's start out with the positives.

2  What did you hear about her performance that was

3  positive?

4     A     Dr. Velez has always been a caring clinician

5  about her patients, and so to work through red tape to

6  find ways to get the job done to make sure that the

7  patients are cared for has been a priority of hers.  I'm

8  sure it continues to be a priority for hers [sic], and

9  people have been admirable of her advocacy for making

10  sure that the patients were cared for and that the

11  system were in place on the Martinez campus that would

12  assist in doing that.

13     Q     And who do you remember giving you that

14  positive feedback about her?

15     A     I don't recall the specifics.

16     Q     You don't remember anyone giving you -- anyone

17  in particular giving you positive feedback about her?

18     A     I don't remember in particular, no.

19     Q     Fair enough.  Okay, what about the negative

20  opinions of her performance in that role?

21     A     Well, I prefer not to actually articulate what

22  I heard that were negatives unless I'm required to do

23  so.

24     Q     You are required to do so, sir.  Sorry about

25  that.

1        A     There were complaints that she played
2   favorites, that it was disorganized as far as who was
3   responsible for what activity.  There were complaints
4   that she would change her mind often or do things that
5   were unknown through back channels of the organization,
6   and there were concerns that she was antimanagement.
7        Q     Anything else?
8        A     No.
9        Q     Okay.  Let's see.  The complaints about her
10  playing favorites, do you remember anyone in particular
11  giving you that feedback?
12       A     I remember hearing it more than one time, but
13  I cannot recall who or what specific circumstances.
14       Q     Okay.  What about the disorganization; who did
15  you hear that from?
16       A     Just like with the positives, I can't remember
17  the -- the names and the specific occurrences.  I can't
18  in any of these ones either.
19       Q     Okay.  And I think you said she was dis- --
20  the criticism was that she was disorganized with respect
21  to various activities.  Did I hear you right?
22       A     I don't believe I used the word
23  "disorganized."  Inconsistent and switching decisions is
24  one of the depictions that I gave.
25       Q     I see.  Okay.  I'm sorry.  Inconsistent.

 1           Do you remember anything in particular that
 2   she was inconsistent about?
 3       A    I don't recall the -- the complaints that I
 4   heard with the specific instances or situations.
 5       Q    Okay.  I'm just going to walk through them
 6   to -- to get as much detail as you have -- that you're
 7   able to recall.
 8           Do you remember any particular instances where
 9   we changed her mind?
10           MS. SMITH:  Objection.
11   BY MR. HOYER:
12       Q    You can answer.
13       A    I don't recall the specifics.
14       Q    Okay.  What about the back-channel stuff; any
15   particular instances or anybody in particular that
16   complained about that?
17       A    I don't recall the specifics.
18       Q    Okay.  Did Dr. Hundahl ever give you negative
19   feedback about her?
20       A    Yes.
21       Q    Do you remember what he said about her that
22   was negative?
23       A    In the context of surgical service, his
24   thoughts were that she often didn't follow the corporate
25   party line, that she was a rogue that would do thing her

1  own way in her own time, and so she was more difficult

2  to manage.

3      Q    And do you remember any examples that he gave

4  you about her not following the party line?

5      A    I don't recall the specifics.

6      Q    And did you give his opinion about her any

7  credence?

8           MS. SMITH:  Objection.

9  BY MR. HOYER:

10     Q    You can answer.

11     A    I didn't do anything about it one way or

12 another.

13     Q    Did you believe him, though?

14          MS. SMITH:  Objection.

15 BY MR. HOYER:

16     Q    You can answer.

17     A    Yes.  My personal historical knowledge and

18 perspective of Dr. Velez is that she is a -- a go-getter

19 and will do what it takes to get what she thinks is

20 right done.

21     Q    Well, that seems to be a positive opinion.

22 How is that consistent with her not following the party

23 line?  In your mind.

24     A    I think both can be true.  One can be a --

25 a -- a -- a -- a rebel from the perspective of those

1  that are looking to standardize and have uniform

2  processes and be perceived as difficult, and for those

3  that they're advocating for and, quote, going their own

4  way, it might be viewed as a positive.

5      Q    Okay.  And you mentioned antimanagement.  Do

6  you remember anyone that suggested that she was

7  antimanagement to you?

8      A    I don't recall the specifics.

9      Q    Do you recall anything generally about that?

10         MS. SMITH:  Objection.

11 BY MR. HOYER:

12     Q    Who, what, where, when, how?

13         MS. SMITH:  Objection.  Compound question.

14 BY MR. HOYER:

15     Q    You can answer.

16     A    Well, I already stated I don't recall the

17 specifics, so I don't remember who, what, when, where,

18 or how.

19     Q    Okay.  Was -- was antimanagement an opinion

20 that you had formed about her?

21         MS. SMITH:  Objection.

22 BY MR. HOYER:

23     Q    You can answer.

24     A    There were times where she demonstrated that

25 tendency, yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1     Q    Do you remember any particular time?

2     A    We were both present in all employee town hall

3  meetings on the Martinez campus, which I would host

4  quarterly, and in her role as the site manager, she

5  would also be present, but she would often form

6  questions from the audience for leadership not as

7  leadership, but towards leadership, with criticisms of

8  things that she thought needed to be addressed.

9     Q    What sorts of criticisms?

10     A    Shuttle service schedules, busing of staff,

11  parking availability, things of that nature.

12     Q    And were those questions inappropriately

13  raised at the town hall meeting?

14         MS. SMITH:  Objection.

15  BY MR. HOYER:

16     Q    You can answer.

17     A    They were appropriate questions for a town

18  hall meeting.  However, somebody with the title of site

19  manager or responsibilities as a site manager might be

20  the exact management individual that should be

21  coordinating parking and shuttles and schedules; and so

22  asking them as an audience member to management appeared

23  to be an interesting quasi antimanagement tactic.

24     Q    So was it your understanding that, in her role

25  as site manager, she was the one that should be fixing a

Atkinson-Baker, a Veritext Company
www.depo.com

1  shuttle service problem, if there was a problem with the

2  shuttle service?

3          MS. SMITH:  Objection.

4          THE WITNESS:  Yes.

5  BY MR. HOYER:

6      Q    Okay.  Do you know if anything was done about

7  the shuttle service problem that she raised?

8      A    Not during that time frame.

9      Q    When -- when, if any, was something done about

10  the shuttle service?

11      A    Eventually, we hired a -- a -- an additional

12  staff member to increase the shuttle activity between

13  the bus station or the Amtrak station or BART and the

14  medical center.

15      Q    I see.  And is that something that she should

16  have done?

17      A    "Should have" is an interesting word [sic].

18  Could have under the responsibilities of a site manager,

19  yes.

20      Q    And what about the parking situation; is there

21  something that she should have herself done about it

22  that she didn't?

23          MS. SMITH:  Objection.

24  BY MS. SMITH:

25      Q    You can answer.

Atkinson-Baker, a Veritext Company
www.depo.com

1    A    Generally speaking, at any of our clinics, if

2  somebody has the role of site manager, they would be

3  responsible for overseeing any of those types of

4  concerns.

5         MR. HOYER:  All right, we've been going about

6  an hour and a half.  Why don't we take a ten-minute

7  break until 11:40?  And then my plan was to break for

8  lunch at -- at 12:30.  Does that sound workable for

9  everybody?

10        MS. SMITH:  That's fine.

11        MR. HOYER:  Okay, terrific.  I'll see you at

12  11:40.

13        MS. SMITH:  Okay.

14             (Break taken from 11:28 a.m. to

15             11:42 a.m.)

16        MR. HOYER:  All right, back on the record.

17    Q    (By Mr. Hoyer)  Mr. Stockwell, do you -- do you

18  have any information as to whether Dr. Velez's role as

19  site manager had any effect on her role as a surgeon

20    A    Can you clarify what you're asking me?

21        MS. SMITH:  Yeah.

22  BY MR. HOYER:

23    Q    Yeah.  I mean, did -- did her duties as site

24  manager adversely affect her ability to be a productive

25  surgeon in any way?

Atkinson-Baker, a Veritext Company
www.depo.com

1          MS. SMITH:  Objection.

2  BY MR. HOYER:

3      Q    You can answer.

4      A    I don't -- I don't understand precisely what

5  you're asking me, but I -- I don't think it would

6  diminish other skills as a surgeon to -- to function as

7  a site manager.

8      Q    Well, I was talking more about time

9  commitment, actually.  Did you have any sense of, you

10  know, how much time she spent her week on average as a

11  site manager in the site manager role versus surgery?

12     A    I don't know.

13     Q    Okay.  Now, there are various other site

14  managers in NorCal.  I'm just wonderings if there's some

15  sort of comparative performance metrics for site

16  managers?

17          MS. SMITH:  Objection.  Vague.  Confusing.

18  BY MR. HOYER:

19     Q    You can answer.

20     A    I don't supervise the site managers, so I'm

21  not aware of how they're evaluated.

22     Q    Now, Dr. Cahill, who is Dr. Cahill?

23     A    He's the chief of staff.

24     Q    And he reports to you directly?

25     A    Yes.

```
 1      Q    Have you and he had any conversations about
 2 Dr. Velez?
 3           MS. SMITH:  Objection.  As to what point in
 4 time?
 5           MR. HOYER:  Ever.
 6           THE WITNESS:  Yes.
 7 BY MR. HOYER:
 8      Q    How many conversations have you had about
 9 Dr. Velez with him?
10      A    I don't recall, over the years, how many times
11 a conversation may have included her.
12      Q    Do you remember anything that you discussed
13 with him about her?
14      A    Yes.
15      Q    And what do you remember?
16      A    She filed an administrative grievance about
17 this very subject, and the reviewer recommended that the
18 chief of staff and I discuss the responsibilities as it
19 relates to chief medical officer needs or
20 responsibilities as part of that administrative
21 grievance review.
22      Q    When you say the reviewer, who are you
23 referring to?
24      A    Lorrie Strohecker.  She's our chief of primary
25 care.
```

1     Q    And what did she say about the duties of chief
2 medical officer?  Did I get that right?
3     A    When she interviewed Dr. Velez, there was a
4 distinction made between her role as a clinical leader
5 and decision-maker at Martinez as part of her site
6 manager role, and Dr. Strohecker recommended that the
7 question of clinical oversight of the location be
8 discussed with the chief of staff.
9     Q    When you say be discussed with the chief of
10 staff, you mean you were supposed to discuss it with the
11 chief of staff?
12     A    Yes.
13     Q    Okay.  And do you remember anything else that
14 Strohecker said about that to you?
15     A    She didn't say it.  She provided it in a
16 written reply it -- in the grievance review.
17     Q    Okay.  And so you then a discussion with the
18 chief of staff about this issue?
19     A    I did.
20     Q    And what was said in that discussion?
21     A    We had two discussions.  The first time I
22 asked him to talk to Dr. Velez and get an understanding
23 of what her concerns or perceptions were with respect to
24 clinical leadership.  So the term CMO is kind of a weird
25 one, chief medical officer, and even understanding what

1  that meant, what role that filled or whether it was

2  necessary on the Martinez campus for the questions I

3  asked him to dialogue with her about.

4       Q    And did you come to an understanding of what

5  she meant by chief medical officer?

6            MS. SMITH:  Objection.

7  BY MR. HOYER:

8       Q    You can -- you can answer.

9       A    I never spoke with her.  I asked the chief of

10 staff to have a conversation with her about her

11 perception of that role.

12 BY MR. HOYER:

13      Q    Right.  And did he?

14      A    He did.

15      Q    And then did he relay that to you?

16      A    He relayed to me his thoughts on whether it

17 was necessary to have a chief medical officer on the

18 Martinez campus or not.

19      Q    What did he say about that?

20      A    He said it was not.

21      Q    Did he say why?

22      A    He said consistency, clarity of

23 responsibility, organizational direction were all

24 reasons why it would be better not to have a separate

25 chief medical officer on one of our campuses.

1      Q    And did he explain what he meant by
2    consistency?
3      A    I interpreted what he meant by consistency,
4    but he did not articulate that.
5      Q    What was your interpretation?
6           MS. SMITH:  Objection.
7    BY MR. HOYER:
8      Q    You can answer.
9      A    That processes put out by his office, he
10   wanted to make sure were followed uniformly across the
11   organization.
12     Q    And do you have an understanding of how making
13   Dr. Velez chief medical officer in Martinez would be
14   inconsistent with that goal?
15          MS. SMITH:  Objection.
16          THE WITNESS:  You're asking me to tell you
17   what I think Dr. Cahill thinks?
18   BY MS. SMITH:
19     Q    Or what you think.  Do you have an
20   understanding of how the goal of consistency,
21   specifically what he said -- sorry, specifically what
22   you interpreted him to mean by consistency, how that was
23   inconsistent with Dr. Velez being the chief medical
24   officer at Martinez?
25          MS. SMITH:  Objection.  Calls for speculation.

1  BY MR. HOYER:

2      Q    You can answer.

3      A    Well, my general understanding is that if he

4  says:  This is how we're going to do clinic schedules,

5  this is how we're going to organize OR time, this is how

6  we're going to divide up time for administrative duties

7  for clinical staff, these are the priorities that we

8  want our physicians to take, this is what we expect from

9  a productivity perspective, this is how we resolve

10  conflicts between physicians, all of those things are

11  leadership responsibilities, and he wanted to make sure

12  it was consistent, understood, and that it was under the

13  purview of the chief of staff.

14      Q    And -- and how would Dr. Velez being chief

15  medical officer interfere with that?

16          MS. SMITH:  Objection.

17  BY MR. HOYER:

18      Q    You can answer.

19      A    Well, I -- I think it not having -- so the

20  same issue with the site manager title and the associate

21  director who's present, the clarity of who's responsible

22  for what, and leadership would be harmed with the

23  addition of a second leader/clinical voice at Martinez.

24      Q    Now, did you ever become aware that Dr. Velez

25  had complained that Dr. Hundahl had disparaged her?

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1       A    No.

 2       Q    Did you hear -- have you heard from anyone

 3  that Dr. -- Dr. Hundahl was vindictive or aggressive?

 4       A    No.

 5       Q    Have you ever heard that Dr. Hundahl had

 6  discriminated against anyone based on their sex or race?

 7            MS. SMITH:  Objection.

 8  BY MR. HOYER:

 9       Q    You can answer.

10       A    No.

11       Q    All right.  Let's see if I can pull up a

12  document here.

13            Okay.  Mr. Stockwell, do you see the document

14  on the screen there?

15       A    Yes.

16            MS. SMITH:  Sorry, we're marking this as 1?

17            MR. HOYER:  This is Exhibit 1, and it is a

18  document dated October 2, 2018, from Dr. Velez to

19  Mr. Stockwell, and it's -- the subject is formal

20  grievance, change of assignment.

21       Q    (By Mr. Hoyer)  Do you recognize the document?

22            MS. SMITH:  Can you just ask -- give him

23  permission to look through the entire document before we

24  ask him -- or not?

25            MR. HOYER:  Yeah.  Now, I guess -- sorry, what
```

1  did you say about permission, Valerie?

2          MS. SMITH:  Can you give him -- can you let

3  him look at the entire document before you start asking

4  questions about it?

5          MR. HOYER:  Yeah.  I'm just asking if he

6  recognized the document.  I'm happy --

7          MS. SMITH:  Right, but you're --

8          MR. HOYER:  -- to scroll --

9          MS. SMITH:  -- only showing him one page of

10  it, so it's not fair to ask him if he recognizes an

11  entire document based on only showing him one page.

12          MR. HOYER:  Okay.

13      Q   (By Mr. Hoyer)  Mr. Stockwell, if -- would you

14  like me to scroll through the whole document so that you

15  can review it before you say whether you recognize it or

16  not?

17      A   Yes, if you could, that would be great.

18      Q   Sure.  Okay.  Did -- just tell me when you

19  want me to scroll down.

20      A   You can go to the next page.  I -- I looked at

21  this one.

22      Q   Okay.

23      A   Is that the entirety the document?

24      Q   I think there's more stuff.  There's an

25  e-mail.  You can tell me when you want me to scroll

Atkinson-Baker, a Veritext Company
www.depo.com

1  down.

2      A    Okay.

3      Q    I'm actually not sure that this is -- we may

4  have lumped more than one document together.  I think

5  the -- the document is just the formal grievance, which

6  is Bates-stamp USA000031 to -32.

7          MS. SMITH:  Okay, so, for the purpose of this

8  exhibit, Exhibit 1, it's USA-31 and -32.

9          MR. HOYER:  That's right.

10         MS. SMITH:  Okay.

11                (Exhibit 1 marked)

12 BY MR. HOYER:

13     Q    All right.  So do you recognize the document,

14 Mr. Stockwell?

15     A    Yes.

16     Q    Okay.  And did you -- when you received this,

17 did you receive it with attachments or just by itself?

18     A    I don't remember.

19     Q    Okay.  Let's . . . now, after you received

20 this grievance, I think you testified earlier that you

21 had a discussion with Mr. Graham about it.

22         MS. SMITH:  Objection.

23 BY MR. HOYER:

24     Q    Is that right?

25     A    Am I supposed to answer?

 1              MS. SMITH:  Yes.  Unless --

 2              MR. HOYER:  Yes.

 3              MS. SMITH:  -- you're instructed otherwise,

 4  you can answer.

 5              THE WITNESS:  Okay.  Sorry, I -- I -- I'm

 6  confused.  You guys do this more often than I do.

 7              MR. HOYER:  That's okay.

 8              THE WITNESS:  I believe we did discuss this

 9  grievance after I received it, yes.

10  BY MR. HOYER:

11      Q    Okay.  And was it before you made a decision

12  on the grievance?

13      A    Yes.

14      Q    Okay.  And you've already told me the

15  substance of that discussion, right?

16              MS. SMITH:  Objection.

17              THE WITNESS:  Yes, I believe we discussed it

18  earlier in this deposition.

19  BY MR. HOYER:

20      Q    Right, okay.  And just making sure that I've

21  got everything from your memory, did you discuss this

22  grievance with anyone else after receiving it before --

23  but before making a decision on the grievance?

24      A    As I testified earlier the grievant reviewer

25  that I assigned, Dr. Lorrie Strohecker, gave me a

1  written reply, and in that reply, it encouraged me to

2  dialogue with Dr. Cahill about the role of the chief

3  medical officer, and so I had a discussion with

4  Dr. Cahill with respect to that.

5      Q    Okay, terrific.  And you've already told me

6  about those discussions and communications, correct?

7      A    Yes.

8      Q    Okay.  Let's see . . . now, I'll direct your

9  attention to this paragraph that starts out:

10             "I have functioned in this assignment, the

11             administrative and clinical coordination at

12             Martinez, with changes in title for

13             approximately 20 years."

14             Do you see that paragraph?

15      A    Yes.

16      Q    And she talks about:

17             "As you well know, in my role as Site

18             Manager, I . . . played a leadership role in

19             activities which may be understood as narrowly

20             administrative (such [as] the design and

21             construction of new admin[istrative]

22             buildings), narrowly clinical but not narrowly

23             surgical (ranging from [the] development of

24             new programs in the CLC to coordination of

25             ultra-sound testing between Radiology,

Atkinson-Baker, a Veritext Company
www.depo.com

1            Medicine and Surgery), and interface issues

2            (such as space allocation for offices and

3            examination rooms for all clinical . . .

4            administrative services).  Mr. Graham was

5            candid that as a non-physician he could not

6            perform those clinically related functions."

7        Is it your understanding that he could not

8   perform those clinically related functions as she's

9   described them?

10           MS. SMITH:  Objection.  Calls for speculation.

11  BY MS. SMITH:

12       Q    You can answer.

13       A    Well, I don't what functions specifically.  I

14  could comment on the examples that are listed in the

15  parentheses, if you like.

16       Q    Sure.

17       A    Part of coordinating ultrasound testing as

18  a -- it's important to differentiate what the assistant

19  chief of surgical service would do administratively and

20  what a site manager would do.  We -- we would never ask

21  a site manager to coordinate ultrasound between clinical

22  departments.  So Mr. Graham would not be appropriate to

23  do that sort of work.

24           In the second parentheses example, it would be

25  appropriate to assign space for activities to an

Atkinson-Baker, a Veritext Company
www.depo.com

1  administrative function, and he would be capable of

2  performing that.

3      Q   Okay.  Let's take that first set of

4  parentheses.  Who would you expect to do those --

5  perform those functions?

6          MS. SMITH:  Objection.  Can you let us know

7  what functions you're referring to?

8          MR. HOYER:  Yeah, the -- the ones that he just

9  referred to in the first set of parentheses --

10          MS. SMITH:  [Unintelligible].

11          MR. HOYER:  -- the development of new programs

12  in the CLC --

13              (Reporter clarification)

14  BY MR. HOYER:

15      Q   Okay.  Specifically, I'm referring to the

16  parentheses that includes "(ranging from [the]

17  development of new programs in the CLC to coordination

18  of ultra-sound testing between Radiology, Medicine and

19  Surgery) . . . ."

20          Who would you expect to do those?

21      A   I would expect service chiefs, assistant

22  service chiefs, if there were -- was a program manager

23  involved, so individuals that are involved as leaders

24  within our organization that oversee clinical functions

25  partnering together.

1      Q    Okay, the service chiefs are, for the most

2  part, located in Sacramento; is that correct?

3      A    It's a mix.  Some are in Martinez.

4      Q    Okay.  And which service chiefs are in

5  Martinez that have to deal with the coordination of

6  ultrasound testing between radiology, medicine, and

7  surgery?

8           MS. SMITH:  Objection as to what point in time

9  are you talking about, Mr. Hoyer.

10          MR. HOYER:  The time of this grievance.

11          THE WITNESS:  Well, the 20 years -- that's

12  first part of that paragraph -- it's a different answer,

13  depending on the timing of which service chiefs were

14  located where.

15  BY MR. HOYER:

16      Q    Again, it's -- at the date of this grievance.

17      A    There are assistant chiefs or leads in

18  surgery, medicine, and radiology located on the Martinez

19  campus, and we certainly have the community living

20  center, or the CLC (nursing home) on the campus, has

21  on-site leadership as well.  And had at the time.

22      Q    And that on-site leadership, that's who you

23  would expect to -- to develop new programs in the CLC

24  and coordinate ultrasound testing between radiology,

25  medicine, and surgery?

1          MS. SMITH:  Objection.  Leading.

2     BY MS. SMITH:

3     Q     You can answer.

4     A     In partnership with their service chief, so it

5     doesn't have to be on-site, but, yes, this would be an

6     appropriate function for an assistant chief of surgery.

7     Q     So, the coordination of ultrasound testing

8     between radiology, medicine, and surgery should be

9     coordinated by an assistant chief of surgery?

10    A     Well, it could be.  Could be from an assistant

11    chief in radiology.  It -- it could be from the

12    supervisor of the diagnostic radiology text.  Folks in

13    leadership positions have the ability to apply their

14    oversight and improve programs across our entire health

15    care system.

16    Q     And how do we know -- where's the clarity in

17    who is -- which assistant chief is supposed to do this

18    coordination: radiology or surgery?

19    A     The example she cited was just something that

20    she did, not that she was directed to do.

21    Q     That doesn't answer my question, sir.

22          How do we know which assistant chief should

23    coordinate the ultrasounding -- ultrasound testing:

24    Radiology or surgery?

25    A     It's such a nuanced set of circumstances that

Atkinson-Baker, a Veritext Company
www.depo.com

1  you can't ask that question and get an answer.  It

2  depends on too many variables.

3       Q    And what are those variables?

4            MS. SMITH:  Objection.

5            THE WITNESS:  There are so many, it -- it's

6  impossible to -- to list them in an abbreviated fashion.

7  BY MR. HOYER:

8       Q    Well, isn't it true that if you -- what she's

9  saying is that, as the site manager, she was able to do

10 it.  So there was clarity of having her as site manager

11 and figuring out who was supposed to do that.

12           MS. SMITH:  Objection.  Calls for -- calls for

13 speculation as to what she meant by this letter.

14 BY MR. HOYER:

15      Q    Isn't that your understanding of what she

16 meant?

17           MS. SMITH:  Objection.  Calls for speculation.

18 BY MR. HOYER:

19      Q    You can answer.

20      A    Well, I don't know what she meant by the --

21 the letter.  I think she's implying that she performed

22 some coordination, clinical activities, and was somehow

23 attaching those in her request for me to hear the

24 grievance.

25      Q    Did you ask her what she meant by it?

1       A     I did not.

2       Q     Did you not understand what -- what she was

3  saying?

4             MS. SMITH:   Objection.

5             THE WITNESS:   I appointed a -- a -- someone to

6  hear the grievance and adjudicate it.

7  BY MR. HOYER:

8       Q     And this was Ms. Strohan?

9       A     A Dr. Lorrie Strohecker.

10      Q     Strohecker, sorry.

11            So my question was, So Dr. Strohecker

12 adjudicated the grievance.  Is that right?

13      A     Yes.

14      Q     Okay.  And -- and what was her decision on the

15 grievance?

16      A     Her decision was to uphold Mr. Graham's

17 decision and not grant the relief that Dr. Velez was

18 requesting.

19      Q     And that was after she asked you to consider

20 the suggestion of making her, Dr. Velez, the chief

21 medical officer, correct?

22      A     That was in her reply.

23      Q     All right.  What conversations did you have

24 with Dr. Strohecker about this grievance, if any?

25      A     I did not speak with her directly.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q    See if I can pull up exhibit . . . all right,

2  what I've got here is Exhibit 2, it's a memo dated

3  November 5, 2018, from you to Lorrie Strohecker.

4           Do you recognize the document?

5      A    Yes.

6                (Reporter clarification)

7           MR. HOYER:  Yes, it's Exhibit 2.

8      Q    (By Mr. Hoyer)  Sorry.  Did you answer,

9  Mr. Stockwell?

10     A    Yes.  I declared "yes."

11     Q    Okay.  Now, is there a reason that you chose

12 Dr. Strohecker to adjudicate this grievance?

13     A    The -- she's a management official.  She's a

14 physician, so she has the ability to understand clinical

15 and administrative duties, and she also has

16 administrative duties, as the service chief, over a

17 large department.

18     Q    And did you consider appointing anyone else to

19 adjudicate this grievance?

20     A    No.

21     Q    Have you appointed her to adjudicate other

22 grievances?

23     A    Not that I recall.

24     Q    All right.  See if I can pull up the

25 next . . . so, I've got up on the screen what we'll mark

1  as Exhibit 3.  It's a December 12, 2018, memo from

2  Strohecker to you, and I can scroll down when you tell

3  me to.

4              (Exhibit 3 marked)

5          THE WITNESS:  You can scroll down.

6          You can go a little more.

7          Okay.

8          Yes.

9  BY MR. HOYER:

10     Q    Okay.  Now, the list of interviews that she

11  connect -- conducted contains two employees.

12         Did you have an opinion whether she should

13  have been -- interviewed anyone else?

14         MS. SMITH:  Objection.

15  BY MR. HOYER:

16     Q    You can answer.

17     A    No.

18     Q    Now, she says here, on the second page, "The

19  title of assistant chief of surgery is an appropriate

20  title for Dr. Velez's clinical duties."

21         Do you have an understanding of what qualifies

22  Dr. Strohecker to make that conclusion?

23     A    Well, I think she appreciates what are

24  administrative responsibilities of a clinical service

25  with respect to a -- a physician and what would be asked

1  of them.  She herself is a physician and is a service

2  chief that has administrative responsibilities.

3      Q    Okay, down in the bottom, in the

4  "Recommendations" section, she says:

5              "Dr. Velez did bring up her concern that

6          larger locations, such as Martinez and

7          Redding, need medical operational oversight on

8          the location due to the mix of multiple

9          specialties and the need for coordination."

10         Do you understand what Dr. Strohecker was

11  saying there?

12         MS. SMITH:  Objection.  Calls for speculation.

13  BY MS. SMITH:

14     Q    You can answer.

15     A    I understand the sentence.

16     Q    And does it make sense to you that a larger

17  location, such as Martinez, might need medical

18  operational oversight?

19         MS. SMITH:  Objection.

20         You can answer.

21         THE WITNESS:  Well, the recommendation doesn't

22  render an opinion.  It just says that Dr. Velez was

23  worried that it was so.

24  BY MR. HOYER:

25     Q    Yeah, I understand that.

Atkinson-Baker, a Veritext Company
www.depo.com

1          My question is that -- is whether you think

2     that Dr. Velez -- her point makes sense that a larger

3     location, such as Martinez, needs medical operational

4     oversight due to the mix of multiple specialties and the

5     need for coordination.

6          A    This is the exact question I asked the chief

7     of staff to look into.

8          Q    And his response to you was that, basically,

9     that was his job.

10         A    Yes.

11         Q    And what physical location is he at?

12     Sacramento, right?

13              MS. SMITH:  Objection.

14              THE WITNESS:  Yes, Dr. Cahill's office is at

15     the Mather facility in east Sacramento.

16     BY MR. HOYER:

17         Q    Got here -- ooh, I pulled out the wrong one.

18     Hold on a sec.  Here we go.

19              Okay.  What we've got here is Exhibit 4 we're

20     marking.  It's a February 1, 2019, memo from you to

21     Dr. Velez.

22                    (Exhibit 4 marked)

23     BY MR. HOYER:

24         Q    And do you recognize the document?

25         A    Yes.

1      Q     When you received a report from

2  Dr. Strohecker, other than your discussion with

3  Dr. Cahill, did you discuss it with anyone?

4      A     No.

5      Q     Now, you say, in this first paragraph, that

6  you agreed with the recommendations identified in No. 7

7  of the grievance examiner's report.

8            What did you mean by that?

9            Do you want me to pull that back up?

10     A     No.

11           Well, the recommendations were not to -- to

12  concur that Mr. Graham had done it correctly, and No. 7

13  was the part where we needed to discuss with the chief

14  of staff.

15     Q     All right.  I think, before I go to the next

16  exhibit, which is a little bit longer, this is probably

17  a good time to take our lunch break.  So, let's take a

18  break and come back at 1 o'clock.

19           MS. SMITH:  That's fine.

20                    --oOo--

21           (LUNCHEON RECESS TAKEN FROM

22           12:27 P.M. TO 1:03 P.M.)

23                    --oOo--

24           MR. HOYER:  All right, let's go back on the

25  record.

1              MS. SMITH:  Oh, before you start questioning,

2  there -- there are two points that need to be clarified.

3              MR. HOYER:  Okay.

4              MS. SMITH:  Mr. Stockwell, at the time of the

5  grievance and the time of the review, was there a

6  position of chief medical officer within NorCal VA?

7              THE WITNESS:  No.

8              MS. SMITH:  Okay.  And, when you were asked

9  questions about clarification of roles, what

10  specifically did you mean when you were talking about

11  clarifying the roles of site manager and the executive

12  at Martinez?

13              THE WITNESS:  The duplication of who's

14  responsible for what activities, the clarity as far as

15  who should be a decision-maker or people look to as the

16  decision-maker, so it's really the -- the duplication of

17  what were the expectations for the associate director

18  and what were the expectations for someone named as a

19  site manager.

20              MS. SMITH:  Okay.  Thank you.

21                    EXAMINATION (Resumed)

22  BY MR. HOYER:

23     Q    Okay.  Pull up your affidavit here.  So, we're

24  going to mark, as Exhibit 5, a document entitled

25  "Written Affidavit of David Stockwell," and so I'm going

Atkinson-Baker, a Veritext Company
www.depo.com

1  to let you review the document, Mr. Stockwell.  Oh, wait

2  a minute.

3          MS. SMITH:  Thank you.

4          Yeah, we don't have it yet.  There we go.

5  Thank you.

6          MR. HOYER:  All right.  Can we see it?

7          MS. SMITH:  Yes.  It's a three-page document.

8          MR. HOYER:  It is.

9                  (Exhibit 5 marked)

10  BY MR. HOYER:

11      Q    And I will scroll down at your direction,

12  Mr. Stockwell.

13      A    Okay.  Go ahead.

14          Okay.

15          Okay.

16          Okay.

17          All right.

18          Thank you.

19      Q    All right.  So you recognize this document?

20      A    Yes.

21      Q    And it's -- that's your signature at the

22  bottom?

23      A    It is.

24      Q    Okay.  Now, couple questions.  Item in 6 here,

25  question, Do you have past EEO activity?  And the answer

Atkinson-Baker, a Veritext Company
www.depo.com

1  is "yes."

2          What -- what did you -- what were you

3  referring to when you said yes?

4      A    Well, I filled out a number of these

5  interrogatories that the ORM agents have had in the

6  past.  I have been a named as a responsible management

7  official in an EEO case prior.  I've been involved in

8  settlement discussions as a medical center directer on a

9  number of EEO cases that are under review, and so I

10  answered yes.

11     Q    Okay.  The case involving you being named as a

12  responsible official, were there allegations made

13  against you in that case?

14     A    Yes.

15     Q    And what were the nature of the allegations?

16     A    That a hiring decision was made based on age

17  and gender.

18     Q    And what was the result of that case?

19     A    There was a final agency decision that found

20  against the complainant.

21     Q    And then did it go to court?

22     A    No.

23     Q    Now, under claim specific questions, the first

24  one is, "Please state your involvement/knowledge of the

25  above-listed event."

1           And your response was, "I was aware it took
2    place."
3           Was that all of your involvement in the
4    above-listed event?
5       A    Yes.  I was not the decision-maker.  I
6    probably should state, for the record, that's probably
7    not the most complete response in the world.  I
8    certainly wasn't declaring that there was any
9    discrimination.  My response was only to the part about
10   that she was -- what's the right terminology? --
11   clarifying of duties for site manager at NorCal
12   Martinez.
13          MR. HOYER:  I'm sorry.  Can I have that answer
14   back, Ms. Do?
15              (Record read as follows:
16              "ANSWER:  Yes.  I was not the
17              decision-maker.  I probably should
18              state, for the record, that's
19              probably not the most complete
20              response in the world.  I certainly
21              wasn't declaring that there was any
22              discrimination.  My response was
23              only to the part about that she
24              was -- what's the right
25              terminology? -- clarifying of

1                    duties for site manager at NorCal

2                    Martinez.")

3    BY MR. HOYER:

4        Q    Well, isn't it true that -- that you actually

5    urged Mr. Graham to clarify the duties of the site

6    manager title there?

7            MS. SMITH:  Objection as to the term "urged."

8    BY MR. HOYER:

9        Q    Do you understand the term "urged"?

10   Mr. Stockwell?

11       A    Yes, I understand that term.

12       Q    So isn't it true that -- that you actually

13   urged Mr. Graham to clarify the duties of the site

14   manager?

15           MS. SMITH:  Objection.

16           You can answer.

17           THE WITNESS:  I had a conversation with him

18   about clarifying the duties.  I -- I did not instruct

19   him to undo her site management responsibilities.

20   BY MR. HOYER:

21       Q    Well, it's fair to say that -- that you wanted

22   him to clarify those responsibilities.  Isn't that true?

23       A    Yes.

24       Q    And, as you sit here today, was there any

25   action that he could have taken to clarify those duties

1  that would satisfy your concerns other than removing the

2  site manager title from her?

3          MS. SMITH:  Objection.  Calls for speculation.

4  BY MR. HOYER:

5      Q    You can answer.

6      A    I think that there's a whole bunch of ways he

7  potentially could have arrived at clarity.  This was

8  only one of the options.

9      Q    What are the -- the -- the other bunch of ways

10  that he could have done that?

11          MS. SMITH:  Objection.  Calls for speculation.

12  BY MR. HOYER:

13      Q    You can answer.

14      A    He could have set out a list of things that

15  the associate director was responsible for and a list of

16  things that the person that was holding the name title

17  of site manager was responsible for, breaking down

18  expectations between the -- the two departments and

19  identifying who would be over what component and portion

20  of the responsibilities and, of course, the -- degrees

21  of spectrum on how far that could or couldn't go.

22  There's a -- a -- potentially an infinite number of

23  solutions.

24      Q    Did you suggest to him to set out a list of

25  duties of the associate director versus the -- the site

Atkinson-Baker, a Veritext Company
www.depo.com

1  manager?

2         MS. SMITH:  Objection.

3         THE WITNESS:  I gave him no instructions on

4  how to accomplish the task.

5  BY MR. HOYER:

6     Q    And, after the decision was made by him, did

7  you, at any point, tell him, "Well, gosh, you could have

8  just done a list of duties, breaking down the

9  responsibilities instead of taking away her -- her

10 title"?  Did you say anything --

11        MS. SMITH:  Object- --

12 BY MR. HOYER:

13    Q    -- like that?

14        MS. SMITH:  Objection.

15        THE WITNESS:  No.  I thought his -- his -- his

16 conclusion was a rational way to accomplish the task.

17 BY MR. HOYER:

18    Q    Do you think it was the best way?

19        MS. SMITH:  Objection.

20 BY MR. HOYER:

21    Q    You can answer.

22    A    I don't know.

23    Q    All right, let's pull up, as Exhibit 6, the

24 investigative report.

25        So we're marking, as Exhibit 6, a document

 1  entitled "Investigative Report In the Matter of the EEO

 2  Complaint of Discrimination of Pauline Velez."

 3          And I can scroll through it as your -- at your

 4  direction, Mr. Stockwell.

 5          MS. SMITH:  And this is an eight-page

 6  document, Mr. Hoyer?

 7          MR. HOYER:  Looks like it.

 8                  (Exhibit 6 marked)

 9          THE WITNESS:  You can go to the top of page 2.

10          Okay, down to the summary part, if you will.

11          Okay.

12          Okay.  Whoops.  You went too far.  I wasn't

13  able to read -- little further up where it starts --

14  right there.  Okay, thank you.

15          Okay.

16          Okay.  Whoops you went a little too far.

17          MR. HOYER:  Sorry.

18          THE WITNESS:  Thank you.  Oop.

19          MR. HOYER:  That good?

20          THE WITNESS:  Yes.  I'll -- I'll pick it up

21  from here.

22          Okay.  Whoop.  There we go.

23          Okay.

24          Okay.

25          Okay.

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1              Okay.
 2              Can you scroll just a tiny bit?  I missed the
 3    top of this page.  There we go.  Thank you.
 4              Okay.
 5              Okay.
 6              Okay.
 7              Okay.
 8              All right.
 9    BY MR. HOYER:
10         Q    All right, do you recognize the document, sir?
11         A    I -- I, at this moment, recognize it, yes.
12         Q    Did you receive it after it was issued?
13              MS. SMITH:  Objection.
14    BY MR. HOYER:
15         Q    You can answer.
16         A    I believe all of the investigative reports go
17    to the medical center.  I don't specifically recall
18    reviewing this document.
19         Q    Okay.  Were you interviewed by the
20    investigator?
21         A    I'm not certain.  I don't think so.  I think
22    he just mailed me the questions, and I answered them and
23    sent them back.
24         Q    Okay.  And that's the document that we looked
25    at before.
```

Atkinson-Baker, a Veritext Company
www.depo.com

1        A     The previous exhibit, I believe.

2        Q     So, just after lunch, I think your counsel had

3   you clarify a couple of points, and I was -- I wondered

4   about -- you said that your conversation with Mr. Graham

5   was about clarifying respective roles of associate

6   director and the person that had the site manager title.

7   I think that's what you said.  Is that right?

8        A     Yes.

9        Q     And -- and you were interested in avoiding

10  further duplication of efforts between the two; is that

11  right?

12       A     Yes.

13       Q     Okay, so when you said a little while ago that

14  another possible solution, other than removing the site

15  manager title from Dr. Velez, Mr. Graham could have set

16  out a list of duties and broke down the expectations as

17  between the two -- the associate director and the site

18  manager person.

19             I'm just wondering, do you have in mind any

20  set of duties that could have remained with Dr. Velez to

21  justify her retaining the title of site manager?

22             MS. SMITH:  Objection.  Calls for speculation.

23  BY MS. SMITH:

24       Q     You can answer.

25       A     I didn't create a list or dream up what that

Atkinson-Baker, a Veritext Company
www.depo.com

1  list might look like.  You asked me for possible

2  alternative solutions to the one that he landed upon,

3  and I presented that hypothetically as something that

4  could have been done.

5      Q    No, I understand that.  But I'm just wondering

6  if you have anything specific you could offer in terms

7  of duties that Dr. Velez could have retained that would

8  have allowed her to retain the title.

9          MS. SMITH:  Objection.  Calls for speculation.

10 BY MR. HOYER:

11     Q    You can answer.

12     A    I don't have a list.

13     Q    Forget about the list.  Do you have any duties

14 in mind that you could offer, that it would have been

15 appropriate for her to retain versus everything being

16 consolidated with the associate director?

17         MS. SMITH:  Objection.  Calls for speculation.

18 BY MR. HOYER:

19     Q    You can answer.

20     A    I don't have a specific idea of duties that

21 could have been retained in order to keep the title of

22 site manager.

23     Q    Now, here, on page -- the last page of the

24 exhibit, the investigator relates the results of -- of

25 what the witness Addagatla, Dr. Addagatla, told him.

Atkinson-Baker, a Veritext Company
www.depo.com

1  Now, she says that she was the site manager for the

2  previous three years at the time of this report.  She

3  says she's aware of the management contention that site

4  managers should not be clinicians.

5          Is that your understanding of the management

6  contention, that site managers shouldn't be clinicians?

7          MS. SMITH:  Objection.

8  BY MR. HOYER:

9      Q    You can answer.

10     A    Can you repeat the question?

11     Q    Yeah.  Addagatla says here that she is aware

12 of management's contention that site managers should not

13 be clinicians, and I'm just wondering is that an

14 accurate statement that management contends that site

15 managers should not be clinicians?

16     A    I don't believe --

17          MS. SMITH:  Object --

18          THE WITNESS:  -- so.

19          MS. SMITH:  That's fine.

20 BY MR. HOYER:

21     Q    And what is incorrect about that statement?

22     A    I don't think management's contentions are

23 that site managers shouldn't be clinicians.

24     Q    Well, it -- it -- it's true, isn't it, that,

25 to the extent that a clinician has site manager duties,

1  that may detract from their ability to provide clinical

2  service to patients?

3      A   As you stated, that is probably true.

4      Q   She also says that she does not do a lot of

5  administrative work.

6          Are you aware of how much administrative work

7  Dr. Velez did when she was site manager?

8      A   I don't -- I do not know.

9      Q   Okay.  And she's further -- Addagatla further

10  says she has the admin officer who takes care of those

11  duties for her.  And are you aware of whether that was

12  also true for Dr. Velez, that she had an admin officer

13  who took care of those duties for her?

14          MS. SMITH:  Objection.

15          THE WITNESS:  I believe, at one time, there

16  were, as I testified earlier, four or five, something

17  like that number of employees, that reported to

18  Dr. Velez in her site management role.  If I recall, one

19  of those was an administrative officer, but it was taken

20  away from her, and that -- that FTEE slot, or full-time

21  employee equivalent slot, was given to the associate

22  director's office in Martinez.

23  BY MR. HOYER:

24      Q   When did that happen?

25      A   I'm not sure of the time frame.

Atkinson-Baker, a Veritext Company
www.depo.com

1       Q    Did you have any involvement in that decision?

2            MS. SMITH:  Objection.

3            THE WITNESS:  I recall it occurring.  I not

4    the decision-maker.

5    BY MR. HOYER:

6       Q    Do you know who the decision-maker was?

7       A    I can't recall if it was Mr. Mastalski or

8    Mr. Graham at the time frame when it happened.

9       Q    Did you have any discussions with whichever it

10   was prior to the decision to remove that admin from her?

11      A    We have a commitment called the Position

12   Management Board that reviews all changes in -- in FTEE

13   alignments or whether to hire new people or remove jobs

14   that used to be in the organizations, and I remember

15   that there was dialogue at the position management board

16   committee meeting regarding this FTEE.

17      Q    Do you remember who raised the issue with the

18   committee?

19      A    I don't recall which of the two associate

20   directors it was, either Mastalski or Graham.

21              (Reporter clarification)

22            THE WITNESS:  Yes.  Full-time employee

23   equivalent.  It's an acronym.  I couldn't think of the

24   right word for an employee, full-time employee.

25   BY MR. HOYER:

Atkinson-Baker, a Veritext Company
www.depo.com

1     Q    And did you develop an opinion -- I'm sorry.

2    Scratch that.

3          Were you on that committee?

4     A    Yes.

5     Q    On that committee, did you an opinion about

6    whether that decision was the right decision to make?

7          MS. SMITH:  Objection.

8    BY MR. HOYER:

9     Q    You can answer.

10    A    I concurred with the request.

11    Q    And do you remember the basis for your

12    concurrence?

13    A    In support of eliminating duplicative efforts

14    and confusion, it made sense to me to align the -- the

15    position under the associate director.

16    Q    Other than -- hang on, let me stop the screen

17    share.

18          All right, other than the clarity, achieving

19    clarity for who was responsible for what and avoiding

20    duplication, did you think there were reasons to justify

21    removing the site manager title from Dr. Velez?

22          MS. SMITH:  Objection.

23    BY MR. HOYER:

24    Q    You can answer.

25          MS. SMITH:  Objection.  Calls for speculation.

Atkinson-Baker, a Veritext Company
www.depo.com

1  BY MR. HOYER:

2      Q    You could still answer.

3      A    You're going to have to repeat the question

4  now after all of those, so I make I get it right.

5      Q    Sure.

6           Other than the rationale that you offered

7  before about achieving clarity about who's responsible

8  for what and avoiding duplication, did you have anything

9  in mind as a justification for removing the site manager

10 title from Velez?

11          MS. SMITH:  Objection.  Calls for speculation.

12          THE WITNESS:  No.

13 BY MR. HOYER:

14     Q    Did you ever talk with Dr. Velez directly

15 about the issue of achieving clarity and who's

16 responsible for what and avoiding duplication?

17     A    Well, I don't recall such a conversation, but

18 the document that you showed me earlier on her

19 administrative grievance stated that she and I had a

20 conversation about it a couple years before that time.

21     Q    But you don't remember what was said in that

22 conversation.

23     A    I don't actually remember us having the

24 conversation, but I read it in the document.

25               (Reporter clarification)

1          MS. SMITH:  I objected, but the witness

2   clarified the point, so it's fine.

3   BY MR. HOYER:

4       Q    Were you ever interviewed by the office of

5   resolution management in connection with the complaint

6   by Dr. Velez?

7       A    I believe you asked me this question already,

8   and I said no.

9       Q    Fair enough.

10          In the town hall meetings at Martinez while

11  Dr. Velez was site manager, was there ever any

12  discussion of discrimination?

13      A    I can't remember that subject coming up in a

14  town hall meeting, but it may have.

15      Q    Now, have you ever been accused of sexually

16  harassing an employee?

17      A    No.

18      Q    Have you ever been accused of discriminating

19  against an employee based on any protected category?

20          MS. SMITH:  Objection.  Asked and answered.

21  BY MR. HOYER:

22      Q    You can answer.

23      A    I -- I did have a EEO complaint filed against

24  me based on several protected categories.

25      Q    And that's the one that you testified to

Atkinson-Baker, a Veritext Company
www.depo.com

1    previously, right?

2        A    Yes.

3        Q    Okay.  Now, did you become aware in December

4    of 2016 that there were several women at the Martinez

5    facility that had alleged that they had been sexually

6    harassed?

7        A    I don't recall the dates.

8        Q    But you do recall that there were several

9    women several years ago, at the Martinez facility, that

10   alleged that they had been sexually harassed?

11       A    Yes.

12       Q    And did you have any involvement in the

13   investigation or resolution of -- of those cases?

14            MS. SMITH:  Objection.  Compound question.

15            MR. HOYER:  No, it's not.

16       Q   (By Mr. Hoyer)  You can answer.

17       A    I don't recall all the specifics on the cases,

18   but I have been asked to engage in settlement activity

19   discussions during EEO process.

20       Q    And were those harassment claims settled?

21       A    Not yet.

22       Q    Do any of the women continue to work at the

23   Martinez facility?

24       A    Yes.

25       Q    As part of your job responsibilities, do you

Atkinson-Baker, a Veritext Company
www.depo.com

1   have any duties to ensure that discrimination does not

2   occur?

3       A    Can you clarify the question?

4       Q    Yeah.  You're, in effect, the CEO of NorCal,

5   right?

6           MS. SMITH:  Objection.

7           THE WITNESS:  Yes.

8   BY MR. HOYER:

9       Q    And as part of your responsibilities is to

10  ensure that discrimination does not occur against

11  employees that work for you?

12      A    Yes.

13      Q    And how much time do you spend on average on

14  that responsibility?

15          MS. SMITH:  Objection.

16  BY MR. HOYER:

17      Q    Say, per month?

18          MS. SMITH:  Objection.

19          THE WITNESS:  Lots of my job is involved in

20  disputes between people and managing people.  So to

21  figure out how much of my day or how many hours I spend

22  in my job responsibilities making sure that we have a --

23  a safe and undiscriminated workplace is -- is hard to

24  calculate.

25  BY MR. HOYER:

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q    Well, it's fair to say that -- that not all

2  disputes between people involve discrimination based on

3  protected characteristics, right?

4    A    Yes, I think that's true.

5    Q    So, my question is actually narrower than your

6  response.  My question is about what -- how much time do

7  you spend in your day-to-day activities ensuring that

8  discrimination based on protected categories does not

9  occur?

10         MS. SMITH:  Objection.

11  BY MR. HOYER:

12    Q    In NorCal.

13         MS. SMITH:  Objection.

14  BY MR. HOYER:

15    Q    You can answer.

16         MS. SMITH:  Well, let me state my basis.

17  Objection.  Vague, confusing, and overbroad.

18  BY MR. HOYER:

19    Q    You can answer.

20    A    I would estimate 10 percent of my time.

21    Q    And what types of things do you do to ensure

22  that discrimination based on protected categories does

23  not occur, you personally?

24    A    I meet on a regular basis with the EEO program

25  manager.  I have a separate meeting with HR and EEO to

Atkinson-Baker, a Veritext Company
www.depo.com

1  review cases, mediations, potential resolution.  I offer

2  office hours for employees to come talk directly with me

3  if they want to, if they're concerned, every single

4  week.  I regularly round when we're not in the middle of

5  a worldwide pandemic, interacting with staff at all of

6  our locations.  I've offered group meetings for anybody

7  concerned with protected activity discrimination in the

8  past.  I review, with our executive leadership team,

9  trends and cases.  We have a recurring meeting where we

10  review EEO activity by theme or -- or by category to

11  determine if we're -- we need to take corrective action.

12  So those are some examples of things that I personally

13  do to make sure that we have a -- a discrimination-free

14  work environment.

15      Q    Okay.  How often do you meet with the EEO

16  program manager?

17      A    Once a month at minimum.

18      Q    And how often do you meet which -- with HR to

19  review the discrimination cases in process?

20      A    That's also a monthly meeting.

21      Q    And what -- what are you -- you said you have

22  office hours for people to approach you personally and

23  talk about discrimination?

24      A    Yes.

25      Q    How often do people -- how -- how often do

1   people come and talk to you about that in your office

2   hours?

3            MS. SMITH:  Objection.

4            THE WITNESS:  Every Friday at 2 o'clock.

5   BY MR. HOYER:

6        Q    So every Friday at 2 o'clock somebody will

7   show up and talk about discrimination with you.

8        A    Not every week does an employee book the time

9   slot, but it's available every week if they want to.

10       Q    Yeah, how often do they actually show up?

11       A    As you mentioned, not every dispute is based

12  on discrimination, but probably three out of four times

13  in a month an employee will take advantage of seeing me

14  during office hours.

15       Q    To talk about discrimination?

16       A    To talking about their concerns as an

17  employee.

18       Q    No.  I'm just asking about how often does the

19  employee show up in your office hours to talk about

20  discrimination?

21       A    It would be hard to estimate and define the

22  categorization of the breadth of what somebody brings to

23  the table.  They don't bring a category.  They bring a

24  whole milieu of things when they want to talk.

25       Q    Well, when's the last time an employee showed

1  up during your office hours and said something about

2  discrimination?

3          MS. SMITH:  Objection.

4          THE WITNESS:  Probably last week.

5  BY MR. HOYER:

6      Q    And what about group meetings; you said

7  there -- you have group meetings with employees about

8  discrimination issues?

9      A    Before the pandemic, as I would travel to

10 locations.  I would offer, after town hall meetings, an

11 opportunity for any staff member that -- that wanted to

12 talk about concerns about discrimination to -- to have a

13 separate meeting after the -- the town hall meetings

14 where -- where they could discuss issues with me.

15     Q    Do you have a sense of -- of what -- what

16 percentage of the physicians at NorCal are white males?

17         MS. SMITH:  Objection.  Calls for speculation.

18 BY MR. HOYER:

19     Q    You can answer.

20     A    I do not know.

21     Q    Can you give me any estimate?

22         MS. SMITH:  Objection.  Same objection.

23         THE WITNESS:  40 percent would be just a

24 guess, but I -- I -- I do not know the accuracy of that

25 guess.

1  BY MS. SMITH:

2      Q    And is part of your duties to encourage racial

3  diversity in NorCal?

4           MS. SMITH:  Objection.

5  BY MR. HOYER:

6      Q    You can answer.

7           MS. SMITH:  To the extent you understand the

8  question, you can answer.

9           THE WITNESS:  What do you mean by "racial

10  diversity"?

11  BY MR. HOYER:

12     Q    To -- to -- to increase the -- the -- the

13  numbers of minority employees.  Let's try that one.

14     A    We monitor, as I mentioned and testified

15  earlier, and have a recurring report from our EEO

16  program manager regarding any disparities from the --

17  the demographic area where we reside and our employment

18  statistics; and if we were low in any of those

19  categories, then we would ask our EEO program manager to

20  partner with human resources to figure out how we could

21  become more in line with the community.

22     Q    Okay.  Has there been any indication that the

23  racial disparity among physicians at north -- NorCal is

24  low, as you put it?

25           MS. SMITH:  Objection.

```
 1              THE WITNESS:  It -- it -- the data we get
 2   doesn't break it out by professional responsibility or
 3   title.
 4   BY MR. HOYER:
 5       Q    Really?
 6            MS. SMITH:  Objection.
 7   BY MR. HOYER:
 8       Q    And then, finally, you said there was a
 9   recurring executive committee meeting.  How often does
10   that happen with respect to this issue of ensuring
11   discrimination doesn't happen?
12       A    Quarterly.
13       Q    Okay.  And put those all together and it's
14   about 10 percent of your time?
15       A    That was an estimate.
16       Q    Would you like to revise the estimate?
17            MS. SMITH:  Objection.
18   BY MR. HOYER:
19       Q    -- more detail?
20            MS. SMITH:  Objection.
21                (Reporter clarification)
22   BY MR. HOYER:
23       Q    Yeah.  The question was, Would you like to
24   revise the estimate now that we've been through it in
25   more detail?
```

1            MS. SMITH:  Objection.

2            THE WITNESS:  No.

3   BY MS. SMITH:

4       Q    Now, were you aware that Dr. Velez supported

5   Dr. Martin in an EEO issue resulting from Dr. Martin's

6   exposure to Dr. Lazzarino?

7       A    Can you rephrase the question?

8       Q    Not sure why you want me to rephrase it.

9            Are you aware that Dr. Velez assisted

10  Dr. Martin in pursuing an EEO claim resulting from

11  Martin's exposure to Dr. Lazzarino?

12      A    I wanted you to -- to rephrase it.

13           I was aware that Dr. Velez was an advocate for

14  Dr. Martin.  What involvement she had in her EEO case,

15  I'm not certain of.

16      Q    Okay.  What is your awareness of her being an

17  advocate in that situation?

18      A    Dr. Martin was frustrated with clinical

19  processes as far as which clinics that she ran when,

20  whether it was -- there was a fair distribution of work,

21  whether or not she was overworked and overtaxed, and

22  whether her superior had the credentials to accurately

23  deliberate on decision-making, and so she had vocalized

24  that, and Dr. Velez was advocating and sporting

25  Dr. Martin's stance with regards to her podiatry

Atkinson-Baker, a Veritext Company
www.depo.com

1  profession and concern with workload distribution, is

2  the best I can recall.

3      Q    At the time, did you believe that Dr. Martin's

4  stance was valid?

5          MS. SMITH:  Objection.

6  BY MR. HOYER:

7      Q    You can answer.

8      A    You know, I don't know all the details.  I

9  think Dr. Martin was a hard-working podiatrist who had

10 the patient's best interest at heart, and so it's -- was

11 worth exploring her concerns.

12     Q    And was there a resolution to her concerns?

13         MS. SMITH:  Objection.

14         THE WITNESS:  I vaguely recall that we added

15 podiatry staff as far as workload volume.  I do not

16 recall -- I don't remember what happened with respect --

17 if she had an EEO case even, what the outcome was.

18 BY MR. HOYER:

19     Q    And did you come to an opinion as to whether

20 Dr. Velez's advocacy on behalf Dr. Martin was well

21 founded?

22         MS. SMITH:  Objection.

23 BY MR. HOYER:

24     Q    You can answer.

25     A    I don't know whether it was well founded.

1  It -- they were clinical questions.

2      Q    Well, there were more than just clinical

3  questions, weren't they?  Dr. Lazzarino was ultimately

4  asked to leave, right?

5          MS. SMITH:  Objection.  Mr. Hoyer, you were

6  asking him about what he recalled regarding this

7  incident between Mr. Martin, Plaintiff, and

8  Dr. Lazzarino.  Now you're asking a specific question

9  about Dr. Lazzarino.

10          MR. HOYER:  That's right.

11          MS. SMITH:  The beginning of your question --

12  my objection stands.

13  BY MR. HOYER:

14      Q    Okay.  Do you have my question in mind,

15  Mr. Stockwell?

16      A    I believe you're asking me if the outcome of

17  Dr. Martin's concerns led to Dr. Lazzarino' departure.

18      Q    That's a good question.  Why don't you answer

19  that one?

20          MS. SMITH:  Objection.

21          THE WITNESS:  I don't believe they had

22  anything to do with each other.

23  BY MR. HOYER:

24      Q    Okay.  Dr. Lazzarino was asked to leave

25  because of allegations of fraud?

 1      A    I believe he resigned.  I don't think he was

 2  asked to leave.

 3      Q    And he was subsequently convicted of fraud?

 4           MS. SMITH:  Objection to the extent the

 5  witness knows.

 6           THE WITNESS:  Yes.

 7  BY MR. HOYER:

 8      Q    And were you aware of whether Dr. Velez

 9  assisted Dr. White with any EEO complaints?

10      A    No.

11      Q    What about Dr. Lee; were you aware of her

12  assistance to Dr. Lee in pursuing an EEO complaint?

13      A    No.

14      Q    Were you aware of Velez's assistance to

15  Dr. Dow in complaint -- in an EEO complaint?

16      A    No.

17      Q    What about Dr. Forest; were you aware of

18  Dr. Velez's assistance in Dr. Forest's EEO complaint?

19      A    No.

20      Q    Is it your understanding that Dr. Velez has a

21  reputation, amongst the staff, for helping women and

22  minorities with EEO problems?

23           MS. SMITH:  Objection.

24  BY MS. SMITH:

25      Q    You can answer.

1      A    No, that's not -- I don't know.

2      Q    Now, at some point, Dr. Hundahl left NorCal;

3  is that right?

4      A    Yes.  He retired.

5      Q    And do you know whether he was asked to leave?

6      A    I don't believe so.

7      Q    Now, Dr. Hundahl was sued in a Bonzani case.

8  Are you aware of that?

9                (Reporter clarification)

10          MR. HOYER:  Bonzani, B-o-n-z-a-n-i.

11          THE WITNESS:  Yes, I'm of that.

12  BY MR. HOYER:

13      Q    Okay.  Did the VA pay the resulting judgment

14  against Hundahl?

15          MS. SMITH:  Objection.  Assumes a fact not

16  established.

17  BY MR. HOYER:

18      Q    You can answer.

19      A    I don't know.  I -- I'm not actually sure

20  that -- that -- that -- that the -- the -- the . . .

21  that there was a financial settlement against Hundahl.

22      Q    And do you know where -- what that case

23  involved?  What were the allegations?

24          MS. SMITH:  Objection.

25  BY MR. HOYER:

Atkinson-Baker, a Veritext Company
www.depo.com

1       Q     You can answer.

2       A     The case actually occurred before my time as

3    medical center director.

4       Q     Yeah.  My question is, Are you aware of what

5    the allegations were?

6              MS. SMITH:  Objection.

7              THE WITNESS:  My general understanding was

8    that the -- Dr. Bonzani was claiming that he was let go

9    from the VA inappropriately.

10   BY MR. HOYER:

11      Q     And was it -- were there allegations of

12   discrimination?

13             MS. SMITH:  Objection.

14             THE WITNESS:  I don't recall.

15             MR. HOYER:  All right.  Why don't we take a

16   five-minute break?  I think I'm almost done with my

17   questions, but I want to make sure that my -- my notes

18   don't have any other questions.  So let's come back at

19   2:15.

20             MS. SMITH:  That's fine.

21             MR. HOYER:  Thanks.

22                  (Break taken from 2:07 p.m. to

23                  2:17 p.m.)

24             MR. HOYER:  I don't think I have any other --

25   for -- any other questions for you, Mr. Stockwell.

Atkinson-Baker, a Veritext Company
www.depo.com

1  Thank you for your cooperation today.

2          MS. SMITH:  There's two points that we need to

3  clarify.

4          Did you tell Mr. Graham or Mr. Mastalski that

5  you expected them to take action with regard to

6  clarifying the site manager role?

7      A    No.

8          MR. HOYER:  Leading.

9              (Reporter clarification)

10         MR. HOYER:  Yes, leading was the objection.

11         MS. SMITH:  And the record has his answer?

12         THE REPORTER:  [Nodding].

13         MS. SMITH:  Okay.

14         Is there anyone who has clinical oversight

15  duties for a whole clinic?

16         THE WITNESS:  No.

17         MS. SMITH:  And why not?

18         THE WITNESS:  That's chief of staff's

19  responsibility for the organization.

20         MS. SMITH:  Okay.  That's the two points that

21  we needed to clarify, so thank you.

22         MR. HOYER:  All right.  I think we're done for

23  today.

24         MS. SMITH:  Thank you.

25              (Discussion off the record)

1          MS. SMITH:  We're requesting a copy to review

2   and sign.

3          THE REPORTER:  Would you like to order a copy?

4          MS. SMITH:  Yes, but I have to get budget

5   approval before I can, and I can coordinate with your

6   office.

7          THE REPORTER:  Are we off the record?

8          MR. HOYER:  No.  Well, yeah.  Let's -- let's

9   go off the record.

10          (The deposition concluded at 2:19 p.m.)

11                     --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, DAVID STOCKWELL, do hereby certify, under

4     penalty of perjury, that I have read the foregoing

5     transcript of my deposition taken on May 4, 2021; that I

6     have made such corrections as appear noted on the

7     Deposition Errata Page, attached hereto, signed by me;

8     that my testimony as contained herein, as corrected, is

9     true and correct.

10          Dated this _____ day of _____,

11     2021, at _____, _____.
                          (City)                           (State)

12

13                    _____

14                    DAVID STOCKWELL

15

16

17

18

19

20

21

22

23

24

25

Atkinson-Baker, a Veritext Company
www.depo.com

1        CERTIFICATE OF REPORTER

2        I, Quyen N. Do, CSR No. 12447, a Certified

3  Shorthand Reporter, hereby certify that the witness in

4  the foregoing deposition was, by me, duly sworn to tell

5  the truth, the whole truth, and nothing but the truth in

6  the within-entitled cause;

7        That said deposition was taken down in

8  shorthand by me, a disinterested person, at the time and

9  place therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12        That before completion of the deposition,

13  review of the transcript [X] was [ ] was not requested.

14  If requested, any changes made by the deponent (and

15  provided to the reporter) during the period allowed are

16  appended hereto.

17        I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto.

22

         DATED:  July 16, 2021

23

24  _____

         Quyen N. Do, CSR No. 12447

25

Atkinson-Baker, a Veritext Company
www.depo.com

Index: --ooo--..appointing

**-**

**--ooo--** 5:4,11
73:20,23 106:11

**-32** 60:6,8

**1**

**1** 58:16,17 60:8,
11 72:20 73:18

**10** 93:20 98:14

**11:28** 51:14

**11:40** 51:7,12

**11:42** 51:15

**12** 11:20 12:5,9
70:1

**12:27** 73:22

**12:30** 51:8

**1994** 12:23 13:3,
25

**1:03** 73:22

**2**

**2** 58:18 69:2,7
81:9 95:4,6

**20** 16:15 17:11,
25 62:13 65:11

**2001** 14:1

**2013** 11:7 12:3,
20 14:3,6,18
32:19 36:1

**2016** 91:4

**2017** 21:18
25:11,19 27:7
28:5 29:10,15,
16,17,19

**2018** 58:18 69:3
70:1

**2019** 72:20

**2021** 5:2

**250** 20:11

**2:07** 104:22

**2:15** 104:19

**2:17** 104:23

**2:19** 106:10

**3**

**3** 70:1,4

**4**

**4** 5:2 72:19,22

**4,500** 11:24

**40** 96:23

**40,000** 11:20

**5**

**5** 69:3 74:24 75:9

**6**

**6** 75:24 80:23,25
81:8

**7**

**7** 73:6,12

**9**

**9:46** 5:2

**A**

**a.m.** 5:2 51:14,
15

**abbreviated**
67:6

**abbreviation**
10:14

**ability** 8:13
51:24 66:13

69:14 86:1

**above-listed**
76:25 77:4

**acceptable**
10:20

**accomplish**
80:4,16

**accomplishme
nts** 35:10

**accuracy** 96:24

**accurate** 35:19
85:14

**accurately**
99:22

**accused** 90:15,
18

**achieving** 88:18
89:7,15

**acquisition**
13:9

**acronym** 10:16
87:23

**action** 21:22
27:20,21,22
28:19 29:23
30:2,24 33:11
34:1 78:25 94:11
105:5

**activities** 45:21
62:19 63:25
67:22 74:14 93:7

**activity** 45:3
50:12 75:25
91:18 94:7,10

**Addagatla** 8:24,
25 84:25 85:11
86:9

**added** 100:14

**addition** 36:24
57:23

**additional**
16:21 50:11

**address** 33:3

**addressed** 28:4
49:8

**adjudicate** 68:6
69:12,19,21

**adjudicated**
68:12

**admin** 86:10,12
87:10

**admin[istrative**
62:21

**administrative**
22:13 36:23
37:6,7,9,12,14,
15,20,23 53:16,
20 57:6 62:11,20
63:4 64:1 69:15,
16 70:24 71:2
86:5,6,19 89:19

**administrativel
y** 63:19

**admirable** 44:9

**advantage**
95:13

**adverse** 30:24
34:15,18,21

**adversely** 51:24

**advocacy** 44:9
100:20

**advocate** 38:6
99:13,17

**advocating**
48:3 99:24

**Affairs** 10:11

**affect** 8:12 51:24

**affidavit** 74:23,
25

**age** 76:16

**agency** 76:19

**agents** 76:5

**aggressive**
58:3

**agreed** 73:6

**ahead** 75:13

**Air** 38:13

**Alaska** 13:19
14:1

**align** 88:14

**alignments**
87:13

**allegations**
6:10 76:12,15
101:25 103:23
104:5,11

**alleged** 91:5,10

**allocating** 22:14

**allocation** 24:20
63:2

**allowed** 9:20
84:8

**alternative** 84:2

**alternatives**
28:13

**Alto** 41:2,13

**amended** 7:18

**Amtrak** 50:13

**answers** 7:20

**anticipate** 8:6

**antidiscriminati
on** 38:6

**antimanageme
nt** 45:6 48:5,7,19
49:23

**appeared** 49:22

**applicants** 39:3,
14

**application**
43:4

**apply** 38:24
66:13

**appointed** 68:5
69:21

**appointing**
69:18

Atkinson-Baker, a Veritext Company
www.depo.com

**appointment**
8:20

**appreciates**
70:23

**approach** 40:9
94:22

**approval** 106:5

**approximately**
6:1 17:23 20:9
21:14,18 23:25
32:19 62:13

**area** 97:17

**areas** 24:21

**arise** 32:20

**arising** 24:22

**arrangement**
19:25

**arrival** 33:12

**arrived** 29:14
79:7

**articulate** 44:21
56:4

**articulated**
42:15

**assign** 63:25

**assigned** 61:25

**assignment**
58:20 62:10

**assist** 44:12

**assistance**
102:12,14,18

**assistant** 12:16
13:9,18 63:18
64:21 65:17
66:6,9,10,17,22
70:19

**assisted** 99:9
102:9

**associate** 12:13
13:18 15:4,7,12
32:24 57:20
74:17 79:15,25
83:5,17 84:16

86:21 87:19
88:15

**Assumes**
103:15

**attaching** 67:23

**attachments**
60:17

**attention** 20:6
62:9

**attorney** 7:15
9:6,8,10,23 10:4

**attorney-client**
9:9

**attractive** 42:8,
22

**audience** 49:6,
22

**availability**
49:11

**average** 52:10
92:13

**avoiding** 83:9
88:19 89:8,16

**aware** 15:20,25
25:25 34:17
36:21 38:1,5,12,
24 39:2 52:21
57:24 77:1 85:3,
11 86:6,11 91:3
99:4,9,13 102:8,
11,14,17 103:8
104:4

**awareness**
99:16

———

**B**

**B-O-N-Z-A-N-I**
103:10

**back** 14:18 43:3
45:5 51:16 73:9,
18,24 77:14
82:23 104:18

**back-channel**
46:14

**background**
10:10

**BART** 50:13

**base** 17:12

**based** 17:13
29:20 42:18 58:6
59:11 76:16
90:19,24 93:2,8,
22 95:11

**basically** 72:8

**basis** 24:5 88:11
93:16,24

**Bates-stamp**
60:6

**Bay** 15:7,9

**beginning**
101:11

**behalf** 100:20

**benefit** 40:11

**bit** 10:9 73:16
82:2

**block** 31:23

**board** 87:12,15

**Bonzani** 103:7,
10 104:8

**book** 95:8

**booklet** 7:15

**bottom** 71:3
75:22

**breadth** 95:22

**break** 8:1,2,4
51:7,14 73:17,18
98:2 104:16,22

**breaking** 8:5
79:17 80:8

**bring** 71:5 95:23

**brings** 95:22

**broad** 39:12

**broke** 83:16

**brought** 42:23

**budget** 106:4

**buildings** 62:22

**bunch** 79:6,9

**bus** 50:13

**busing** 49:10

———

**C**

**Cahill** 52:22
56:17 62:2,4
73:3

**Cahill's** 72:14

**calculate** 92:24

**California** 5:1,7
11:4,21 13:5
17:18,20,24

**call** 10:1

**called** 10:18
87:11

**calls** 16:10
56:25 63:10
67:12,17 71:12
79:3,11 83:22
84:9,17 88:25
89:11 96:17

**campus** 22:14
23:7 27:2 32:24
35:8,18 44:11
49:3 55:2,18
65:19,20

**campuses**
55:25

**candid** 63:5

**candidate** 40:1,
5,24,25 41:5,14
42:8,11,19,22

**candidates**
40:6,13,15,23
41:8 43:7

**capable** 64:1

**care** 11:4,19,20,
21,25 13:7 17:14
53:25 66:15
86:10,13

**cared** 44:7,10

**caring** 44:4

**case** 6:4,5,6,10,
11,12 7:23 8:24
22:5 76:7,11,13,
18 99:14 100:17
103:7,22 104:2

**cases** 76:9
91:13,17 94:1,9,
19

**categories**
90:24 93:8,22
97:19

**categorization**
95:22

**category** 90:19
94:10 95:23

**center** 11:3,9,10
14:7 19:23 20:6
26:9,25 38:22
50:14 65:20 76:8
82:17 104:3

**CEO** 92:4

**Certified** 5:7

**change** 34:11,
14,16,19 45:4
58:20

**changed** 7:19
12:2,20 46:9

**channels** 45:5

**characteristics**
93:3

**characterizatio
n** 21:22 41:20

**charge** 22:16

**chat** 9:18,25

**chatting** 10:5,6

**chief** 12:12,13,
14 13:9,14,15
19:18 38:25
40:21 43:4,9,12
52:23 53:18,19,
24 54:1,8,9,11,
18,25 55:5,9,17,
25 56:13,23

David Stockwell
May 04, 2021

Atkinson-Baker, a Veritext Company
www.depo.com

57:13,14 62:2
63:19 66:4,6,9,
11,17,22 68:20
69:16 70:19 71:2
72:6 73:13 74:6
105:18

**chiefs** 64:21,22
65:1,4,13,17

**choice** 28:10

**chose** 69:11

**circumstances**
12:24 14:5,17
42:6 45:13 66:25

**cited** 66:19

**claim** 76:23
99:10

**claiming** 104:8

**claims** 91:20

**clarification**
64:13 69:6 74:9
87:21 89:25
98:21 103:9
105:9

**clarified** 74:2
90:2

**clarify** 22:2,11
51:20 78:5,13,
22,25 83:3 92:3
105:3,21

**clarifying** 33:3
74:11 77:11,25
78:18 83:5 105:6

**clarity** 16:20
22:18,22 23:1,20
24:23 25:16 27:3
28:2 31:18 32:23
34:8 36:7 55:22
57:21 66:16
67:10 74:14 79:7
88:18,19 89:7,15

**CLC** 62:24
64:12,17 65:20,
23

**clear** 23:6,9,10

**clinic** 57:4
105:15

**clinical** 36:24
54:4,7,24 57:7
62:11,22 63:3,21
64:24 67:22
69:14 70:20,24
86:1 99:18
101:1,2 105:14

**clinically** 63:6,8

**clinician** 44:4
85:25

**clinicians** 85:4,
6,13,15,23

**clinics** 51:1
99:19

**close** 30:3 41:15

**CMO** 54:24

**comment** 7:22
63:14

**commitment**
33:18 34:4 39:4
40:16,20 52:9
87:11

**committee**
87:16,18 88:3,5
98:9

**communication**
9:20 31:22

**communications** 32:14 62:6

**community**
65:19 97:21

**comparative**
52:15

**complainant**
76:20

**complained**
46:16 57:25

**complaint** 81:2
90:5,23 102:12,
15,18

**complaints**
38:3 45:1,3,9
46:3 102:9

**complete** 77:7,
19

**completing**
37:13

**compliance**
12:14,15

**component**
42:14 79:19

**Compound**
48:13 91:14

**concern** 71:5
100:1

**concerned**
94:3,7

**concerns** 45:6
51:4 54:23 79:1
95:16 96:12
100:11,12
101:17

**concluded**
106:10

**conclusion**
70:22 80:16

**concur** 73:12

**concurred**
88:10

**concurrence**
88:12

**conducted**
70:11

**conference**
10:7

**conflicts** 57:10

**confused** 61:6

**confusing**
26:24 28:15 37:1
52:17 93:17

**confusion** 23:1
24:18 36:21
37:21 88:14

**connect** 70:11

**connection**
90:5

**connections**
40:8 42:21

**consistency**
55:22 56:2,3,20,
22

**consistent**
47:22 57:12

**consolidated**
84:16

**construction**
62:21

**contact** 13:2,24,
25 14:2,5,10
15:14

**contends** 85:14

**contention**
85:3,6,12

**contentions**
85:22

**contest** 8:3

**context** 7:1
26:10 46:23

**continue** 43:1
91:22

**continues** 44:8

**contract** 22:14

**contracts** 24:20

**contributions**
35:20

**conversation**
6:23 19:1,7 22:1
27:7,9,11 28:5
29:10,15,21,22
30:1,5,8 31:4,7
32:4,18,20,21,22
33:12 35:21
36:1,5,12,15,18
53:11 55:10
78:17 83:4
89:17,20,22,24

**conversations**
18:12,18,21
20:14,18 26:19
29:11 32:9,12,17
35:23 53:1,8
68:23

**convicted** 102:3

**cooperation**
105:1

**coordinate**
63:21 65:24
66:23 106:5

**coordinated**
66:9

**coordinating**
49:21 63:17

**coordination**
62:11,24 64:17
65:5 66:7,18
67:22 71:9 72:5

**copy** 106:1,3

**corner** 9:1

**corporate** 13:4
46:24

**correct** 26:1,11
27:17 29:23
33:19 37:6,24
38:7 40:13 43:13
62:6 65:2 68:21

**corrective**
94:11

**correctly** 73:12

**counsel** 7:3
8:17 20:22 83:2

**couple** 6:21
8:17 15:18 42:23
75:24 83:3 89:20

**court** 7:8,13
76:21

**COVID** 12:6

**COVID-19** 42:4

**create** 83:25

**credence** 47:7

**credentials**
99:22

**criticism** 45:20

**criticisms** 49:7,
9

**criticize** 42:11

**critique** 42:17

**current** 11:17
14:19

**D**

**data** 98:1

**date** 65:16

**dated** 58:18 69:2

**dates** 5:25 91:7

**David** 5:12 21:2
24:13 38:22
74:25

**Davis** 40:9 42:21

**day** 8:6 19:22
20:5,13 92:21

**day-to-day** 93:7

**deal** 65:5

**December** 70:1
91:3

**decision** 30:13
31:17 34:25
61:11,23 68:14,
16,17 76:16,19
80:6 87:1,10
88:6

**decision-maker**
54:5 74:15,16
77:5,17 87:4,6

**decision-
making** 99:23

**decisions** 22:14
45:23

**declared** 20:7
69:10

**declaring** 77:8,
21

**deduced** 17:25

**defendant** 6:13

**define** 95:21

**degrees** 79:20

**deliberate**
99:23

**demographic**
97:17

**demonstrated**
48:24

**department**
10:11 40:9,10
42:25 69:17

**departments**
63:22 79:18

**departure**
101:17

**depending**
65:13

**depends** 67:2

**depictions**
45:24

**deposition** 5:8,
21 6:16 7:21
10:13 61:18
106:10

**depositions**
9:13

**deputy** 11:10

**describe** 11:13
29:9

**describing**
42:25

**description**
41:25

**design** 62:20

**detail** 46:6
98:19,25

**details** 31:3
100:8

**determine**
94:11

**detract** 86:1

**develop** 65:23
88:1

**development**
62:23 64:11,17

**diagnostic**
66:12

**dialogue** 31:14,
16,19,24 55:3
62:2 87:15

**difference** 17:3
37:11

**differentiate**
63:18

**difficult** 24:25
47:1 48:2

**diminish** 52:6

**dining-room**
17:4,7,9

**direct** 10:4 12:7,
19 14:24 27:13,
16,17 62:8

**directed** 66:20

**directer** 76:8

**direction** 28:9
55:23 75:11 81:4

**directly** 18:4
52:24 68:25
89:14 94:2

**director** 11:3,10
13:19 14:7 15:7,
12 26:9 32:24
38:15 57:21
74:17 79:15,25
83:6,17 84:16
88:15 104:3

**director's** 86:22

**directors** 12:13
15:4 87:20

**dis-** 45:19

**disagreement**
31:22

**disaster** 22:17

**discriminated**
58:6

**discriminating**
90:18

**discrimination**
6:10 18:13 77:9,
22 81:2 90:12
92:1,10 93:2,8,

22 94:7,19,23
95:7,12,15,20
96:2,8,12 98:11
104:12

**discrimination-
free** 94:13

**discuss** 19:25
29:13 53:18
54:10 61:8,21
73:3,13 96:14

**discussed**
25:16 53:12
54:8,9 61:17

**discussing**
22:2

**discussion**
25:11 38:14
54:17,20 60:21
61:15 62:3 73:2
90:12 105:25

**discussions**
9:10 24:9 54:21
62:6 76:8 87:9
91:19

**disorganization**
45:14

**disorganized**
45:2,20,23

**disparaged**
57:25

**disparities**
97:16

**disparity** 97:23

**displeasure**
34:25

**dispute** 95:11

**disputes** 92:20
93:2

**distinction**
37:11,17 54:4

**distraction** 34:3

**distribution**
99:20 100:1

**diversity** 12:17
18:16 38:6 97:3,

10

**divide** 57:6

**division** 10:15

**doctors** 14:10

**document** 8:21,
23 58:12,13,18,
21,23 59:3,6,11,
14,23 60:4,5,13
69:4 72:24 74:24
75:1,7,19 80:25
81:6 82:10,18,24
89:18,24

**documents**
8:15,18,19 9:2

**Dow** 102:15

**dream** 83:25

**due** 36:22 71:8
72:4

**duly** 5:13

**duplication**
74:13,16 83:10
88:20 89:8,16

**duplicative**
88:13

**duties** 11:14,17
12:2 14:19,23
15:6 51:23 54:1
57:6 69:15,16
70:20 77:11
78:1,5,13,18,25
79:25 80:8
83:16,20 84:7,
13,20 85:25
86:11,13 92:1
97:2 105:15

**E**

**e-mail** 9:19
59:25

**e-mails** 25:2

**earlier** 24:2
60:20 61:18,24
86:16 89:18
97:15

**early** 29:16

**east** 15:7,9 72:15

**easy** 10:21 34:11,14

**EEO** 8:22,24 12:16 38:2 75:25 76:7,9 81:1 90:23 91:19 93:24,25 94:10, 15 97:15,19 99:5,10,14 100:17 102:9,12, 15,18,22

**effect** 51:19 92:4

**effectively** 32:2

**efforts** 38:6 83:10 88:13

**eight-page** 81:5

**eliminating** 88:13

**emergency** 22:16 24:20

**employed** 16:1

**employee** 6:6 17:18 49:2 86:21 87:22,24 90:16, 19 95:8,13,17, 19,25

**employees** 11:24 12:25 14:8 23:13 31:21 38:2 70:11 86:17 92:11 94:2 96:7 97:13

**employer** 10:10

**employment** 97:17

**encourage** 31:14 36:8 97:2

**encouraged** 62:1

**endeavor** 7:1

**endurance** 8:3

**engage** 91:18

**ensure** 92:1,10 93:21

**ensuring** 93:7 98:10

**ENT** 42:25

**entire** 11:25 58:23 59:3,11 66:14

**entirety** 59:23

**entitled** 17:10 74:24 81:1

**environment** 94:14

**equipment** 5:8

**equity** 12:17

**equivalent** 86:21 87:23

**established** 103:16

**estimate** 16:3,7 17:3,5,8,10,12 18:7 93:20 95:21 96:21 98:15,16, 24

**evaluated** 52:21

**evaluation** 42:11

**event** 76:25 77:4

**events** 23:15,22 24:24,25

**eventually** 34:1 50:11

**exact** 17:6 21:13 49:20 72:6

**examination** 5:16 63:3 74:21

**examined** 5:13

**examiner** 8:20

**examiner's** 73:7

**examples** 47:3

63:14 94:12

**executive** 12:16 13:6 22:3 25:17 26:25 74:11 94:8 98:9

**exhibit** 58:17 60:8,11 69:1,2,7 70:1,4 72:19,22 73:16 74:24 75:9 80:23,25 81:8 83:1 84:24

**expect** 27:19,20 57:8 64:4,20,21 65:23

**expectations** 22:15 74:17,18 79:18 83:16

**expected** 27:1, 22 105:5

**experienced** 22:25

**experiences** 26:18

**explain** 56:1

**exploring** 100:11

**exposure** 99:6, 11

**extent** 16:13 33:20 85:25 97:7 102:4

**F**

**facility** 72:15 91:5,9,23

**fact** 7:22 20:4 36:22 103:15

**factors** 40:10

**fair** 17:2 18:3 34:4 43:11 44:19 59:10 78:21 90:9 93:1 99:20

**fairly** 30:3

**fall** 29:17

**fashion** 67:6

**favorites** 45:2, 10

**February** 72:20

**feedback** 22:21 39:20,22,24 40:15,22 42:12 44:14,17 45:11 46:19

**fellow** 12:18

**figure** 17:25 92:21 97:20

**figuring** 67:11

**filed** 53:16 90:23

**filled** 55:1 76:4

**final** 76:19

**finally** 98:8

**finances** 11:24

**financial** 103:21

**find** 44:6

**fine** 24:16 51:10 73:19 85:19 90:2 104:20

**finish** 7:1

**five-minute** 104:16

**fix** 7:20

**fixing** 49:25

**focus** 33:6,15

**focusing** 33:17

**Folks** 66:12

**follow** 46:24

**Force** 38:13

**Forest** 102:17

**Forest's** 102:18

**Forget** 84:13

**form** 49:5

**formal** 58:19 60:5

**formed** 41:12 48:20

**forward** 16:22 29:14 32:1 41:24 43:1

**found** 37:21 76:19

**founded** 100:21, 25

**fourth** 36:15

**frame** 21:13 50:8 86:25 87:8

**fraud** 101:25 102:3

**Friday** 95:4,6

**frustrated** 99:18

**FTEE** 86:20 87:12,16

**full** 26:16

**full-time** 20:16 86:20 87:22,24

**Fuller** 40:3,4 41:1

**Fuller's** 41:16

**fullest** 8:11

**function** 9:18,19 43:23 52:6 64:1 66:6

**functioned** 62:10

**functions** 9:19 15:8 63:6,8,13 64:5,7,24

**funded** 42:24

**G**

**game** 41:23 42:2,13

**gave** 8:17 32:4 39:20,22 40:15, 23 41:8 42:12 43:7 45:24 47:3 61:25 80:3

Atkinson-Baker, a Veritext Company
www.depo.com

**gender** 76:17

**general** 17:15, 17 31:5 38:20 42:16 57:3 104:7

**generally** 6:9 11:13 29:16 32:13 42:13 43:4 48:9 51:1

**give** 7:3 8:2,10 16:3,23 17:5,8 18:7 39:24 40:22 41:11 46:18 47:6 58:22 59:2 96:21

**giving** 17:3 44:13,16,17 45:11

**go-getter** 47:18

**goal** 56:14,20

**good** 5:6,19 10:19 30:18 73:17 81:19 101:18

**gosh** 80:7

**Graham** 10:13 21:2,5,12 22:6 24:10 25:11 27:7 29:20 32:9,23 33:12 34:1 37:10 60:21 63:4,22 73:12 78:5,13 83:4,15 87:8,20 105:4

**Graham's** 21:19 68:16

**grandeur** 35:18

**grant** 38:22 68:17

**great** 59:17

**Green** 35:2,4,6

**grievance** 8:20 53:16,21 54:16 58:20 60:5,20 61:9,12,22,23 65:10,16 67:24 68:6,12,15,24 69:12,19 73:7 74:5 89:19

**grievances** 69:22

**grievant** 61:24

**ground** 6:15

**group** 94:6 96:6, 7

**grow** 41:24 42:14 43:1

**growing** 42:4

**guess** 16:17,22 17:8,16,21 24:2 29:19 58:25 96:24,25

**guessed** 17:13

**guessing** 17:3

**guys** 61:6

**H**

**half** 51:6

**hall** 49:2,13,18 90:10,14 96:10, 13

**hang** 88:16

**happen** 86:24 98:10,11

**happened** 25:11 87:8 100:16

**happy** 7:20 8:2 59:6

**harassed** 91:6, 10

**harassing** 90:16

**harassment** 6:10 18:14 91:20

**hard** 92:23 95:21

**hard-working** 100:9

**harmed** 57:22

**hated** 35:10

**head** 7:10 16:17

**health** 11:4,19, 21,25 13:7 17:14 66:14

**Healthcare** 13:19

**hear** 9:24 41:25 43:24 44:2 45:15,21 58:2 67:23 68:6

**heard** 38:14 44:22 46:4 58:2, 5

**hearing** 31:24 45:12

**heart** 100:10

**held** 5:8

**helped** 38:2

**helpful** 6:25 7:3 37:10

**helping** 102:21

**hey** 36:6

**Hill** 13:5

**hire** 43:9 87:13

**hired** 14:7 50:11

**hiring** 76:16

**Hispanic** 15:20, 25 16:7 17:24,25

**Hispanics** 17:15

**historical** 47:17

**Hold** 72:18

**holding** 79:16

**home** 65:20

**hope** 31:21,24

**hospital** 19:24

**host** 49:3

**hour** 51:6

**hours** 92:21 94:2,22 95:2,14, 19 96:1

**Hoyer** 5:18 9:24 10:2 11:16 12:1 14:14 15:10 16:5,11,21 17:1 19:11 20:23,25 21:16,23 23:4 24:14,17 25:9, 14,22 26:3,22 27:24 28:7,16 29:8 30:10,21 31:1,12 32:7 33:22 34:9,22 35:15 37:2 38:9 39:10,18 40:18 41:10,21 43:20 46:11 47:9,15 48:11,14,22 49:15 50:5 51:5, 11,16,17,22 52:2,18 53:5,7 55:7,12 56:7 57:1,17 58:8,17, 21,25 59:5,8,12, 13 60:9,12,23 61:2,7,10,19 64:8,11,14 65:9, 10,15 67:7,14,18 68:7 69:7,8 70:9, 15 71:24 72:16, 23 73:24 74:3,22 75:6,8,10 77:13 78:3,8,20 79:4, 12 80:5,12,17,20 81:6,7,17,19 82:9,14 84:10,18 85:8,20 86:23 87:5,25 88:8,23 89:1,13 90:3,21 91:15,16 92:8, 16,25 93:11,14, 18 95:5 96:5,18 97:5,11 98:4,7, 18,22 100:6,18, 23 101:5,10,13, 23 102:7 103:10, 12,17,25 104:10, 15,21,24 105:8, 10,22 106:8

**HR** 93:25 94:18

**human** 97:20

**Hundahl** 18:19, 22 19:5 20:14 38:17,18 46:18

57:25 58:3,5 103:2,7,14,21

**hypothetically** 84:3

**I**

**idea** 15:23 28:18,21,24 84:20

**identified** 73:6

**identifying** 79:19

**immediately** 30:1

**implemented** 42:2

**implying** 67:21

**important** 6:21 33:15 63:18

**impossible** 67:6

**impression** 29:3 39:7 42:18

**impressions** 43:16,19

**improve** 66:14

**inappropriately** 49:12 104:9

**inches** 17:7

**incidence** 26:15

**incident** 101:7

**include** 11:22

**included** 39:5 53:11

**includes** 64:16

**including** 34:25

**inclusion** 12:17

**inconsistent** 45:23,25 46:2 56:14,23

**incorrect** 35:12

Atkinson-Baker, a Veritext Company
www.depo.com                    Index: increase..management

85:21

**increase** 50:12 97:12

**indication** 97:22

**individual** 32:25 49:20

**individuals** 15:8 22:18 23:16 34:24 39:25 64:23

**infinite** 79:22

**information** 16:23 17:12 51:18

**informing** 30:12

**initial** 25:10

**initiate** 19:7 30:4

**initiated** 32:21, 22

**instances** 15:16 26:12 36:20 46:4,8,15

**instruct** 78:18

**instructed** 61:3

**instructions** 80:3

**instructs** 7:5

**interacted** 14:17

**interacting** 94:5

**interest** 100:10

**interested** 19:15,20 83:9

**interesting** 49:23 50:17

**interface** 63:1

**interfere** 57:15

**interpretation** 56:5

**interpreted** 56:3,22

**interrogatories** 76:5

**interview** 39:8, 15 42:18

**interviewed** 39:3,15 40:12 42:12 43:7 54:3 70:13 82:19 90:4

**interviewing** 39:5

**interviews** 70:10

**investigation** 8:22 91:13

**investigative** 80:24 81:1 82:16

**investigator** 82:20 84:24

**involve** 34:3 93:2

**involved** 23:24 64:23 76:7 92:19 103:23

**involvement** 77:3 87:1 91:12 99:14

**involvement/ knowledge** 76:24

**involving** 6:6 18:13,16 76:11

**issue** 24:9 25:3, 6 26:17 29:12 32:10,14,17 33:2,16 35:22 37:22 54:18 57:20 87:17 89:15 98:10 99:5

**issued** 82:12

**issuery** 25:2

**issues** 63:1 96:8,14

**item** 38:14 75:24

———

**J**

**job** 11:2,11,13, 17 12:2,10,20 13:8,11,13,20 14:20 23:17,19, 23 35:8 39:4,13 44:6 72:9 91:25 92:19,22

**jobs** 87:13

**Jon** 35:2

**judgment** 103:13

**jump** 6:24

**jury** 7:23

**justification** 89:9

**justify** 83:21 88:20

———

**K**

**kind** 6:4 33:13 54:24

**knowledge** 25:4 47:17

———

**L**

**lack** 22:18,20,22 23:1 24:22 27:3

**lacking** 23:20

**landed** 84:2

**large** 69:17

**larger** 71:6,16 72:2

**late** 29:17

**lawsuit** 38:23

**Lazzarino** 99:6, 11 101:3,8,9,24

**Lazzarino'** 101:17

**leader** 13:6 40:10 54:4

**leader/clinical** 57:23

**leaders** 64:23

**leadership** 35:10 49:6,7 54:24 57:11,22 62:18 65:21,22 66:13 94:8

**leading** 11:23 23:7,20 30:9 66:1 105:8,10

**leads** 65:17

**leave** 101:4,24 102:2 103:5

**led** 14:5 101:17

**Lee** 102:11,12

**left** 14:1 103:2

**legal** 8:17

**length** 17:4,9

**letter** 10:17 67:13,21

**letters** 9:1 10:23

**list** 67:6 70:10 79:14,15,24 80:8 83:16,25 84:1, 12,13

**listed** 63:14

**living** 65:19

**located** 13:4 65:2,14,18

**location** 15:11, 17 23:21 54:7 71:8,17 72:3,11

**locations** 71:6 94:6 96:10

**logic** 18:1

**long** 7:7 11:5,11 13:11,15,20 18:24 25:19 27:6 29:25 31:6

**longer** 73:16

**looked** 59:20 82:24

**Lorrie** 53:24 61:25 68:9 69:3

**lot** 33:16 34:3 86:4

**Lots** 37:7 92:19

**low** 97:18,24

**lower** 8:25

**lumped** 60:4

**lunch** 8:5 51:8 73:17 83:2

**LUNCHEON** 73:21

———

**M**

**machine** 6:19

**made** 7:22 19:5 28:10 37:10 42:8,21 54:4 61:11 76:12,16 80:6 88:14

**mailed** 82:22

**make** 7:16,21 25:12 26:15 31:9 44:6 56:10 57:11 70:22 71:16 88:6 89:4 94:13 104:17

**makes** 24:24 72:2

**making** 44:9 56:12 61:20,23 68:20 92:22

**males** 96:16

**manage** 14:25 47:2

**management** 11:22 12:14 13:10 15:6 22:15,16 24:20 49:20,22 69:13 76:6 78:19 85:3,

5,14 86:18
87:12,15 90:5

**management's**
85:12,22

**manager** 12:17,
18 14:23 15:12
20:19 21:20
22:4,5,9 25:18
29:2 32:25 34:2
37:22 43:15,25
49:4,19,25 50:18
51:2,19,24 52:7,
11 54:6 57:20
62:18 63:20,21
64:22 67:9,10
74:11,19 77:11
78:1,6,14 79:2,
17 80:1 83:6,15,
18,21 84:22
85:1,25 86:7
88:21 89:9 90:11
93:25 94:16
97:16,19 105:6

**managers**
14:20 15:1
52:14,16,20
85:4,6,12,15,23

**managing**
92:20

**mark** 69:25
74:24

**marked** 60:11
70:4 72:22 75:9
81:8

**marking** 58:16
72:20 80:25

**Martin** 99:5,10,
14,18 100:9,20
101:7

**Martin's** 99:5,
11,25 100:3
101:17

**Martinez** 5:1
22:13 23:21 27:2
32:24 35:8,18
37:22 44:11 49:3
54:5 55:2,18
56:13,24 57:23
62:12 65:3,5,18

**71:6,17 72:3
74:12 77:12 78:2
86:22 90:10
91:4,9,23

**Mastalski** 21:2,
9 24:13 32:16
33:1 35:22 87:7,
20 105:4

**Mastalski's**
33:13

**material** 13:10

**Mather** 72:15

**Matter** 81:1

**meant** 31:18
55:1,5 56:1,3
67:13,16,20,25

**mediations**
94:1

**medical** 11:3,9,
10 14:7 19:23
20:5 26:9,25
38:22 50:14
53:19 54:2,25
55:5,17,25
56:13,23 57:15
62:3 68:21 71:7,
17 72:3 74:6
76:8 82:17 104:3

**medications**
8:12

**medicine** 63:1
64:18 65:6,18,25
66:8

**meet** 12:22
14:20 93:24
94:15,18

**meeting** 14:9,22
15:18 49:13,18
87:16 90:14
93:25 94:9,20
96:13 98:9

**meetings** 13:6
49:3 90:10 94:6
96:6,7,10,13

**member** 49:22
50:12 96:11

**memo** 69:2 70:1
72:20

**memory** 6:16
8:12 61:21

**memos** 25:2

**memos/e-mails**
25:5

**mentioned**
42:20 48:5 95:11
97:14

**metrics** 52:15

**middle** 94:4

**miles** 11:20

**milieu** 95:24

**mind** 23:14 28:3,
13,22 35:13 45:4
46:9 47:23 83:19
84:14 89:9
101:14

**minimum** 94:17

**minorities**
102:22

**minority** 97:13

**minute** 75:2

**misrepresent**
42:10

**missed** 82:2

**missing** 10:17

**mix** 65:3 71:8
72:4

**moment** 26:8
82:11

**monitor** 97:14

**month** 29:18
92:17 94:17
95:13

**monthly** 94:20

**months** 15:19

**morning** 5:6,19,
20

**move** 32:1

**moving** 41:23

**multiple** 23:24
24:4,6 71:8 72:4

**N**

**named** 6:13
74:18 76:6,11

**names** 23:16
45:17

**narrower** 93:5

**narrowly** 62:19,
22

**nature** 49:11
76:15

**needed** 49:8
73:13 105:21

**negative** 44:19
46:18,22

**negatives** 43:25
44:22

**nice** 39:13

**nodding** 7:10
105:12

**non-physician**
63:5

**nonverbal** 7:9

**Norcal** 10:18,24
13:1,14 14:21
16:1 18:1 19:3
20:10 23:13
29:20 36:21 38:7
42:5 52:14 74:6
77:11 78:1 92:4
93:12 96:16
97:3,23 103:2

**north** 97:23

**northern** 11:4,
21 12:25 17:18,
20,24

**notes** 25:1
104:17

**noticed** 26:8

**November** 69:3

**nuanced** 66:25

**number** 16:19
17:6,13,25 18:6
76:4,9 79:22
86:17

**numbers** 9:1
97:13

**nurse** 12:12

**nursing** 65:20

**O**

**object** 24:15
85:17

**Object-** 80:11

**objected** 90:1

**objection** 11:15
14:12 15:2 16:4,
10 19:8 20:21
21:15,21 23:2
24:12 25:7,13,21
26:2,21 27:23
28:6,15 29:5
30:9,19,25 31:11
32:5 33:20 34:6,
20 35:14 37:1
38:8 39:9,17
40:17 41:6,19
43:18 46:10
47:8,14 48:10,
13,21 49:14
50:3,23 52:1,17
53:3 55:6 56:6,
15,25 57:16 58:7
60:22 61:16
63:10 64:6 65:8
66:1 67:4,12,17
68:4 70:14
71:12,19 72:13
78:7,15 79:3,11
80:2,14,19 82:13
83:22 84:9,17
85:7 86:14 87:2
88:7,22,25 89:11
90:20 91:14
92:6,15,18
93:10,13,17 95:3
96:3,17,22 97:4,
25 98:6,17,20
99:1 100:5,13,22

101:5,12,20
102:4,23 103:15,
24 104:6,13
105:10

**objections** 7:4

**obligated** 7:6

**observations**
26:18

**occasion** 14:20

**occasionally**
12:18

**occasions**
23:24,25

**occur** 23:25
92:2,10 93:9,23

**occurred** 23:24
27:1 104:2

**occurrences**
45:17

**occurring** 87:3

**October** 11:7
12:3,20 14:3,6
58:18

**offer** 84:6,14
94:1 96:10

**offered** 89:6
94:6

**office** 56:9 72:14
86:22 90:4 94:2,
22 95:1,14,19
96:1 106:6

**officer** 12:14,15
53:19 54:2,25
55:5,17,25
56:13,24 57:15
62:3 68:21 74:6
86:10,12,19

**offices** 13:4
63:2

**official** 39:21
43:6 69:13 76:7,
12

**on-site** 22:3,5,
17 25:17 65:21,
22 66:5

**one's** 10:3 37:13

**one-hour** 42:18

**ongoing** 31:14,
16,19

**ooh** 72:17

**Oop** 81:18

**open** 9:25

**operational**
71:7,18 72:3

**opinion** 40:23
41:7,8,12 43:7
47:6,21 48:19
70:12 71:22
88:1,5 100:19

**opinions** 43:22
44:20

**opportunity** 7:4
96:11

**options** 79:8

**order** 84:21
106:3

**organization**
11:23 34:11,15,
18 45:5 56:11
64:24 105:19

**organizational**
37:16 55:23

**organizational-
level** 37:19

**organizations**
87:14

**organize** 57:5

**ORM** 76:5

**outcome** 38:23
100:17 101:16

**outcomes**
24:25

**overbroad**
93:17

**oversee** 11:19
64:24

**overseeing**
11:24 24:19 35:8

51:3

**oversees** 15:5,8

**oversight**
22:13,15 36:22
54:7 66:14 71:7,
18 72:4 105:14

**overstated**
35:17

**overtaxed**
99:21

**overworked**
99:21

---

**P**

**p.m.** 73:22
104:22,23
106:10

**pages** 9:2

**Palo** 41:2,13

**pandemic** 94:5
96:9

**paperwork**
37:13

**paragraph** 62:9,
14 65:12 73:5

**parentheses**
63:15,24 64:4,9,
16

**parking** 49:11,
21 50:20

**part** 36:18 53:20
54:5 63:17 65:2,
12 73:13 77:9,23
81:10 91:25 92:9
97:2

**partner** 97:20

**partnering**
64:25

**partnership**
66:4

**party** 46:25 47:4,
22

**past** 75:25 76:6

94:8

**pathway** 29:14
43:1

**patient's** 100:10

**patients** 37:13
44:5,7,10 86:2

**Pauline** 81:2

**pay** 103:13

**pending** 8:4

**people** 23:19,23
43:22 44:9 74:15
87:13 92:20 93:2
94:22,25 95:1

**perceived** 48:2

**percent** 93:20
96:23 98:14

**percentage**
17:23 96:16

**perception**
55:11

**perceptions**
54:23

**percolated**
26:13

**perform** 15:6,8
63:6,8 64:5

**performance**
43:16,25 44:2,20
52:15

**performed**
67:21

**performing**
64:2

**performs** 14:23

**permission**
58:23 59:1

**person** 6:22
9:14 79:16 83:6,
18

**personal** 47:17

**personally**
93:23 94:12,22

**perspective**
22:16 47:18,25
57:9

**perspectives**
32:1

**physical** 72:11

**physician** 21:10
37:23 69:14
70:25 71:1

**physicians**
16:1,8 17:14,22
18:1 20:10,13
36:23 37:5,7,18
57:8,10 96:16
97:23

**pick** 81:20

**place** 44:11 77:2

**Plaintiff** 8:18
101:7

**plan** 41:23 42:2,
13 51:7

**planner** 13:14,
15

**planning** 12:14

**played** 45:1
62:18

**playing** 45:10

**Pleasant** 13:4

**pleased** 30:12

**podiatrist** 100:9

**podiatry** 99:25
100:15

**point** 7:16 8:5,7
16:17 19:4 20:21
25:19 53:3 65:8
72:2 80:7 90:2
103:2

**points** 74:2 83:3
105:2,20

**pool** 17:18

**population**
17:15,17,23

**portion** 79:19

Atkinson-Baker, a Veritext Company
www.depo.com

**Portland** 11:9
13:22

**position** 34:2
74:6 87:11,15
88:15

**positions** 66:13

**positive** 35:9
44:3,14,17 47:21
48:4

**positives** 43:24
44:1 45:16

**potential** 94:1

**potentially**
79:7,22

**practice** 7:19

**precisely** 52:4

**predisposition**
30:15

**prefer** 44:21

**preferred** 33:10

**preparation**
8:15 9:11

**prepared** 39:13

**present** 13:5
49:2,5 57:21

**presented** 84:3

**pretty** 34:7
41:15

**previous** 7:18
83:1 85:2

**previously** 26:7
38:12 91:1

**primary** 53:24

**prior** 11:8 21:19
38:23 76:7 87:10

**priorities** 33:7,
15,17 34:4 57:7

**priority** 44:7,8

**privilege** 9:9

**problem** 24:22
25:20,25 26:8
28:14,23,25

33:19 50:1,7

**problems** 28:4
102:22

**process** 8:8
43:4,8 91:19
94:19

**processes** 48:2
56:9 99:19

**prodding** 36:6

**productive**
51:24

**productivity**
57:9

**profession**
100:1

**professional**
39:13 98:2

**program** 12:16,
17 40:8 41:24
42:4,16 64:22
93:24 94:16
97:16,19

**programs** 62:24
64:11,17 65:23
66:14

**progress** 35:20

**protected**
90:19,24 93:3,8,
22 94:7

**provide** 7:15
86:1

**provided** 54:15

**provider** 20:16

**providers** 20:15

**pull** 58:11 69:1,
24 73:9 74:23
80:23

**pulled** 72:17

**purely** 17:16

**purpose** 19:12
30:7 60:7

**purposes** 16:20

**pursue** 36:8
38:2

**pursuing** 99:10
102:12

**purview** 57:13

**put** 7:4 56:9
97:24 98:13

---

**Q**

**qualifies** 70:21

**quality** 12:13

**quarterly** 49:4
98:12

**quasi** 49:23

**question** 6:24
7:2,5,7 8:4 9:7
10:23 22:24
23:18 28:11,12,
17 33:21 39:12
48:13 54:7 66:21
67:1 68:11 72:1,
6 75:25 85:10
89:3 90:7 91:14
92:3 93:5,6 97:8
98:23 99:7
101:8,11,14,18
104:4

**questionable**
33:14

**questioning**
74:1

**questions** 7:7
8:8 42:1,16 49:6,
12,17 55:2 59:4
74:9 75:24 76:23
82:22 101:1,3
104:17,18,25

**quote** 48:3

**Quyen** 5:6

---

**R**

**race** 15:21 58:6

**racial** 97:2,9,23

**radiology** 62:25
64:18 65:6,18,24
66:8,11,12,18,24

**raised** 28:14
33:2 49:13 50:7
87:17

**ran** 99:19

**ranging** 62:23
64:16

**rank** 41:8

**rational** 28:10
80:16

**rationale** 89:6

**react** 30:16

**reaction** 30:18,
24 34:16,18

**read** 9:4 77:15
81:13 89:24

**reason** 6:20
8:10 32:22 69:11

**reasons** 55:24
88:20

**reassign** 29:2

**reassigning**
21:19

**rebel** 47:25

**recall** 5:25 21:13
23:15,17,22,23
24:25 25:8 28:9
32:11 34:24 35:5
36:3,16 38:17
41:3 44:15 45:13
46:3,7,13,17
47:5 48:8,9,16
53:10 69:23
82:17 86:18
87:3,7,19 89:17
91:7,8,17 100:2,
14,16 104:14

**recalled** 101:6

**recalling** 24:24

**receive** 60:17
82:12

**received** 60:16,

19 61:9 73:1

**receiving** 61:22

**RECESS** 73:21

**recognize** 58:21
59:15 60:13 69:4
72:24 75:19
82:10,11

**recognized**
59:6

**recognizes**
59:10

**recommendatio
n** 71:21

**recommendatio
ns** 25:12 71:4
73:6,11

**recommended**
53:17 54:6

**record** 7:4 24:16
51:16 73:25
77:6,15,18
105:11,25 106:7,
9

**recurring** 94:9
97:15 98:9

**red** 44:5

**Redding** 71:7

**refer** 10:19,22

**referred** 39:4
64:9

**referring** 23:12
53:23 64:7,15
76:3

**refresh** 6:16

**regard** 105:5

**regular** 93:24

**regularly** 12:5
94:4

**reimbursing**
19:24

**related** 63:6,8

**relates** 53:19
84:24

Atkinson-Baker, a Veritext Company
www.depo.com

**relationship** 43:2

**relay** 55:15

**relayed** 55:16

**relief** 68:17

**remained** 83:20

**remember** 6:21 7:18 14:16 18:9, 11 19:4 24:7,21 26:6,10,12,14, 17,24 27:8,10 29:11,25 30:23 31:3,4,6 32:3,8, 13 33:1 35:23 36:1,4,14 38:18 44:13,16,18 45:10,12,16 46:1,8,21 47:3 48:6,17 49:1 53:12,15 54:13 60:18 87:14,17 88:11 89:21,23 90:13 100:16

**Remler** 34:25 35:1,4

**remotely** 5:10

**remove** 87:10, 13

**removing** 79:1 83:14 88:21 89:9

**render** 41:7 71:22

**repeat** 85:10 89:3

**repeatedly** 27:2

**rephrase** 99:7, 8,12

**replied** 8:23

**reply** 40:20 54:16 62:1 68:22

**report** 14:24 27:16 73:1,7 80:24 81:1 85:2 97:15

**reported** 86:17

**reporter** 5:6,7,9 7:8,14 24:15 64:13 69:6 87:21 89:25 98:21 103:9 105:9,12 106:3,7

**reporting** 22:17

**reports** 12:7,19 27:17 43:12 52:24 82:16

**reputation** 102:21

**request** 67:23 88:10

**requesting** 68:18 106:1

**required** 38:21 44:22,24

**research** 12:15 40:9 42:7,14,16

**reside** 97:17

**resident** 12:18

**residents** 42:24

**resigned** 102:1

**resolution** 20:1 90:5 91:13 94:1 100:12

**resolve** 57:9

**resources** 97:20

**respect** 34:2 45:20 54:23 62:4 70:25 98:10 100:16

**respective** 83:5

**respond** 7:10

**responded** 33:2 40:21

**response** 8:21, 22,25 31:10 33:8,13,25 36:9, 19 72:8 77:1,7,9, 20,22 93:6

**responses** 7:9

**responsibilities** 11:22,25 22:3,12 25:17 32:23 33:4 36:7,24,25 37:6, 8,10,12,16,19,24 38:22 49:19 50:18 53:18,20 57:11 70:24 71:2 78:19,22 79:20 80:9 91:25 92:9, 22

**responsibility** 14:25 36:22 43:9 55:23 92:14 98:2 105:19

**responsible** 45:3 51:3 57:21 74:14 76:6,12 79:15,17 88:19 89:7,16

**result** 23:1 24:22 76:18

**resulting** 99:5, 10 103:13

**results** 84:24

**Resumed** 74:21

**resurrected** 33:11

**retain** 84:8,15

**retained** 84:7,21

**retaining** 83:21

**retired** 103:4

**returned** 14:2

**review** 7:15 25:5 53:21 54:16 59:15 74:5 75:1 76:9 94:1,8,10, 19 106:1

**reviewed** 8:15

**reviewer** 53:17, 22 61:24

**reviewing** 82:18

**reviews** 87:12

**revise** 98:16,24

**right-hand** 9:1

**rogue** 46:25

**role** 14:3 27:1 42:3 43:17,24 44:20 49:4,24 51:2,18,19 52:11 54:4,6 55:1,11 62:2,17,18 86:18 105:6

**roles** 22:19 74:9, 11 83:5

**room** 5:9 9:15, 16

**rooms** 63:3

**roughly** 31:6

**round** 94:4

**rules** 6:15 16:21

**S**

**Sacramento** 15:5,6,11 65:2 72:12,15

**safe** 92:23

**satisfy** 79:1

**schedules** 49:10,21 57:4

**scope** 33:18

**score** 39:14

**Scratch** 88:2

**screen** 6:18 58:14 69:25 88:16

**scroll** 59:8,14, 19,25 70:2,5 75:11 81:3 82:2

**search** 39:4

**sec** 72:18

**secretary** 12:16

**section** 71:4

**seek** 32:23

**selecting** 39:20 43:6

**selection** 40:16, 20 43:8

**sense** 29:16 41:4 52:9 71:16 72:2 88:14 96:15

**sentence** 71:15

**sentiment** 35:3

**separate** 55:24 93:25 96:13

**service** 13:6,10 46:23 49:10 50:1,2,7,10 63:19 64:21,22 65:1,4,13 66:4 69:16 70:24 71:1 86:2

**services** 63:4

**set** 14:22 64:3,9 66:25 79:14,24 83:15,20

**settled** 91:20

**settlement** 76:8 91:18 103:21

**sex** 58:6

**sexually** 90:15 91:5,10

**shaking** 16:16

**share** 38:21 88:17

**shared** 35:3

**Shorthand** 5:7

**show** 95:7,10,19

**showed** 89:18 95:25

**showing** 59:9, 11

**shuttle** 49:10 50:1,2,7,10,12

**shuttles** 49:21

**sic** 44:8 50:17

David Stockwell
May 04, 2021

119

Atkinson-Baker, a Veritext Company
www.depo.com

**sign** 106:2

**signature** 75:21

**significant** 34:8
35:9

**significantly**
12:3,20

**similar** 37:21

**single** 94:3

**sir** 44:24 66:21
82:10

**sit** 78:24

**site** 14:20,23
15:1,6,12 20:19
21:20 22:4,9
25:18 29:2 32:25
34:2 37:22
43:15,25 49:4,
18,19,25 50:18
51:2,19,23 52:7,
11,13,15,20 54:5
57:20 62:17
63:20,21 67:9,10
74:11,19 77:11
78:1,5,13,19
79:2,17,25 83:6,
14,17,21 84:22
85:1,3,6,12,14,
23,25 86:7,18
88:21 89:9 90:11
105:6

**sites** 11:20 12:5
14:21

**situation** 31:20
50:20 99:17

**situations** 46:4

**skills** 52:6

**slightly** 22:24
28:11

**slot** 86:20,21
95:9

**slots** 42:24

**small-time**
33:18

**Smith** 9:22
11:15,18 14:12
15:2 16:4,10,13,

16,20 19:8 20:21
21:15,21 23:2
24:12,15,16
25:7,13,21 26:2,
21 27:23 28:6,15
29:5,7 30:9,19,
25 31:11 32:5
33:20 34:6,20
35:14 37:1 38:8
39:9,17 40:17
41:6,19 43:18
46:10 47:8,14
48:10,13,21
49:14 50:3,23,24
51:10,13,21
52:1,17 53:3
55:6 56:6,15,18,
25 57:16 58:7,
16,22 59:2,7,9
60:7,10,22 61:1,
3,16 63:10,11
64:6,10 65:8
66:1,2 67:4,12,
17 68:4 70:14
71:12,13,19
72:13 73:19
74:1,4,8,20 75:3,
7 78:7,15 79:3,
11 80:2,11,14,19
81:5 82:13
83:22,23 84:9,17
85:7,17,19 86:14
87:2 88:7,22,25
89:11 90:1,20
91:14 92:6,15,18
93:10,13,16 95:3
96:3,17,22 97:1,
4,7,25 98:6,17,
20 99:1,3 100:5,
13,22 101:5,11,
20 102:4,23,24
103:15,24 104:6,
13,20 105:2,11,
13,17,20,24
106:1,4

**solution** 28:13
83:14

**solutions** 28:4
79:23 84:2

**solve** 28:23,25

**sort** 6:11 28:20
33:18 37:14

52:15 63:23

**sorts** 49:9

**sound** 51:8

**space** 22:14
24:19 63:2,25

**speak** 6:22 9:22
68:25

**speaking** 42:13
51:1

**specialties** 71:9
72:4

**specific** 14:17
23:15,16,22,23
24:24 26:12,15
28:9 39:24 40:22
45:13,17 46:4
76:23 84:6,20
101:8

**specifically**
23:14 30:23
32:11 35:5 36:3
56:21 63:13
64:15 74:10
82:17

**specifics** 18:11
31:3 44:15
46:13,17 47:5
48:8,17 91:17

**spectrum** 79:21

**speculation**
16:10 56:25
63:10 67:13,17
71:12 79:3,11
83:22 84:9,17
88:25 89:11
96:17

**spend** 92:13,21
93:7

**spending** 19:22
20:5

**spends** 20:13

**spent** 52:10

**spite** 42:4

**spoke** 55:9

**sporadic** 15:16

**sporting** 99:24

**spread** 11:20

**spring** 29:17

**square** 11:20

**staff** 12:12 24:21
40:21 43:13
49:10 50:12
52:23 53:18
54:8,10,11,18
55:10 57:7,13
72:7 73:14 94:5
96:11 100:15
102:21

**staff's** 105:18

**stance** 99:25
100:4

**stand** 24:16

**standardize**
48:1

**stands** 101:12

**start** 7:2 44:1
59:3 74:1

**started** 29:20

**starts** 62:9
81:13

**state** 76:24 77:6,
18 93:16

**stated** 48:16
86:3 89:19

**statement**
85:14,21

**statements**
8:24

**station** 50:13

**statistics** 97:18

**step** 43:3

**Stockwell** 5:12,
19 14:15 16:14,
16,22 51:17
58:13,19 59:13
60:14 69:9 74:4,
25 75:1,12 78:10
81:4 101:15
104:25

**stop** 88:16

**strike** 22:23

**Strohan** 68:8

**Strohecker**
53:24 54:6,14
61:25 68:9,10,
11,24 69:3,12
70:2,22 71:10
73:2

**strongest** 40:1,
5,24 41:9

**stuff** 33:15 46:14
59:24

**stumbling**
31:23

**subject** 31:5
36:17 53:17
58:19 90:13

**subsequently**
102:3

**substance** 36:4
61:15

**success** 39:16

**successfully**
42:23

**sued** 38:12
103:7

**suffering** 22:25

**suggest** 79:24

**suggested** 48:6

**suggestion**
32:3 68:20

**suggestions**
31:10

**suing** 6:6

**summary** 81:10

**summer** 29:18

**superior** 99:22

**supervise** 52:20

**supervisor**
19:14 66:12

Atkinson-Baker, a Veritext Company
www.depo.com

**support** 22:17 24:20 88:13

**supported** 99:4

**supposed** 54:10 60:25 66:17 67:11

**surgeon** 41:2,5, 13 51:19,25 52:6

**surgeons** 19:2, 17

**surgery** 19:18 38:22,25 40:9 42:24 43:5,10,12 52:11 63:1 64:19 65:7,18,25 66:6, 8,9,18,24 70:19

**surgical** 40:8 41:24 42:4,24 46:23 62:23 63:19

**surprise** 30:14

**switching** 45:23

**sworn** 5:10,13

**system** 11:4,19, 21,25 13:7,19 14:21 17:14 44:11 66:15

**T**

**table** 17:5,7,9 95:23

**tactic** 49:23

**takes** 47:19 86:10

**taking** 6:19 16:17 43:3 80:9

**talk** 21:5,8 54:22 89:14 94:2,23 95:1,7,15,19,24 96:12

**talked** 18:4,10 21:1,11 24:11 36:2

**talking** 19:12,16

**talks** 62:16

**tape** 44:5

**task** 80:4,16

**team** 13:6 94:8

**ten-minute** 51:6

**tendency** 48:25

**term** 34:20 43:18 54:24 78:7,9,11

**termination** 6:12

**terminology** 77:10,25

**terms** 12:19 34:4 39:15 84:6

**terrific** 51:11 62:5

**testified** 5:14 60:20 61:24 86:16 90:25 97:14

**testimony** 7:17, 21,23 8:11,16 9:11,21 26:16

**testing** 62:25 63:17 64:18 65:6,24 66:7,23

**text** 66:12

**texting** 9:19

**theme** 94:10

**thing** 29:4 46:25

**things** 6:21 24:19 27:1 33:6 35:18 45:4 49:8, 11 57:10 79:14, 16 93:21 94:12 95:24

**thinks** 47:19 56:17

**thought** 35:19 39:25 40:10,24 41:9 49:8 80:15

**thoughts** 46:24 55:16

**three-page** 75:7

**time** 5:24 6:22 8:2 10:23 15:18 18:19 19:24 20:17,22 21:3, 11,13 24:8 33:4, 17 34:4 36:2,10 45:12 47:1 49:1 50:8 52:8,10 53:4 54:21 57:5, 6 65:8,10,21 73:17 74:4,5 85:2 86:15,25 87:8 89:20 92:13 93:6,20 95:8,25 98:14 100:3 104:2

**times** 18:4,21 21:5,8 23:6,8 36:17 43:24 48:24 53:10 95:12

**timing** 65:13

**Timothy** 21:2

**tiny** 82:2

**title** 11:2,6 12:11,20 13:8 20:19,20 21:20 22:4,8 25:18 29:3 32:25 43:15 49:18 57:20 62:12 70:19,20 78:6 79:2,16 80:10 83:6,15,21 84:8,21 88:21 89:10 98:3

**titles** 23:17,19, 23

**today** 7:13,17 8:11,16 9:11 78:24 105:1,23

**told** 24:2 26:20 31:10 35:21 38:16 61:14 62:5 84:25

**top** 43:7 81:9 82:3

**topic** 19:5,21 20:2,13 27:10 29:22

**total** 17:16

**town** 49:2,13,17 90:10,14 96:10, 13

**travel** 96:9

**trends** 94:9

**trial** 7:23

**true** 47:24 67:8 78:4,12,22 85:24 86:3,12 93:4

**TUESDAY** 5:2

**turn** 10:1

**turned** 9:18

**type** 7:14

**types** 51:3 93:21

**typically** 9:13

**U**

**UC** 40:8 42:21

**uh-huh** 7:10

**ultimately** 101:3

**ultra-sound** 62:25 64:18

**ultrasound** 63:17,21 65:6,24 66:7,23

**ultrasounding** 66:23

**understand** 7:7 19:19 23:18 26:14 28:17 37:17 41:11 52:4 68:2 69:14 71:10,15,25 78:9,11 84:5 97:7

**understandable** 30:17 33:14

**understanding**

27:3 31:23,25 35:19 38:20 49:24 54:22,25 55:4 56:12,20 57:3 63:7 67:15 70:21 85:5 102:20 104:7

**understood** 57:12 62:19

**undertaking** 34:8

**undiscriminated** 92:23

**undo** 78:19

**unhappiness** 31:17

**uniform** 48:1

**uniformly** 56:10

**Unintelligible** 64:10

**unknown** 45:5

**unusual** 20:15

**uphold** 68:16

**urged** 78:5,7,9, 13

**USA-31** 60:8

**USA000031** 60:6

**USA005743** 9:5

**utilization** 19:2, 16

**V**

**VA** 6:5,7 11:3,9, 21 12:25 13:14, 19 19:3,23 20:5 23:13 29:20 38:2,13 41:2 74:6 103:13 104:9

**Vague** 37:1 52:17 93:17

**vaguely** 100:14

**Valerie** 59:1

**valid** 100:4

**Valley** 15:5,7

**VANCHCS** 10:17

**VANCHS** 10:16

**variables** 67:2,3

**vascular** 19:2, 16 38:21

**Velez** 12:22 13:24 14:2,17 15:14,20 18:5, 19,22 19:22 20:7 22:9 29:3 31:15 34:15 35:7 38:1, 5,24 39:5,23 40:5 41:1,5,14, 18 42:9,22 43:15 44:4 47:18 53:2, 9 54:3,22 56:13, 23 57:14,24 58:18 68:17,20 71:5,22 72:2,21 81:2 83:15,20 84:7 86:7,12,18 88:21 89:10,14 90:6,11 99:4,9, 13,24 102:8,20

**Velez's** 20:19 51:18 70:20 100:20 102:14, 18

**verbal** 7:11 39:20

**verbally** 40:21

**versus** 52:11 79:25 84:15

**Veterans** 10:11

**videoconferenc e** 5:8

**view** 35:7

**viewed** 48:4

**vindictive** 58:3

**vision** 40:7 41:17

**visit** 12:5

**vocalized** 99:23

**voice** 57:23

**voicing** 34:24

**volume** 100:15

---

**W**

**wait** 7:1 75:1

**walk** 43:5,8 46:5

**wanted** 19:24 28:2,19 31:14 33:6 56:10 57:11 78:21 96:11 99:12

**ways** 28:22,23, 24 30:2 41:24 44:6 79:6,9

**week** 19:22 20:5, 13 52:10 94:4 95:8,9 96:4

**weighed** 40:11

**weird** 54:24

**when's** 95:25

**whichever** 87:9

**white** 96:16 102:9

**whom's** 14:25

**Whoop** 81:22

**Whoops** 25:13 29:6 81:12,16

**winter** 29:17

**women** 91:4,9, 22 102:21

**wondered** 83:3

**wonderful** 35:8

**wondering** 24:5 28:20 35:25 41:12 83:19 84:5 85:13

**wonderings** 52:14

**word** 41:17 45:22 50:17 87:24

**words** 10:23

**work** 6:25 10:13, 15 11:8 20:10,16 44:5 63:23 86:5, 6 91:22 92:11 94:14 99:20

**workable** 51:8

**worked** 11:9

**working** 18:1 19:23 29:20

**workload** 100:1, 15

**workplace** 92:23

**works** 6:17 10:24

**world** 77:7,20

**worldwide** 94:5

**worried** 71:23

**worry** 10:3

**worth** 100:11

**worthy** 20:13

**write** 25:1

**written** 8:22 54:16 62:1 74:25

**wrong** 29:4 72:17

**wrongful** 6:12

---

**Y**

**years** 6:1 11:12 13:12,16,21 15:15 18:5,25 25:24 26:1,7 35:9 36:16 38:23 41:23 53:10 62:13 65:11 85:2 89:20 91:9

**yesterday** 10:12 37:11

---

**Z**

**zoom** 9:14 10:1