Atkinson-Baker, a Veritext Company
www.depo.com

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4    PAULINE M. VELEZ,              )
                                    )
5                    Plaintiff,     )
                                    )    No.
6        vs.                        )    4:20-cv-05170-KAW
                                    )
7    DEPARTMENT OF VETERANS AFFAIRS )
     ET AL.,                        )
8                                   )
                     Defendants.    )
9

10

11

12                  DEPOSITION OF

13                  CRYSTAL KEELER

14            VIA REMOTE WEB CONFERENCE

15             Friday, August 13, 2021

16

17

18

19

20

21

22   ATKINSON-BAKER, A VERITEXT COMPANY
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  WAYNE A. HUNTER, CSR 5456

25   FILE NO.:  AF05721

Atkinson-Baker, a Veritext Company
www.depo.com

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4    PAULINE M. VELEZ,                    )
                                          )
5                        Plaintiff,       )
                                          )  No.
6        vs.                              )  4:20-cv-05170-KAW
                                          )
7    DEPARTMENT OF VETERANS AFFAIRS       )
     ET AL.,                              )
8                                         )
                         Defendants.      )
9

10

11

12          Deposition of CRYSTAL KEELER, taken on

13   behalf of Plaintiff, via remote web conference,

14   commencing at 9:33 a.m., on Friday, August 13, 2021,

15   before Wayne A. Hunter, CSR No. 5456.

16

17

18

19

20

21

22

23

24

25

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                  A P P E A R A N C E S

 2         FOR THE PLAINTIFF (via Zoom):

 3         HOYER & HICKS
           BY:  NICOLE B. GAGE, ESQ.
 4         Four Embarcadero Center
           Suite 1400
 5          San Francisco, Ca. 94111
            (415) 766-3539
 6          ngage@hoyerlaw.com

 7         FOR THE DEFENDANT (via Zoom):

 8         VALERIE E. SMITH, ESQ.
           Assistant U.S. Attorney
 9         450 Golden Gate Avenue, Box 36055
           San Francisco, Ca. 94102
10         (415) 436-6985
            Valerie.smith2@usdoj.gov

11

12  ALSO PRESENT:

13         COLEEN WELCH, ESQ.
           U.S. Department of Veterans Affairs
14         150 Muir Road
           Martinez, Ca. 94553
15         (202) 552-9605
           coleen.welch@va.gov

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                    I N D E X

 2


 3   WITNESS:  CRYSTAL KEELER

 4   EXAMINATION                              PAGE

 5        BY MS. GAGE                           5

 6


 7   EXHIBITS:

 8
                            PLAINTIFF'S
 9   NUMBER                  DESCRIPTION      PAGE

10   1    Notification of Personnel Action      41
     2    Executive Career Field Performance
11        Appraisal                             49
     3    Executive Career Field Performance
12        Appraisal                             55
     4    Performance Plan for Fiscal Year 2010 63
13   5    Compensation Plan Action              66

14


15

     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
16
                        (None)
17


18

     INFORMATION TO BE SUPPLIED:
19
                        (None)
20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE REPORTER:  Hello.  My name is Wayne

2     Hunter.  I am a California certified court reporter,

3     and this deposition is being held via videoconference

4     equipment.  The witness and reporter are not in the

5     same room.  The witness will be sworn remotely.

6                    CRYSTAL KEELER

7               having been first duly sworn was

8                examined and testified as follows:

9                EXAMINATION BY MS. GAGE

10         Q.  Good morning, Ms. Keeler.  My name is Nicole

11    Gage, and I'm one of the attorneys representing the

12    plaintiff in this case.  Can you please state your full

13    name for the record?

14         A.  Crystal Keeler.

15         Q.  Thank you.  And have you ever been deposed

16    before?

17         A.  I believe so, for some kind of EEO complaint

18    in the past.

19         Q.  Okay.  So, I'm just going to go over a few

20    rules to familiarize you with the process a little bit

21    since it's been awhile.

22         A.  Sure.

23         Q.  So, the first thing is that everything that's

24    said in is this room is subject to the penalty of

25    perjury.  You took an oath, and that means that your

1    testimony will be like if you were testifying in a

2    court of law.  And the penalty of perjury includes if

3    you say you do not recall something when in fact you do

4    recall something.  So, please be sure to give your

5    best, most accurate testimony today.  And the testimony

6    that you give today can be used at trial.  But you will

7    be given an opportunity to review the transcript and

8    make any corrections.  However, any corrections that

9    you make can be pointed out to the jury later on, and

10   you can be asked to explain why you changed your

11   testimony.  Does that make sense?

12       A.  Yes.

13       Q.  Great.  And another thing is that the court

14   reporter will be recording everything as we go, so

15   there will be a transcript to review.  So, one of the

16   things to keep in mind is to please not interrupt.

17   Sometimes you'll think you know where a question is

18   going and will just naturally want to jump in with an

19   answer.  But just so we can have a clear record just

20   make sure to let me finish a question before you begin

21   to answer.

22           Another thing is to please give verbal answers

23   so they can be recorded properly.  So, please respond

24   with yes or no instead of nodding, or saying like uh

25   huh.  And if you don't understand a question, please

Atkinson-Baker, a Veritext Company
www.depo.com

1  ask me to rephrase it.  I'm happy to rephrase any

2  question that doesn't make sense.  And it's better to,

3  you know, get clarification than try to answer a

4  question that you don't understand.  Does that make

5  sense?

6  　　A.  Yes.

7  　　Q.  Okay.  And from time to time your counsel may

8  make objections to the questions that I ask to preserve

9  the record, but unless you're instructed not to answer

10 by your counsel, then I am entitled to a response.

11 Does that make sense?

12 　　A.  Yes.

13 　　Q.  Great.  And you can ask for a break at any

14 time throughout the day.  Feel free to let me know if

15 you need to take a break for any period of time.  I

16 just ask that you wait until there's not an actual

17 question pending.  And then finally, I don't want you

18 to speculate today.  If you don't have the answer to a

19 question, if you really have no idea as to what the

20 answer could be, I don't want you to just pull a guess

21 out of thin air.  However, I am entitled to your best

22 estimate.  So, for instance, if I were to ask you how

23 long is the desk in my office, you wouldn't be able to

24 give an estimate because you've never seen it.  But if

25 I were to ask how long the desk is in your office, you

1  would be able to give an estimate even if you might not

2  actually know the exact answer, because you're sitting

3  there and have knowledge of that fact.  Does that make

4  sense to you?

5      A.  Yes.

6      Q.  Okay.  Great.  Is there any reason that you

7  cannot give your best testimony today?

8      A.  No.

9      Q.  Okay.  Have you taken any medication in the

10 past 24 hours that would interfere with your ability to

11 accurately testify?

12     A.  No.

13     Q.  Okay.  Have you had any alcoholic beverages in

14 the last 24 hours?

15     A.  No.

16     Q.  Okay.  Is there any other reason you would not

17 be able to testify completely and accurately today?

18     A.  No.

19     Q.  Great.  And have you ever been convicted of a

20 felony?

21     A.  No.

22     Q.  Okay.  And you said that you had been deposed

23 before, is that correct?

24     A.  Yes.

25     Q.  Do you recall how many times?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.  I believe just once.

2      Q.  Okay.  And you said it was in an EEO case?

3      A.  Yes.

4      Q.  Do you remember broadly what the case was

5  related to?

6          MS. SMITH:  Objection.  Without naming a

7  specific name you can answer.

8          THE DEPONENT:  I -- I believe it was in

9  relation to -- shoot.  I really don't know.  I -- I

10  don't recall exactly what it was.  It was some employee

11  um... supervisor issue.  That's all I can recall about

12  it.  It was sometime ago.

13          Q.  BY MS. GAGE:  Okay.  Do you know

14  approximately how long ago?

15      A.  I mean, I can't even tell you what the subject

16  matter was exactly, so no, I can't tell you

17  approximately how long.

18      Q.  Was it more than five years ago?

19      A.  No.  I don't think it was that long ago.

20      Q.  Okay.  More than two years ago?

21      A.  Yes.  I think so.

22      Q.  And have you ever been called to testify in

23  court or in an arbitration?

24      A.  No.  No.

25      Q.  Did you review any documents in preparation

1   for today's deposition?

2          MS. SMITH:  Objection.  To the extent you're

3   asking about documents she may have reviewed with her

4   attorney, with counsel, I'm instructing her not to

5   respond.

6          Q.  BY MS. GAGE:  Sure.  I don't want any

7   information about what you may have discussed with

8   counsel or anything that you reviewed in conjunction

9   with counsel.  But on your own accord did you review

10   any documents to prepare for today?

11          MS. SMITH:  You can answer.

12          THE DEPONENT:  Okay.  I reviewed the personnel

13   record for Dr. Velez.

14          Q.  BY MS. GAGE:  Okay.  And just because

15   we're remote, do you have any documents with you right

16   now?  Is there anything visible that you can look at

17   while we're in the deposition?

18      A.  No.  No.

19      Q.  Okay.  And I don't want to know any

20   information that was exchanged between you and your

21   attorney, because that information is privileged, but I

22   would like to know if you met to discuss today's

23   deposition.  Just a yes or no answer.

24          MS. SMITH:  You can answer.

25          THE DEPONENT:  Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1          Q.  BY MS. GAGE:  Okay.  And when did you

2    meet?

3          A.  Yesterday.

4          Q.  Okay.  And about how long did you meet for?

5          A.  Half an hour.

6          Q.  Okay.  And was anyone else privy to those

7    meetings?

8          A.  Uh... Ms. Welch and Ms. Smith and myself.

9          Q.  Okay.  Have you discussed today's deposition

10   with anyone other than your counsel?

11         A.  No.

12         Q.  Okay.  And are you currently employed by the

13   VA, Northern California Health System?

14         A.  I am.

15         Q.  And I'm probably going to refer to that just

16   as the VA throughout the day, just because that's

17   easier.

18              MS. SMITH:  Objection.  If we're going to talk

19   about the VA in general, then that's distinct from Nor

20   Cal VA.

21              MS. GAGE:  Got it.

22         Q.  Okay.  Nor Cal VA is not the best way to refer

23   to it?  Does that make sense to you if I say Nor Cal

24   VA, or would that get into like other branches?  Does

25   Nor Cal VA work as a description?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.  Yes.

2      Q.  Okay.  So, when did you first begin working

3  for Nor Cal VA?

4      A.  I started with Nor Cal VA in March of 1999.

5      Q.  Okay.  And what was your job title at that

6  time?

7      A.  At that time I was a Program Analyst assigned

8  to the Nursing Service.

9      Q.  Okay.  And what types of responsibilities did

10 you have in that role?

11     A.  Admin support.  Timekeeping.  I was a

12 supervisor for Inpatient Medical Support Clerks.

13     Q.  Okay.  And how long were you in that position

14 for?

15     A.  I was in that position for three years.

16     Q.  And did you apply for another position after

17 that?

18     A.  Yes.

19     Q.  And what position was that?

20     A.  I was then the Administrative Officer for

21 Nursing Service.

22     Q.  {Okay.  And what year did you begin that

23 position?

24     A.  Let's see.  First one was three years, so...

25 about 2003, I believe.

```
 1        Q.   Sure.  And how were your rolls -- your job
 2   duties different in that role as opposed to the role
 3   that you were in to begin with?
 4        A.   In that role I was now the lead administrative
 5   person within the entire service.  I wasn't just
 6   supporting one group or supervisor.  I was part of the
 7   executive team of the Nursing Service.
 8        Q.   And what is your current job title?
 9        A.   My current job title is Healthcare Recruiter
10   for Northern California VA.
11        Q.   And after you were the admin officer for
12   Nursing Service approximately 2003, did you have
13   various other rolls before you became Health Care
14   Recruiter?
15        A.   Yes.  I worked as the supervisory Health
16   System Specialist in Medical Service, which is
17   essentially an Administrative Officer for the Medical
18   Service.
19        Q.   And do you know approximately what years you
20   were in that position?
21        A.   Let's see.  It was 2007 until 2015.
22        Q.   And what position did you hold after that one?
23        A.   After that one I came into this position.
24        Q.   Okay.  So,  you began this position around
25   2015?
```

Atkinson-Baker, a Veritext Company
www.depo.com

1       A.  Yes.  October.

2       Q.  October 2015.  And what are your job duties as

3   a Health Care Recruiter?

4       A.  As an Health Care Recruiter my job duties are

5   to advertise for vacancies for physicians, dentists and

6   other positions as determined by my facility that are

7   hard to recruit or fill.  I also vet those candidates

8   that may apply to the opportunities that I've

9   advertised, and refer them as necessary to the Hiring

10  Manager.

11      Q.  Did you ever vet candidates in any of your

12  previous rolls when you were working with Nor Cal VA?

13      A.  When I was in Medical Service, because it is a

14  largely physician-based service line, yes.  That was my

15  No. 1 priority assigned to me, was to recruit

16  physicians.

17      Q.  And that was the role that you were in from

18  about 2007 to 2015, correct?

19      A.  Yes.  I had many --

20      Q.  Go ahead.

21      A.  I had many duties within that department, but

22  that was made my No. 1 priority by the Service Chief.

23      Q.  And what was the name of the Service Chief

24  when you were in that role?

25      A.  Dr. David Siegel.

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q.  Okay.  And so you have a fair amount of

2   experience in vetting candidates, physicians then,

3   correct?

4    A.  Correct.

5    Q.  And about how many candidates would you say

6   you get per year in your current role?

7    A.  Per year, anywhere between 200 and 300.

8    Q.  And how many of those candidates actually end

9   up being hired by Nor Cal VA?

10    A.  On average we have hired approximately

11   anywhere from 90 to 120.

12    Q.  And what is the process that you use when you

13   go about vetting candidates?

14    A.  I verify whether or not they're a U.S.

15   citizen, whether they have a -- so everything is based

16   on basic requirements in the qualifications standards

17   for positions, so it's U.S. citizenship, their

18   education, their residency training and their medical

19   license, according to whatever states that they have

20   worked in, whether they be active or inactive.

21        So, I review their CV, and many times they

22   will not list an inactive license.  But if I notice

23   that they had a state they've worked, in I will check

24   that state to be sure that there were no restrictions

25   on any license, or that they were relinquished for

1  negative reasons.  So, those candidates will not be

2  eligible for referral.

3      Q.  And assuming that the candidates meet the

4  basic qualification, like U.S. citizenship and

5  licensure requirements, is there a certain process that

6  you use to determine which candidates rank higher than

7  others in terms of qualifications for each position?

8      A.  No.

9          MS. SMITH:  Objection.

10         Q.  BY MS. GAGE:  Is that something that you

11 use your subjective judgment to determine?

12         MS. SMITH:  Objection.

13         Q.  BY MS. GAGE:  You can answer.

14     A.  I do not make a determination of who gets

15 referred and who does not.  Every candidate who meets

16 basic requirements is referred for consideration.

17     Q.  I see.  And who do you refer the candidates

18 to?

19     A.  The Hiring Manager for that particular

20 position.

21     Q.  How many Hiring Managers are there that you

22 work with?

23     A.  I couldn't give you a number.  There's a great

24 number of departments within the facilities throughout

25 Nor Cal VA, so it's a very large number.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.  Do you know approximately how many departments

2   there are?

3      A.  I could... let's see.  Service.  Give me a

4   second to count the services that I am working with

5   currently.  Let me make a -- check notes -- oh.  I have

6   a list of services.

7         MS. SMITH:  Objection.  Objection.  Ms.

8   Keeler, don't refer to anything outside of this

9   deposition.  Anything that you should be looking at

10   will be provided to you by counsel.  At this point Ms.

11   Gage is just asking for your best estimate.  If you're

12   unable to provide one, please let us know.  Otherwise,

13   provide your best estimate.

14         THE DEPONENT:  Okay.  I could say maybe 15

15   service line, and within those service line there could

16   be a dozen Hiring Managers depending on the specialty

17   or subspecialty.

18         Q.  BY MS. GAGE:  Okay.  And when you're

19   vetting candidates, do you have to have particular

20   knowledge as to each service line to determine whether

21   they're qualified?

22         MS. SMITH:  Objection.  Go ahead.  You can

23   answer if you understand the question.

24         THE DEPONENT:  So, I have references through

25   the service lines of like the number of years required

Atkinson-Baker, a Veritext Company
www.depo.com

1  in a residency for the various specialties.  So, that

2  kind of knowledge I would have.

3       Q.  BY MS. GAGE:  Is that documentation that

4  is given to you, that explains, you know, standards,

5  such as the number of years they were qualified?

6       MS. SMITH:  Objection.

7       THE DEPONENT:  No.

8       Q.  BY MS. GAGE:  So, when you say you had

9  references through the service lines, what do you mean

10  by that?

11       A.  I will talk with the Hiring Manager to verify

12  what is the proper number of years of residency if I am

13  not already aware.  I have been vetting position

14  candidates for a number of years now, and so I

15  generally know.  Internal medicine requires four years.

16  Neurosurgery requires seven, so...

17       Q.  And I want to talk a little bit about your

18  educational history.  What's the highest education that

19  you've completed?

20       A.  High school.

21       Q.  And after high school did you go directly into

22  this field?

23       A.  No, I went into the military.

24       Q.  The military.  Okay.  How long were in the

25  military for?

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   Seven -- a little over seven years.

2      Q.   And what did you do in the military?

3      A.   My job series was a Medical Administration

4  Specialist.

5      Q.   And did you gain skills that helped you with

6  your current position?

7      A.   Not exactly.

8      Q.   What types of duties were you performing as a

9  Medical Administration Specialist?

10      A.   Initially we start as outpatient records,

11  managing patient files.  We can also work in admissions

12  and dispositions, air vac, coordinating patients going

13  from base to base for various care that's delivered.

14           Um... resource management, which is billing.

15  So, any administrative role within the hospital, we

16  could be assigned.

17      Q.   Okay.  And are you familiar personally with

18  Dr. Velez?

19      A.   I know Dr. Velez by name.

20      Q.   By name.  Have you ever interacted with her in

21  person?

22      A.   In person?  At occasional meetings, yes.

23      Q.   Would you say multiple times a year?

24      A.   No.  Maybe once or twice.

25      Q.   Like in the history of your working for Nor

1  Cal?

2     A.  In the history of working for Nor Cal, I

3  haven't interacted with her a lot.  I would say over

4  the last few years I haven't interacted with her at

5  all.

6     Q.  Do you know, is there any reason why you have

7  interacted with her less over time?

8        MS. SMITH:  Objection.

9        THE DEPONENT:  Yes.  Oh.

10       MS. SMITH:  You can answer.  Go ahead.

11       THE DEPONENT:  Sorry.  When I was in medical

12  assist, I worked a lot with clinic graphics, um...

13  things that had to do with performance measures for the

14  physicians seeing patients.  And her team was uh... a

15  group that I worked with.  So, I would have to get the

16  okay from her to participate with her team.

17       Um... and being in the position I am in now,

18  it's not necessary for me to interact with her.

19       Q.  BY MS. GAGE:  I see.  And when you say her

20  team, are you referring to the vascular surgery team?

21     A.  No.  It was an administrative team at the

22  time.  I think -- I believe she oversaw a couple of

23  administrative staff who were working on those types of

24  things.

25     Q.  So, are you referring to the Martinez campus?

1      A.  Yes.

2          MS. SMITH:  Objection.  Can you clarify what

3   you mean by Martinez campus?

4          Q.  BY MS. GAGE:  So, my understanding is that

5   Dr. Velez had the position of Site Manager at the

6   Martinez campus, and there were admin staff at that

7   facility that they oversaw and worked with.  Is that

8   correct?

9          MS. SMITH:  Objection.  To the best of her

10   knowledge she can answer.

11          THE DEPONENT:  I know that there were

12   administrative staff under her purview.  I am not sure

13   if she was a supervisor, but I did work with those team

14   members and some of the efforts that I had to do in

15   Medical Service.

16          Q.  BY MS. GAGE:  Okay.  And what kind of work

17   did you do with those team members?

18      A.  So many years ago.  Um... it had something to

19   do with clinic graphics uh... how many appointments

20   were available, how many appointments were missed by

21   patients, um... doctors signing notes timely, things of

22   that nature.

23      Q.  Okay.  And what was your involvement with that

24   process?  I guess I can clarify that a little bit.  Did

25   you go in person to meet with these team members and

1   discuss certain issues?

2        A.  No.

3        Q.  Okay.  Did you communicate via email?

4        A.  Email, yes.

5        Q.  And were there any other ways you communicated

6   with them?

7        A.  No.

8        Q.  And you would sort of coordinate what was

9   going on by asking them questions, is that correct?

10       A.  Yes.

11       Q.  Okay.  And how frequently would you say that

12  you interacted with Dr. Velez's team?

13       A.  I don't really know.

14       Q.  Do you have an estimate?

15       A.  Um...

16       Q.  Was it more than once a week?

17       A.  Uh... I would be okay with saying once a week.

18  I -- I can't say for sure.  It was so long ago.

19       Q.  And around what time frame would this have

20  been?  Would this have been somewhere in between 2007

21  to 2015 when you were the supervisor of health system

22  specialists?

23       A.  Yes.

24       Q.  And did you ever communicate with Dr. Velez

25  via email or phone during that time?

1     A.  I don't recall.

2     Q.  Okay.  But you did communicate with members of

3  her team?

4     A.  Yes.

5     Q.  Okay.  And how did you know that they were

6  members of her team?  Was there a certain way that you

7  understood that to be the case?

8     A.  I don't know exactly how to answer that.  I

9  mean, you know, the department and who supports that

10  department.

11     Q.  Okay.  So, your understanding was that Dr.

12  Velez supported the department at Martinez?

13     A.  The people I was talking to, she was working

14  with.

15     Q.  I see.  And were they in a specific field of

16  people that you were talking to?

17     A.  Um... a specific field?  I mean, they worked

18  doing benefits and data management type work.

19     Q.  I see.  And do you know if they were based at

20  Martinez specifically?

21     A.  Yes.

22     Q.  Okay.  Did you work with similar groups of

23  people at other Nor Cal VA campuses?

24     A.  Yes.

25     Q.  And how many other campuses are there?

Atkinson-Baker, a Veritext Company
www.depo.com

1     A.  I believe Nor Cal VA has 10 locations.

2     Q.  Okay.  Did you work more closely with some

3  locations than others?

4     A.  The Martinez VA outpatient clinic is the

5  second largest site for us, so that would be usually

6  probably the -- the next -- the second place that would

7  be the most communicated with.

8     Q.  Okay.  And what was the first largest site?

9     A.  Sacramento.

10    Q.  And currently do you communicate with the same

11 people at the Martinez site or the Sacramento site?

12    A.  I do not.  I have no need to as a Health Care

13 Recruiter.

14    Q.  Do you know what the Office of Resolution

15 Management is?

16    A.  I know the name.

17    Q.  Okay.  Have you ever interacted with the

18 Office of Resolution Management during your tenure with

19 Nor Cal VA?

20    A.  I'm not sure.  But I had --

21       (Simultaneous speech.)

22    Q.  I'm sorry.  Go ahead.

23    A.  I'm sorry.  I had been a trained mediator with

24 the VA, so I'm not sure.  So, I don't recall if that

25 was before or after that group.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   And when you say you were a trained mediator,

2  what year did you receive training for that?

3      A.   I could not -- I couldn't tell you that today.

4      Q.   Was it more than five years ago?

5      A.   Absolutely it was.

6      Q.   More than ten years ago?

7      A.   It was when I was in Nursing Service, during

8  that time frame.

9      Q.   Okay.  Somewhere around early 2000 maybe?

10     A.   Yeah.  I would say I was there from 1999 until

11  2005, so somewhere in that time frame.

12     Q.   And what did that training consist of?

13     A.   Uh... wow!  Um... it's hard to recall that far

14  back.  But something to do with, you know, meeting with

15  two different people who have an issue, and trying to

16  get them to come to a common place so that they can

17  proceed with whatever, you know, disagreement that they

18  were having, without having to go to the next level.

19     Q.   Okay.  And did you apply to become a mediator

20  with the VA?

21     A.   I don't believe I had to apply.  I believe it

22  was one of those additional tasks that you could kind

23  of volunteer for, or maybe you were volunteered for by

24  your manager.

25     Q.   Sure.  And did you ever actually engage as a

1  mediator in any case?

2      A.  I'm sure I did a few times, but not too many.

3      Q.  Do you think more than five times?

4      A.  No.  I think probably five or less.

5      Q.  Okay.  Do you remember any of those occasions

6  what exactly the dispute was?

7          MS. SMITH:  Objection.  Don't mention specific

8  names.  To the extent you remember you can answer.

9          THE DEPONENT:  I do not recall.

10         Q.  BY MS. GAGE:  Did you enjoy being a

11  mediator?

12     A.  I'm sorry?

13     Q.  Did you enjoy being a mediator?

14     A.  No.  It's not a lot of fun.

15     Q.  Okay.  Is that why you stopped doing that?

16     A.  My role in Medical Service was more uh...

17  required more of me.  So, I did not have the time to do

18  that any longer.

19     Q.  Was it pretty contentious?  Is that why it

20  wasn't much fun?

21         MS. SMITH:  Objection.

22         THE DEPONENT:  It can be contentious.

23         Q.  BY MS. GAGE:  Were you ever involved in

24  the investigation of any complaints?

25         MS. SMITH:  Objection.  What do you mean by

Atkinson-Baker, a Veritext Company
www.depo.com

1   the term complaints?

2        MS. GAGE:  I guess I can specify.

3        Q.  EEO complaints?

4        A.  I... I'm trying to think.  I know that I have

5   been asked for -- or had to speak to someone at our

6   facility, but I don't know if it was an EEO complaint.

7   It was some kind of investigation about a complaint

8   that had been made, but I'm not positive if it was EEO

9   or not.

10       Q.  And was that during the time that you worked

11  as a mediator?

12       A.  No.

13       Q.  When was that?

14       A.  I think is that was within the last five

15  years.

16       Q.  Okay.  And do you know why you were asked

17  specifically to speak with someone about the complaint?

18       A.  Yes, because I worked with the people within

19  those departments.

20       Q.  Okay.  Do you recall which department?

21       A.  The Mental Health Service.

22       Q.  Mental Health Service.  Okay.  So, just to

23  clarify, someone who worked in the Mental Health

24  Service Department had made some kind of complaint, and

25  there was an investigation, and you were interviewed

Atkinson-Baker, a Veritext Company
www.depo.com

1  about what had taken place, is that right?

2      A.  Correct.

3          MS. SMITH:  Objection.

4          Q.  BY MS. GAGE:  Was that the only time

5  you've been interviewed in connection with the

6  investigation of an EEO complaint?

7      A.  To the best of my knowledge.

8      Q.  Okay.  Were you ever involved in the process

9  of employees filing complaints with the Office of

10  Resolution Management?

11         MS. SMITH:  Objection.

12         THE DEPONENT:  No.

13         Q.  BY MS. GAGE:  Do employees submit

14  complaints of any type to you?

15         MS. SMITH:  Objection as to the term -- as to

16  the definition of complaint.

17         Q.  BY MS. GAGE:  Formal complaints about

18  workplace misconduct.

19     A.  No.

20     Q.  Okay.  Has that ever been the case throughout

21  your tenure with Nor Cal VA?

22     A.  No.  It has never been a case.  I've never had

23  anyone report to me directly those issues.

24     Q.  Okay.  Are you aware that Dr. Velez filed an

25  EEO complaint of discrimination and retaliation?

Atkinson-Baker, a Veritext Company
www.depo.com

1       A.  I was not.

2       Q.  Are you aware of any other physicians who

3   filed EEO complaints against Nor Cal VA?

4       A.  I am not.

5           MS. SMITH:  Objection.

6       Q.  BY MS. GAGE:  I want to shift a little bit

7   to pay administration.  Do you have an understanding of

8   the policies regarding pay administration at VA Nor

9   Cal?

10          MS. SMITH:  Objection as to the term pay

11  administration.

12      Q.  BY MS. GAGE:  The way the employees are

13  compensated, the different ways that employees can be

14  compensated.

15      A.  So, my familiarity is with physician and

16  dentists pay.

17      Q.  And do you have a pretty clear understanding

18  of how the physicians and the dentists, how they are

19  paid is determined?

20      A.  Yes.  I would be considered the subject matter

21  expert at my facility.

22          MS. SMITH:  Objection to the extent she is not

23  here testifying as an expert witness.  She is

24  testifying as a fact witness.

25      Q.  BY MS. GAGE:  And are there certain

1   policies in effect regarding how physicians and

2   dentists are to be paid within the system?

3       A.  Yes.  There is a handbook, a directive.

4       Q.  Okay.  And does that directive get updated

5   frequently?

6       A.  I don't know how frequently they're updated in

7   the VA.  Sometimes not so frequently, but, you know, it

8   does get updated.

9       Q.  Okay.  Do you think it should be updated more

10  frequently?

11      MS. SMITH:  Objection.  Her view point is

12  irrelevant.

13      Q.  BY MS. GAGE:  You can answer.

14      MS. SMITH:  You can answer.

15      THE DEPONENT:  That's a VA national thing, not

16  a local facility thing.  So, I have no... I have

17  nothing to add there.

18      Q.  BY MS. GAGE:  I was just curious because

19  you laughed a little bit when you said that it was not

20  updated so much.  I just thought you felt it should be

21  updated.

22      MS. SMITH:  Objection.  She's provided a

23  response.  Objection to the extent that's a question.

24      Q.  BY MS. GAGE:  Do you know what -- do you

25  have an estimate of how frequently the handbook is

1    updated?

2        A.  I do not.

3        Q.  Would you say more than every five years, more

4    frequently than every five years?

5        A.  I couldn't say.

6        Q.  Well, you've been around when it's been

7    updated, correct?

8        A.  Yes.

9        Q.  Okay.  And I would think you would be able to

10   estimate to some degree of -- you know, you have more

11   knowledge than I do at least of how frequently it is

12   updated.  Is it updated more than every ten years?

13       A.  I would say within the time period I've been

14   in this position I've seen maybe two updates.

15       Q.  Okay.  And that's since you've been in the

16   position --

17       A.  Of Health Care Recruiter.

18       Q.  How many updates have you seen?

19       A.  I... that's a tough one.  The most recent one

20   I can recall is that uh... regarding physician pay.

21   They used to have a PayPal that would meet to review

22   pay recommendations.  And that was disbanded a few

23   years ago.  So, that was one update that I can recall.

24       Q.  When you say it was expended, do you mean that

25   more people were added to the panel to help

1   determine --
2         A.  No.
3             MS. SMITH:  I believe the word was --
4   disbanded.
5             Q.  BY MS. GAGE:  Okay.  Do you have any idea
6   why that was disbanded?
7             MS. SMITH:  Objection.
8             THE DEPONENT:  It's a estimate decision.
9             Q.  BY MS. GAGE:  So, the handbook that you
10  are referencing, is that a national handbook, or are
11  there local handbooks in effect?
12        A.  It is a VA handbook directive.  So, it is not
13  local.
14        Q.  Okay.  Are there other local policies?
15        A.  No.
16        Q.  Okay.  So, all pay is determined at a national
17  level, is that right?
18        A.  All pay is governed by the national directive.
19  We -- we all have to follow that.  We don't get to set
20  our own ways of doing business.
21        Q.  I see.  So, the people who authorize these
22  changes to the handbook are probably people who are
23  much higher up in the VA, is that your understanding?
24            MS. SMITH:  Objection.  Calls for speculation.
25            MS. SMITH:  You can answer, Coleen.  Sorry, I

1  mean Crystal.

2      THE DEPONENT:  That -- I don't know who makes

3  those decisions.  It's VA, so...

4      Q.  BY MS. GAGE:  So, my understanding is that

5  there are various ways that physicians can be

6  compensated within the VA.  And I'm just going to list

7  the five ways that I'm aware of, and I just want you to

8  confirm that that's an accurate understanding.

9      MS. SMITH:  Or if it's inaccurate, please let

10  her know.

11      Q.  BY MS. GAGE:  So, from my understanding

12  there's like a grade and step pay, a market pay, caps,

13  a cost of living formula, and irregular pay decisions.

14  Is that an accurate understanding?

15      A.  That is not accurate.

16      Q.  Okay.  Can you tell me what's inaccurate?

17      A.  Yes.  It's easier for me to tell you what is

18  accurate, because some of those things I won't recall

19  what they were.  I just know that they're not

20  appropriate.  For physicians, their grade and step is

21  based on their time in service.  Every physician starts

22  at a grade 15 step 1, and that is their base and

23  longevity pay, and they get a step increase every two

24  years, up to step 15.

25      In addition to base pay they receive market

Atkinson-Baker, a Veritext Company
www.depo.com

1    pay.  So, base pay plus market pay total their salary,

2    their annual salary.

3         Q.  Okay.

4         A.  Those are the only factors considered for

5    physician pay.

6         Q.  Okay.  And you've said that they receive a

7    step increase every two years.  Did you say there's a

8    limit to how many times they can receive a step

9    increase?

10        A.  Yes, it caps out at step 15.

11        Q.  Okay.  So, then the highest grade and step

12   that a physician can be is grade 15, step 15, correct?

13        A.  Correct.

14        Q.  And you said they also receive market pay.

15   How is that determined?

16        A.  Initially a department will decide if someone

17   is brand new to the VA, based on their specialty or

18   assignment, which is interchangeable, those two words.

19        Q.  Okay.

20        A.  What their total salary should be.  So, let's

21   say, you know, they want to start a provider at

22   300,000.  So, they say step 1 is 186,450.  And they're

23   going to subtract that from 300,000 to determine what

24   that first market pay amount is going to be.  So, that

25   is then what their pay is, their base, their market,

Atkinson-Baker, a Veritext Company
www.depo.com

1    and their total salary for their step 1 assignment.

2              As we go forward they will receive a biannual

3    market pay review to see if there is any reason based

4    on the market, that a market pay increase is not

5    necessary to retain them.

6              And the step increases do not coincide with

7    that biannual research.

8         Q.  Okay.  Are the step increases on their own

9    schedule?

10        A.  They are automatic based on their time in

11   service.

12        Q.  Okay.  And who determines the market pay?

13        A.  The Hiring Manager or the Service Chief make a

14   recommendation.  And then that recommendation is

15   referenced by the Chief of Staff and the Facility

16   Director for approval.

17        Q.  Has this been the same throughout your entire

18   employment with VA Nor Cal as far as you're aware?

19        A.  Yes.

20        Q.  And it was my understanding that there was

21   some sort of cap on the pay.  Is that accurate, or is

22   that what you were referring to when you said step 15

23   would be the highest amount they could be paid.  Would

24   that be considered a cap?

25              MS. SMITH:  Objection.  You can answer.

Atkinson-Baker, a Veritext Company
www.depo.com

1          THE DEPONENT:  Okay.  Base pay is -- does have

2     a cap, because it's payable for their steps only.

3     Physicians' salaries are capped at $400,000, so they

4     can never earn more than 400,000 annually.

5          Q.  BY MS. GAGE:  Okay.  And that would be

6     including the grade and step and the market pay?

7          A.  Yes.  And any performance bonuses.

8          Q.  Are there any other types of caps on pay?

9          A.  No.  That's pretty much it, 400,000.

10         Q.  Okay.  And is there a cost of living payout

11    for physicians?

12         A.  No, there is not.

13         Q.  So, there's no cost of living reimbursement or

14    anything of that nature?

15         A.  No.

16         Q.  Is there a cost of living reimbursement or pay

17    for other employees?

18         MS. SMITH:  Objection.  To the extent she

19    knows she can answer.

20         THE DEPONENT:  I know that the pay tables for

21    many GS positions are based on their location.  So, it

22    takes into account locality.  But for physicians that

23    is not the case.

24         Q.  BY MS. GAGE:  Okay.  Do you have any idea

25    why that's not the case.

Atkinson-Baker, a Veritext Company
www.depo.com

1        MS. SMITH:  Objection.  Calls for speculation.

2   You can answer.

3        THE DEPONENT:  We follow the handbook.  The

4   handbook says base pay and market pay.  Those are the

5   determining factors based on their assignment, what is

6   their specialty.

7        Q.  BY MS. GAGE:  And will a change in

8   assignment, will that be considered an irregular pay?

9        MS. SMITH:  Objection.  I don't understand the

10  question.  To the extent you understand the question,

11  Crystal, you can answer.

12       THE DEPONENT:  Irregular pay would not be

13  something -- it's not a terminology we would use.

14  Change in assignment is a terminology we would use, and

15  market pay review is unexpected if there is a change in

16  assignment.

17       Q.  BY MS. GAGE:  Okay.  So, there -- do you

18  have an understanding of what irregular pay would be?

19       A.  No.

20       Q.  Okay.  And how much of your day-to-day would

21  you say is spent working with physicians and dentists

22  regarding their pay?

23       A.  The last few months, not at all.  I have

24  strictly been doing recruitment.  All of my HR

25  functions have been taken away.

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q.  And why is that?

2    A.  Because they wanted my focus to be on health

3  care recruitment, and not HR and recruitment, but just

4  focused on recruitment.

5    Q.  Okay.  Is there someone else that stepped in

6  to take over those HR functions?

7    A.  There are a few HR specialists within the

8  department who are handling those actions.

9    Q.  And prior to your HR functions being taken

10  away, how much time would you say was spent dealing

11  with pay-related issues?

12    A.  Probably 50 percent.

13    Q.  Okay.  Was that the majority of your HR

14  functions dealing with physician pay?

15    A.  Anything physician-related, be it a personnel

16  action, they changed from full-time to part-time, they

17  went from fee basis employment to part-time.  They had

18  a change in assignment where they became a supervisor,

19  and had not been a supervisor.  So, all of those things

20  involve pay in some way.  So...

21    Q.  Sure.  That makes sense.  Do you have any

22  familiarity with how Dr. Velez was compensated?

23        MS. SMITH:  Objection as to what point in time

24  we're talking about.

25        Q.  BY MS. GAGE:  Over the past three years,

1    past three years.

2            MS. SMITH:  You can answer.

3            THE DEPONENT:  Okay.  Um... so, I know that

4    she is compensated as a physician's supervisor.  And

5    she is paid on the pay table for vascular surgery.

6            Q.  BY MS. GAGE:  Do you have any

7    understanding that she was compensated as a Site

8    Manager for Martinez?

9            A.  I do not.

10           Q.  Are you aware that any Site Managers of the

11   facilities are compensated?

12           MS. SMITH:  Objection.  Vague.

13           Q.  BY MS. GAGE:  I guess my question is, I

14   know that you work with physicians and dentists,

15   physicians and dentists regarding their pay.  Do you

16   have an understanding as to how other physicians are

17   compensated, such as a Site Manager?

18           A.  I do not.

19           Q.  Okay.  Have you ever had any understanding as

20   to how other physicians are compensated?

21           A.  It was not within my purview, so I did not

22   have a need to know.

23           Q.  Okay.  Do you ever deal with benefit

24   administration with physicians and dentists?

25           A.  Could you clarify?

1     Q.  Like are you involved in what types of

2   benefits they receive, or do you have an understanding

3   of certain benefits that are available to physicians

4   and dentists in particular?

5     A.  So, in recruiting for physicians and dentists,

6   I will communicate with them what benefits are offered

7   to that group, how much vacation time they earn, how

8   much sick time they earn.  I will give them a link to

9   review what federal health plans are available to them,

10  things of that nature.  That's the extent of my

11  involvement with benefits.

12    Q.  Okay.  And are there benefit plans offered

13  based on the employee's grade or step?

14    A.  I know that --

15        MS. SMITH:  Objection.

16        THE DEPONENT:  I'm sorry.

17        MS. SMITH:  Objection.  Her basis of knowledge

18  is to speaking to physicians, so the term employee, are

19  you limiting to that physicians, or are we going to be

20  using the term employee to all employees?

21        Q.  BY MS. GAGE:  Right now I just want to

22  know about physicians?

23    A.  For physicians there is a difference if you're

24  part-time versus full-time.  Because all of your

25  benefits will be prorated then.

Atkinson-Baker, a Veritext Company
www.depo.com

1     Q.  Is that the only difference, is that they will

2   be prorated if the physician is part-time?

3     A.  Yes.

4     Q.  Okay.  And do you have any understanding as to

5   benefits that other VA Nor Cal receive who are not

6   physicians or dentists?

7     A.  No.

8     Q.  I want to mark an exhibit.  Is it -- would it

9   be best to share the exhibit through the chat feature?

10  Does that work for everyone?

11         MS. SMITH:  It should be displayed.  You

12  should be able to share it.

13         MS. GAGE:  Sure.

14         MS. SMITH:  If you're not the host you're not

15  able to share your screen.

16         THE REPORTER:  Off the record.

17         (Recess taken.)

18         MS. GAGE:  Back on the record, please.

19     Q.  Ms. Keeler, do you recognize this document?

20     A.  I recognize it.  It's a SF 50.

21         MS. SMITH:  Objection.  Just for the record,

22  you're referring to Exhibit 1, correct?

23         MS. GAGE:  Exhibit 1, yes.

24         (Plaintiff's Exhibit 1 was marked for

25         identification.)

1        MS. SMITH:  Is that a three-page document?

2        MS. GAGE:  Yes, a three-page document.

3        MS. SMITH:  Can the witness have the

4    opportunity to review the document before you start

5    asking questions about it, please?

6        MS. GAGE:  Yes.  Take few minutes to review

7    it, or as long as you need.

8        MS. SMITH:  I don't know if you have to give

9    her control to zoom out.  But Ms. Keeler, just let us

10   know what would be easiest for you.

11       THE DEPONENT:  You can scroll to the next

12   page.

13       Q.  BY MS. GAGE:  Sure.

14     A.  Okay.  Next page.

15     Q.  Just a blank page it looks like.

16     A.  Okay.

17     Q.  Okay.  So, you said that you recognized this

18   as -- was it a specific form that you stated?

19     A.  Yes.  It's a Standard Form 50, up in the upper

20   left-hand corner.  So, we refer to it as an SF 50, and

21   it is a record of the personnel action that was

22   accomplished on a provider.

23     Q.  Okay.  And are you familiar with these types

24   of forms?

25     A.  Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1       Q.   Okay.  And are these forms ones that you would

2   work with when you were doing the HR functions of your

3   current position?

4       A.   When we complete a personnel action, this form

5   is created as a result of that coding.

6       Q.   I see.  Okay.  So, if you take a look, it

7   looks like this form was -- the effective date is

8   listed as May 20th, 2001, correct?

9       A.   Yes.

10      Q.   And that would have been the date that the

11  personnel action became effective?

12      A.   Correct.

13      Q.   Okay.  And it looks like the Nature of Action,

14  it says reassignment.  And from your understanding, is

15  that just reassignment of a physician?

16          MS. SMITH:  Objection.  To the extent she's

17  answering the question what is her understanding of the

18  use of reassignment, she can answer.  But the question

19  as asked is leading.

20          THE DEPONENT:  When coding a reassignment

21  action, it can be any change in an assignment.  Maybe

22  they've had supervisory duties added.  Maybe they've

23  had supervisory duties taken away.  Maybe they have

24  become a Program Manager for a certain program.

25          Q.  BY MS. GAGE:  Okay.  So, would you have

1   received a form similar to this that said reassignment

2   when they removed your already duties recently?

3        A.  No.

4        Q.  Well, I thought you said when there's a change

5   in duty.  Did you not say when there's a change in job

6   duties?

7             MS. SMITH:  Objection.

8             THE DEPONENT:  It is not always necessary.  I

9   am on the same position description as a Human

10  Resources Specialist that the other HR Specialists are

11  on.  So, it was just my role and responsibilities that

12  were changed, not necessarily -- not my PD.

13       Q.  BY MS. GAGE:  All right.  So, when roles

14  and responsibilities are changed, there is not always a

15  form like this that's generated?

16       A.  Correct.

17       Q.  Okay.  And so -- but there sometimes is a form

18  that's generated just due to changes in

19  responsibilities, is that right?

20            MS. SMITH:  Objection.  Calls for speculation.

21  To the extent you know you can answer.

22            THE DEPONENT:  The form would be generally

23  created if a personnel action was accomplished for a

24  job announcement or a change in pay perhaps.

25            Q.  BY MS. GAGE:  Okay.  Are there any other

1   reasons why the form would be created?

2       A.  Any of the reasons I listed as a possible

3   reassignment.

4       Q.  Okay.  So, I just want to clarify, though,

5   you said that one of these forms is not always created

6   when there's a change in job duties.  But is it

7   sometimes created when there's a change in job duties,

8   or is this something that's for something that's more

9   formal?

10          MS. SMITH:  Objection.

11          THE DEPONENT:  There would be more --

12          MS. SMITH:  Go ahead.

13          THE DEPONENT:  It would be more formal, the

14  need for this.

15          Q.  BY MS. GAGE:  Okay.  I understand.  Let's

16  see.  And then under Work Schedule, it looks like No.

17  32, it says Part-time.  And then No. 33 says Part-time

18  Hours Per Biweekly Pay Period, 70.  Do you see that?

19      A.  Yes.

20      Q.  I'm just a little bit confused about exactly

21  what that means.  Would it -- does this mean that the

22  employee, which is Dr. Velez, on this form was working

23  70 hours biweekly in this position?

24      A.  Yes.

25      Q.  Okay.  And biweekly, is that used as every two

Atkinson-Baker, a Veritext Company
www.depo.com

1   weeks, or twice a week?

2       A.  Every two weeks.  Our pay periods are two

3   weeks.

4       Q.  Got it.  Okay.  So, this would seem to say

5   that it lists position title and number as physician.

6       A.  Uh huh.

7       Q.  So, this is the same as a physician.  She was

8   working part-time 70 hours every two weeks, is that

9   correct?

10      A.  Correct.

11      Q.  Okay.  And then towards the bottom it says

12  selected from Martinez Site Manager.  Do you see that?

13      A.  Yes.

14      Q.  Do you know what exactly would have generated

15  that in the form?  Selected From, is that a typical

16  field in the form?

17      A.  I do not know.  I can't -- I can't discern if

18  there was a job announcement that she was selected

19  from.  I don't know.

20      Q.  Okay.  Have you seen the Selected Form

21  generated in these forms before?

22      A.  For physicians, no.  Because all of the

23  personnel actions that I have processed have been

24  non-competitive appointments, and we do not select --

25  we do not select from a certificate in U.S.A. job

Atkinson-Baker, a Veritext Company
www.depo.com

1  advertisements.

2      Q.  Okay.

3      A.  There has been a shift.  Since back in 2001

4  they used to advertise every physician's job on U.S.A.

5  jobs.  And now we have the opportunity to advertise in

6  other venues, so that's not something I've had

7  experience doing.

8      Q.  Okay.  So, when you've seen the Selected From

9  field before, that was in relation to employees who

10  were not physicians?

11      A.  No, I haven't seen it before.

12      Q.  Never seen that before?

13      A.  I don't -- I don't process non-physician or

14  dentist actions, or I have not processed anyone other

15  than physicians or dentists.

16      Q.  So, typically there's no field that says

17  Selected From?

18      A.  Correct.  Not on the actions that I have done

19  for physicians and dentists, if that makes sense.

20      Q.  And then if we scroll down to the next page,

21  under No. 45, Remarks.  It says special pay authorized

22  under 38 U.S.C. 7431.

23          Do you have an understanding of what special

24  pay would mean in this context?

25      A.  I couldn't tell you.  I mean, in reading the

1  document I can take a guess, but I couldn't tell you

2  for certain what that means.

3      Q.  Yeah.  Can you give me a guess based on the

4  knowledge that you have?

5          MS. SMITH:  Objection.  She's been instructed

6  not to guess.

7          Q.  BY MS. GAGE:  Or not -- I guess an

8  estimate -- or not a guess, I would say, would be

9  something where it's not based on personal knowledge,

10  but since you do have knowledge of these forms, if you

11  have like what's your best understanding of what

12  special pay might mean.

13          MS. SMITH:  Objection.  Do you have any

14  personal knowledge of the specific code task being

15  referenced in this document?

16          THE DEPONENT:  I do not.  Not to that

17  reference.

18          MS. SMITH:  My objection stands, and I'm

19  instructing her not to answer, not to guess.

20          Q.  BY MS. GAGE:  Okay.  Have you seen the

21  words special pay on a form like this before?

22      A.  I have not.

23      Q.  Okay.  Is there something called special pay

24  that's another aspect of how a physician or dentist

25  could be paid?

1    A.  No.

2    Q.  Okay.  So, you just have no idea what special

3  pay could refer to here, correct?

4    A.  I do not.

5        MS. GAGE:  Okay.  I'm done with this, so I'll

6  stop sharing this exhibit.  I would like to introduce

7  Exhibit 2.

8            (Plaintiff's Exhibit 2 was marked for

9            identification.)

10        Q.  BY MS. GAGE:  Can everyone see this page?

11    A.  Uh huh.

12    Q.  Okay.  So, this is a four-page document

13  entitled Executive Career Field Performance Appraisal

14  at the top.  I want to give you a few minutes to review

15  this document as well, so let me know when you're

16  ready, I can scroll to the next page.

17    A.  You can scroll to the next page.

18        MS. SMITH:  And for reference, when you say

19  this document, you're referring to Exhibit 2, which is

20  a four-page document, is that correct?

21        MS. GAGE:  Yes.

22        MS. SMITH:  Can you use the mouse so she can

23  see the entire page?

24        Q.  BY MS. GAGE:  Is that better?  Can you

25  see?

1        A.   Uh huh.   Okay.   Okay.

2        Q.   Okay.   And the last page?

3        A.   Okay.

4        Q.   Okay.   Do you recognize this document?

5        A.   I do.

6        Q.   Okay.   And can you explain what an ECF

7   Performance Appraisal is?

8        A.   An Executive Career Field Performance

9   Appraisal is the appraisal used for anyone who is in a

10   supervisory role.   So, each employee has a performance

11   approximately done each year.   This is the one used for

12   supervisors.

13        Q.   Okay.   And it says Position Title, Site

14   Manager here.   And that would be the supervisory role

15   that's being evaluated, is that correct?

16        A.   She actually is a Physician Supervisor in

17   vascular surgery at the Martinez location.

18        Q.   Uh huh.

19        A.   And I don't believe that that's represented

20   here, and it should be.

21        Q.   Okay.   But what is represented is that the

22   Site Manager position is being evaluated under the

23   Performance Appraisal?

24        A.   That's what I see.

25        Q.   Okay.   And what is the result of a Performance

1   Appraisal?  Are any actions taken as a result of the

2   outcome of the Performance Appraisal?

3       A.  Every employee generally who receives an

4   outstanding or an excellent rating as their overall

5   rating is eligible to receive a performance award.

6       Q.  Okay.  And I know you said before that there's

7   a cap of $400,000 for physicians, so that even if an

8   employee were eligible for that, if they had already

9   been making $400,000, they are no longer eligible?

10      A.  Correct.  They would not be able to receive

11  it, because they had already earned 400,000.

12      Q.  I see.  Are you involved at all in these

13  Performance Appraisals?

14      A.  I have been involved in processing the

15  personnel actions um... previously.

16      Q.  Okay.  And what does that entail exactly?

17      A.  That entails collecting all the data for

18  recommendations of the employees, meeting their uh...

19  performance reviews.  Actually I'm misspeaking, because

20  this is in relation to a Performance Appraisal, and I

21  wasn't involved in Performance Appraisals.  I was

22  involved in Physician Performance Pay, which is a

23  separate form.

24      Q.  I see.  Okay.  Do you know how these forms are

25  generated?  Is there someone that fills them in, or are

1    they generated similar to the form that we just looked

2    at as Exhibit 1?

3              MS. SMITH:  Objection.  Vague.  To the extent

4    you understand the question, you can answer.

5              THE DEPONENT:  Okay.  Um... the performance

6    criteria that was listed, I believe, on page 2.

7              Q.  BY MS. GAGE:  Uh huh.

8         A.  Could you scroll to that page?

9         Q.  Sure.

10        A.  So, the performance elements here are dictated

11   by the VA.

12        Q.  Okay.

13        A.  And each facility then breaks them down.

14        Q.  Uh huh.

15        A.  To apply to their location.  So, the director

16   receives the performance measures, and then he passes

17   them on to the Chief of Staff.  The Chief of Staff sets

18   what his elements are, and they go down like that.

19             And each supervisor completes these for their

20   employees.

21        Q.  Okay.  So, scrolling back up to the top here,

22   would a supervisor have entered the fields up here,

23   like Velez, Pauline, pay level salary fields?  Is that

24   pay level entered by the supervisor?

25             MS. SMITH:  Objection.

1          THE DEPONENT:  It could be the supervisor or

2    their Administrative Assistant.

3          Q.  BY MS. GAGE:  Okay.  I just wanted to

4    clarify, did you sa    But these ECF Performance

5    Appraisals are entered manually?

6          A.  It is created manually by the supervisor or

7    their administrative team, to be carried out and

8    finalized.

9          Q.  I see.  Okay.  That makes more sense then.

10   And then on this page, page 2, under Performance -- I'm

11   sorry.  So, on page 2 you said that these elements that

12   are listed come from the VA, is that right?

13         A.  Yes.

14         Q.  Okay.  And then where there's a star, it says

15   Denotes Critical Element.  Do you know who determines

16   which elements are critical?

17         A.  I do not.

18         Q.  Okay.  And then on page 3, Section H, it says

19   Higher Level Review.  And then Action.  And it's

20   checked, Concur with and approve initial rating.  And

21   it doesn't look like there's a signature underneath

22   there.

23         A.  It's at the bottom of the page.

24         Q.  I see.  And that is referring to the person

25   who authorized the Higher Level Review?

1      A.  Yes.

2      Q.  I see.  Okay.  And then finally on the last

3  page it says Pauline Velez, M.D., Site Manager,

4  Martinez Outpatient Clinic.  Goals for fiscal year

5  2007.

6          Are these typical goals that are added to the

7  end of a ECF review?

8          MS. SMITH:  Objection.  You can answer.

9          THE DEPONENT:  I do not know.

10      Q.  BY MS. GAGE:  Okay.  Do you know who would

11  have written these goals?

12          MS. SMITH:  You can answer.

13          THE DEPONENT:  My assumption would be the

14  manager.

15      Q.  BY MS. GAGE:  Okay.  Therefore, the Site

16  Manager position, is that your understanding?

17          MS. SMITH:  Objection.  Calls for speculation.

18      Q.  BY MS. GAGE:  You can answer.  Is that

19  your understanding, Ms. Keeler, that these are for the

20  Site Manager position?

21          MS. SMITH:  Objection again.  Calls for

22  speculation.

23      Q.  BY MS. GAGE:  I'm still entitled to an

24  answer, please.

25          MS. SMITH:  To the best of your ability -- to

1    the best of your ability, after you've reviewed the
2    document you can answer what your understanding is.
3            THE DEPONENT:  It says Site Manager on the
4    form.
5            Q.  BY MS. GAGE:  So, that's your
6    understanding, is that correct?
7        A.  I -- I can't say what the person intended, but
8    that's what it says on the form.
9            MS. GAGE:  Okay.  And I'll stop sharing that
10   exhibit.
11           Okay.  I'm going to share Exhibit 3.
12           (Plaintiff's Exhibit 3 was marked for
13           identification.)
14           Q.  BY MS. GAGE:  Can everyone see this
15   document?
16           MS. SMITH:  Exhibit 3 appears to be a 10-page
17   document.
18           MS. GAGE:  Yes.  That's correct.
19       Q.  Ms. Keeler, can you please take some time to
20   review this document and let me know if I need to
21   scroll down.
22       A.  Can you make it a little bit bigger?
23           Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
24   Okay.  Okay.
25       Q.  Going to the last page.

1      A.  Okay.  Okay.  Okay.

2      Q.  Do you recognize this document?

3      A.  I -- I recognize it as a Performance

4   Appraisal, yes.

5      Q.  Okay.  And it looks like under the position

6   title at the top, it says Assistant Chief, Surgical

7   Service Physician.  And then someone -- it looks like

8   someone wrote in Site Manager, Martinez.  Do you see

9   that?

10      A.  I do.

11      Q.  Okay.  Do you know... oh.  I'm sorry.  It also

12   looks like location, it says NCHCS.  And then

13   Sacramento VAMC is crossed out and replaced with

14   Martinez.  Do you see that there?

15      A.  I see it.

16      Q.  Okay.  Is it common for there to be

17   corrections in pen or in writing on forms like this?

18         MS. SMITH:  Objection.  Calls for speculation.

19   To the extent you know you can answer.

20         THE DEPONENT:  If a document has been fully

21   completed, supervisors or HR may sometimes make

22   corrections based on the actual record.

23         Q.  BY MS. GAGE:  Okay.  So, it wouldn't be

24   appropriate to make these corrections in writing unless

25   a document has been fully executed, is that right?

Atkinson-Baker, a Veritext Company
www.depo.com

1       A.  Correct.

2       Q.  I want to take a look and see... excuse me.

3  So, on this second page right here um... it lists these

4  elements again.  And I think on the last exhibit,

5  Exhibit 2, you said that the elements are determined by

6  the VA, right?

7       A.  Uh huh.  Yes.

8       Q.  And do you have any familiarity with what the

9  elements -- what each of them means, or how they're

10  evaluated?

11       A.  Each year it changes what comes under those

12  element titles.  The performance measures change under

13  those each and every year.

14       Q.  Okay.  And is that a directive from like

15  higher up in the VA at a national level?

16       A.  Yes, ma'am.

17       Q.  Okay.  And then I think you said at some point

18  that there are people at the local level who evaluate,

19  after receiving this from the national level, is that

20  right?

21            MS. SMITH:  Objection.

22       Q.  BY MS. GAGE:  You can answer.

23       A.  So, to clarify what I communicated earlier,

24  when these performance measures come out from national,

25  each facility has to apply it to what their facility

1   does.  So, it has to be relevant to what we do.  This

2   is on a global level, these elements.  And then we have

3   to apply it to what do, we specifically do, what

4   services do we provide, etcetera.

5       Q.  I see.  So, for instance, the first element

6   says, leading change, 20 percent critical, would the

7   leading change element be something that's from the

8   national level, but all of the intricacies of how

9   that's evaluated would be determined at a more local

10  level?

11      A.  Yes.

12      Q.  Okay.  And do you know if the more national

13  level determines which factors are critical versus

14  noncritical, or if that's something being done at the

15  local level?

16      A.  I don't recall.  I -- I used to receive an ECF

17  myself, and I helped to create them for physicians'

18  staff managers, but I don't recall if we set them on

19  critical elements, or if that was determined higher.

20  It's been too many years.

21      Q.  Okay.  That's fair.  Of course, now in the

22  Elements/Achievements box here at the bottom, it says,

23  "Dr. Velez wears many hats; Vascular Surgeon, Assistant

24  Chief of Surgery for East Bay, Site Manager (aka Chief

25  Administrative Officer) for Martinez, and VISN-level

Atkinson-Baker, a Veritext Company
www.depo.com

1   program leader and innovator.  For a variety of

2   reasons, this year, the ECF is being completed by me,

3   apparently in an effort to glean a more clinical

4   perspective on her outstanding performance.  In years

5   past, she was evaluated by administrative supervisors.

6   Obviously, a vast amount of what she does is

7   non-clinical; I have attempted to recognize both her

8   clinical and non-clinical achievements in scoring this

9   year's ECF.  Fortunately, through her detailed fiscal

10  year 14 ECF Self Report document, her outstanding

11  performance is obvious.  I have appended some

12  highlights and comments to emphasize certain

13  accomplishments."

14          And then that looks like it was signed off by

15  her supervisor?

16      A.  I couldn't say whose initials those are.

17      Q.  The person who was evaluating her would have

18  written those comments there, is that right?

19          MS. SMITH:  Objection.  Calls for speculation.

20      Q.  BY MS. GAGE:  Is that typically how that

21  works?

22          MS. SMITH:  Objection.  Calls for speculation.

23  You can answer.

24          THE DEPONENT:  This is the area that the

25  supervisor should be writing their assessment of the

1   employee.

2          Q.  BY MS. GAGE:  Okay.  And so I want to

3   focus on this where the supervisor provides obviously a

4   vast amount of what she does is non-clinical.  Is it

5   your understanding that she's being reviewed for both

6   her clinical and non-clinical position in this

7   evaluation?

8          MS. SMITH:  Objection.  Calls for speculation.

9   She did not create this document.

10         Q.  BY MS. GAGE:  You can answer.

11         A.  I have no knowledge of exactly what she's

12   being rated on.  It's outside of my scope.

13         Q.  So, on the first page up here, where it says

14   Position Title, Assistant Chief, Surgical Service

15   Physician, and then someone one wrote in Site Manager

16   Martinez, I am just wondering if you would know if both

17   of those positions, would that be standard, that the

18   physician is the person that's being evaluated for

19   listed in that box?

20         MS. SMITH:  Objection.  Calls for speculation.

21         Q.  BY MS. GAGE:  You can answer.

22         THE DEPONENT:  That would be an assumption.

23         Q.  BY MS. GAGE:  And based on your experience

24   reviewing these forms, is that typically where it lists

25   the physician that's being reviewed?

1          MS. SMITH:  Objection.  Go ahead.  You can

2     answer.

3          THE DEPONENT:  The functional title is

4     generally put into that book box, yes.

5          Q.  BY MS. GAGE:  What do you mean by

6     functional title?

7          A.  There may be, you know, her role is a

8     physician's supervisor, but her functional title is

9     what they are displaying there.  They are saying those

10    are the hats she wears.

11         Q.  I see.  Okay.  I just want to scroll down to

12    page 5, and it says Self Assessment Fiscal Year 2014.

13    Is it typical with these ECF reviews to write a self

14    assessment?

15         MS. SMITH:  Objection.  Vague.  Calls for

16    speculation.  You can answer.

17         THE DEPONENT:  It is not required, but many

18    employees do submit a self assessment.

19         Q.  BY MS. GAGE:  Okay.  And is a self

20    assessment factored into the evaluation in any way?

21         MS. SMITH:  Objection.  Calls for speculation.

22    To the extent you know, you can answer.

23         THE DEPONENT:  When I was a supervisor I would

24    review what was submitted to me as a self assessment,

25    and I would consider it in rating my employees.  So,

Atkinson-Baker, a Veritext Company
www.depo.com

1   that's how I could respond to that.

2           Q.  BY MS. GAGE:  That makes sense.  And so I

3   think you said earlier that once the form was

4   finalized, it would be okay for HR to make markings on

5   it.  These check marks right here on the side of the

6   self assessment page, is that something that it seems

7   like HR would have checked off on after the form was

8   completed?

9           MS. SMITH:  Objection.  Calls for speculation.

10  She last no idea who would have checked off on these

11  writings.  She did not create this document.

12          MS. GAGE:  I'm just asking about the typical

13  process.

14          MS. SMITH:  If you're asking specifically

15  about this document and the check marks and the

16  writings on this document, it calls completely for

17  speculation.

18          MS. GAGE:  Okay.  I'll can my question.

19          MS. SMITH:  To the extent she knows, she can

20  answer, but it's speculative.

21          MS. GAGE:  I'm going to rephrase the question.

22          MS. SMITH:  Okay.

23          Q.  BY MS. GAGE:  So, in the -- do the HR

24  people typically go through the employee self

25  assessments and make markings, or check off anything

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   that they've written?
 2       A.  Not to my knowledge.
 3           MS. SMITH:  Objection.  Calls for speculation.
 4           MS. GAGE:  Thank you.  Okay.  That's all for
 5   Exhibit 3.
 6           I want to go to a document that is listed as
 7   Exhibit 5, but I want to mark it as Exhibit 4.  So, I
 8   know I sent it to you.
 9           MS. SMITH:  The best way to identify it would
10   be you're displaying what will be marked as Exhibit 4,
11   titled Performance Plan for Fiscal Year 2010, Site
12   Manager.  Does it have Bates number, Ms. Gage?
13           MS. GAGE:  Yes.  It is Bates stamped USA005938
14   through 5952.
15           MS. SMITH:  59...
16           MS. GAGE:  52.
17           MS. SMITH:  52.  Okay.
18           (Plaintiff's Exhibit 4 was marked for
19           identification.)
20       Q.  BY MS. GAGE:  Yes.  Are you able to see
21   this document, Ms. Keeler?
22       A.  Yes.
23       Q.  Okay.  Do you need me to zoom in or zoom out?
24       A.  You can zoom in a little bit.
25       Q.  Sure.  Does that help?
```

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.  Yes.

2      Q.  Okay.  Can you take a moment to review, and

3  let me know if I need to scroll through the pages,

4  please.

5      A.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

6  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

7  Okay.

8      Q.  Do you recognize this document?

9      A.  This is the more laid out version of the

10  elements that you saw on the ECF Performance Appraisal.

11      Q.  Okay.  So, this is a more in-depth explanation

12  of those elements?

13      A.  Correct.

14      Q.  Okay.  And the title of this document, it says

15  Performance Plan for Fiscal Year 2010, Site Manager,

16  October 1, 2009 through September 30th, 2010.  Do you

17  see that at the top?

18      A.  I do.

19      Q.  Okay.  Is it typical for Performance Plans to

20  be where these elements are laid out?

21      MS. SMITH:  Objection.  To the extent she

22  knows she can answer.

23      THE DEPONENT:  The Performance Plan is part of

24  the ECF Performance Appraisal.  It is an attachment to

25  that to further explain element 1, 2, 3, 4, etcetera.

1    So, it identifies exactly what you're being rated on.

2         Q.  BY MS. GAGE:  Okay.  I want to jump to

3    page 3.  In the middle right there, do you see where it

4    says BP1, Human Resources?

5         A.  Uh huh.

6         Q.  Do you have any understanding of what BP1

7    refers to?

8         A.  No.  I don't.

9         Q.  Okay.  Are these types of documents that you

10   have worked with frequently in the past, these

11   Performance uh... what was the title, Performance

12   Plans?

13        A.  As an Administrative Officer in Medical

14   Service, I've had experience working with them.  And in

15   Nursing Services as Administrative Officer I had

16   experience working with them.

17        Q.  Okay.  And when you worked with them did you

18   receive them from someone else to review?  How exactly

19   did you become acquainted with these forms?

20        A.  As the lead administrative person within the

21   service at those times, I was responsible for making

22   sure that the documents were created by myself, my

23   administrative team, and that they were correct in

24   their formatting before the supervisor signed them,

25   shared them with the employees, and they were submitted

```
 1   to HR.
 2        Q.  Okay.  Makes sense.  I'm having trouble
 3   understanding exactly what it was referring to.
 4        A.  I'm sorry.  Was that a question?
 5        Q.  No.  All right.  Is it all right if we take a
 6   15-minute break?  I'm almost done.
 7             MS. SMITH:  Yeah, we can come back at 11:30.
 8             MS. GAGE:  Okay.  That sounds great.
 9             MS. SMITH:  Okay.  Thank you.
10             (Recess taken.)
11             MS. GAGE:  Okay.  So, I want to share this
12   next exhibit marked as Exhibit 5.
13             (Plaintiff's Exhibit 5 was marked for
14             identification.)
15             MS. SMITH:  Just for the record, what are the
16   Bates numbers of Exhibit 5?
17             MS. GAGE:  USA000572 through 573.
18             MS. SMITH:  Thank you.
19        Q.  BY MS. GAGE:  So, Ms. Keeler, can you see
20   this document?
21        A.  Yes.
22        Q.  Okay.  Can you see this document?  If you can
23   just take a few minutes to review, and please let me
24   know if you need me to scroll to the next page.
25        A.  You can scroll to the next page.  Okay.
```

1        Q.  Okay.  Do you recognize this document?

2        A.  I do.

3        Q.  And is that your signature at the bottom of

4    the Panel Members on the second page?

5        A.  It is.

6        Q.  Okay.  And this document is titled

7    Compensation Panel Action.  And the box Bienniel Review

8    is checked.  Would this be a form sort of commemorating

9    the biennial reviews you that you were discussing

10   earlier that takes place?

11       A.  Yes.  It is.

12       Q.  Okay.  And is it typical for there to be a

13   panel review every time?

14       A.  At that time it was.

15       Q.  Okay.  And this was dated December 15th, 2015.

16   Was there any point in time where that stopped being

17   typical?

18       A.  Yes.  I had mentioned previously that they

19   disbanded the compensation panel.

20       Q.  I see.

21       A.  So, just a few years ago.

22       Q.  Okay.  So, prior to this disbandment of the

23   panel, there would be a panel of members who would

24   review any changes in compensation, is that correct?

25       A.  Correct.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.  Okay.  And what did you do in terms of

2   reviewing that decision?  What types of steps did you

3   take to review before signing off on this form?

4      A.  So, as the HR Technical Advisor I attended the

5   meetings.  And the participants, the chair was the

6   Chief of Staff.  The participants would review the

7   recommendations made by the supervisor, or the service

8   chief for a market pay increase, or perhaps even not

9   any increase at all if it was determined that it wasn't

10  necessary.  And I would just document what was

11  approved.

12     Q.  Okay.  And you said you would attend meetings.

13  How many meetings are typical for a pay increase like

14  this?

15         MS. SMITH:  Objection.  Calls for speculation.

16         THE DEPONENT:  We reviewed all physician staff

17  every two years.

18         Q.  BY MS. GAGE:  And was there -- before the

19  panel system was disbanded, was there a meeting with

20  all panel members where you discussed the decision?

21     A.  Yes.  Panel members would be called for the

22  specific group.  Like this -- for instance, Dr. Velez

23  was a Tier 2, so we had to have at least two Tier 2

24  physicians on there, as well as the Chief of Staff.

25  So, that group would get together and review the

1   others.

2       Q.  I see.  And so would Dr. Velez have been

3   eligible to sit on the panel for other Tier 2

4   physicians to review them as well?

5       A.  Not all physician staff participated in

6   compensation panels.

7       Q.  Okay.  Was there some system to determine who

8   would participate in compensation panels?

9       A.  It was generally the service chiefs.

10      Q.  Okay.  I understand.  And it looks like this

11  -- there was a pay increase approval, but then after

12  the fact there's some markings on here with the

13  initials it looks like PD.  Do you see that?

14      A.  Uh huh.

15      Q.  Do you have any idea --

16      A.  Yes.

17      Q.  -- who PD is?

18      A.  I do.  She was my HR assistant.  Her name was

19  Pamela Delpapa.  And it is referencing that the base

20  pay increase occurred in January.  These reviews were

21  completed in December, but the effective date was in

22  January, after the base pay increase had occurred.  So,

23  we had to update the base pay, and as a result the

24  total pay.  So, it was still an increase in salary.

25      Q.  I see.  And is that why it says Accounting for

Atkinson-Baker, a Veritext Company
www.depo.com

1   1% increase in base pay effective 1/10/2016 on the

2   first page?

3       A.  Correct.

4       Q.  Okay.  And do you recall why there was an

5   increase in the base pay?

6       A.  The President ordered it, so...

7       Q.  Okay.  That makes sense.  Okay.  I think that

8   is all for this exhibit, and I don't have any further

9   questions.

10          MS. SMITH:  Thank you.

11          THE REPORTER:  Valerie, would you like a copy?

12          MS. SMITH:  Yes.  We do want a copy, Mr.

13  Hunter.

14                  (Ending time:  11:37 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1   STATE OF CALIFORNIA                    )
                                            )    SS.
 2   COUNTY OF                              )

 3

 4

 5

 6

 7

 8          I, the undersigned, declare under penalty of

 9   perjury that I have read the foregoing transcript, and

10   I have made any corrections, additions, or deletions

11   that I was desirous of making; that the foregoing is a

12   true and correct transcript of my testimony contained

13   therein.

14   EXECUTED this_____day of_____,

15   20_____, at_____, California.
                            (City)
16

17

18

19          _____
            CRYSTAL KEELER
20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
1        R E P O R T E R ' S   C E R T I F I C A T E

2

3          I, WAYNE A. HUNTER, CSR No. 5456,  Certified

4    Shorthand Reporter, certify:

5            That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8            That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12           That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14           I further certify that I am not a relative or

15   employee of any attorney or of any of the parties nor

16   financially interested in the action.

17           Dated this 14th day of August, 2021.

18

19

20                     _____
                       Wayne A. Hunter, C.S.R. No. 5456
21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com                        Index: $400,000..approval

**Exhibits**

Keeler,
 Crystal August
 13, 2021_
 **Exhibit-(1)** 4:10
 41:22,23,24 52:2

Keeler,
 Crystal August
 13, 2021_
 **Exhibit-(2)** 4:10,
 11 49:7,8,19
 57:5

Keeler,
 Crystal August
 13, 2021_
 **Exhibit-(3)** 4:11,
 12 55:11,12,16
 63:5

Keeler,
 Crystal August
 13, 2021_
 **Exhibit-(4)** 4:12
 63:7,10,18

Keeler,
 Crystal August
 13, 2021_
 **Exhibit-(5)** 4:13
 63:7 66:12,13,16

**$**

**$400,000** 36:3
 51:7,9

**1**

**1** 14:15,22 33:22
 34:22 35:1
 41:22,23,24 52:2
 64:16,25

**1%** 70:1

**1/10/2016** 70:1

**10** 24:1

**10-page** 55:16

**11:30** 66:7

**11:37** 70:14

**120** 15:11

**14** 59:10

**15** 17:14 33:22,
 24 34:10,12
 35:22

**15-minute** 66:6

**15th** 67:15

**186,450** 34:22

**1999** 12:4 25:10

**2**

**2** 49:7,8,19 52:6
 53:10,11 57:5
 64:25 68:23 69:3

**20** 58:6

**200** 15:7

**2000** 25:9

**2001** 43:8 47:3

**2003** 12:25
 13:12

**2005** 25:11

**2007** 13:21
 14:18 22:20 54:5

**2009** 64:16

**2010** 63:11
 64:15,16

**2014** 61:12

**2015** 13:21,25
 14:2,18 22:21
 67:15

**20th** 43:8

**24** 8:10,14

**3**

**3** 53:18 55:11,12,
 16 63:5 64:25
 65:3

**300** 15:7

**300,000** 34:22,
 23

**30th** 64:16

**32** 45:17

**33** 45:17

**38** 47:22

**4**

**4** 63:7,10,18
 64:25

**400,000** 36:4,9
 51:11

**45** 47:21

**5**

**5** 61:12 63:7
 66:12,13,16

**50** 38:12 41:20
 42:19,20

**52** 63:16,17

**573** 66:17

**59** 63:15

**5952** 63:14

**7**

**70** 45:18,23 46:8

**7431** 47:22

**9**

**90** 15:11

**A**

**a.m.** 70:14

**ability** 8:10
 54:25 55:1

**Absolutely** 25:5

**accomplished**
 42:22 44:23

**accomplishme
nts** 59:13

**accord** 10:9

**account** 36:22

**Accounting**
 69:25

**accurate** 6:5
 33:8,14,15,18
 35:21

**accurately** 8:11,
 17

**achievements**
 59:8

**acquainted**
 65:19

**action** 38:16
 42:21 43:4,11,
 13,21 44:23
 53:19 67:7

**actions** 38:8
 46:23 47:14,18
 51:1,15

**active** 15:20

**actual** 7:16
 56:22

**add** 30:17

**added** 31:25
 43:22 54:6

**addition** 33:25

**additional**
 25:22

**admin** 12:11
 13:11 21:6

**administration**
 19:3,9 29:7,8,11
 39:24

**administrative**
 12:20 13:4,17
 19:15 20:21,23
 21:12 53:2,7
 58:25 59:5
 65:13,15,20,23

**admissions**
 19:11

**advertise** 14:5
 47:4,5

**advertised** 14:9

**advertisements**
 47:1

**Advisor** 68:4

**ahead** 14:20
 17:22 20:10
 24:22 45:12 61:1

**air** 7:21 19:12

**aka** 58:24

**alcoholic** 8:13

**amount** 15:1
 34:24 35:23 59:6
 60:4

**Analyst** 12:7

**announcement**
 44:24 46:18

**annual** 34:2

**annually** 36:4

**answering**
 43:17

**answers** 6:22

**apparently** 59:3

**appears** 55:16

**appended**
 59:11

**apply** 12:16 14:8
 25:19,21 52:15
 57:25 58:3

**appointments**
 21:19,20 46:24

**appraisal** 49:13
 50:7,9,23 51:1,2,
 20 56:4 64:10,24

**Appraisals**
 51:13,21 53:5

**approval** 35:16
 69:11

Atkinson-Baker, a Veritext Company
www.depo.com

**approve** 53:20

**approved** 68:11

**approximately** 9:14,17 13:12,19 15:10 17:1 50:11

**arbitration** 9:23

**area** 59:24

**aspect** 48:24

**assessment** 59:25 61:12,14, 18,20,24 62:6

**assessments** 62:25

**assigned** 12:7 14:15 19:16

**assignment** 34:18 35:1 37:5, 8,14,16 38:18 43:21

**assist** 20:12

**assistant** 53:2 56:6 58:23 60:14 69:18

**assuming** 16:3

**assumption** 54:13 60:22

**attachment** 64:24

**attempted** 59:7

**attend** 68:12

**attended** 68:4

**attorney** 10:4,21

**attorneys** 5:11

**authorize** 32:21

**authorized** 47:21 53:25

**automatic** 35:10

**average** 15:10

**award** 51:5

**aware** 18:13

28:24 29:2 33:7 35:18 39:10

**awhile** 5:21

_____

**B**

**back** 25:14 41:18 47:3 52:21 66:7

**base** 19:13 33:22,25 34:1,25 36:1 37:4 69:19, 22,23 70:1,5

**based** 15:15 23:19 33:21 34:17 35:3,10 36:21 37:5 40:13 48:3,9 56:22 60:23

**basic** 15:16 16:4,16

**basis** 38:17 40:17

**Bates** 63:12,13 66:16

**Bay** 58:24

**began** 13:24

**begin** 6:20 12:2, 22 13:3

**benefit** 39:23 40:12

**benefits** 23:18 40:2,3,6,11,25 41:5

**beverages** 8:13

**biannual** 35:2,7

**biennial** 67:9

**Bienniel** 67:7

**bigger** 55:22

**billing** 19:14

**bit** 5:20 18:17 21:24 29:6 30:19 45:20 55:22 63:24

**biweekly** 45:18, 23,25

**blank** 42:15

**bonuses** 36:7

**book** 61:4

**bottom** 46:11 53:23 58:22 67:3

**box** 58:22 60:19 61:4 67:7

**BP1** 65:4,6

**branches** 11:24

**brand** 34:17

**break** 7:13,15 66:6

**breaks** 52:13

**broadly** 9:4

**business** 32:20

_____

**C**

**Cal** 11:20,22,23, 25 12:3,4 14:12 15:9 16:25 20:1, 2 23:23 24:1,19 28:21 29:3,9 35:18 41:5

**California** 5:2 11:13 13:10

**called** 9:22 48:23 68:21

**calls** 32:24 37:1 44:20 54:17,21 56:18 59:19,22 60:8,20 61:15,21 62:9,16 63:3 68:15

**campus** 20:25 21:3,6

**campuses** 23:23,25

**candidate** 16:15

**candidates** 14:7,11 15:2,5,8, 13 16:1,3,6,17

17:19 18:14

**cap** 35:21,24 36:2 51:7

**capped** 36:3

**caps** 33:12 34:10 36:8

**care** 13:13 14:3, 4 19:13 24:12 31:17 38:3

**Career** 49:13 50:8

**carried** 53:7

**case** 5:12 9:2,4 23:7 26:1 28:20, 22 36:23,25

**certificate** 46:25

**certified** 5:2

**chair** 68:5

**change** 37:7,14, 15 38:18 43:21 44:4,5,24 45:6,7 57:12 58:6,7

**changed** 6:10 38:16 44:12,14

**chat** 41:9

**check** 15:23 17:5 62:5,15,25

**checked** 53:20 62:7,10 67:8

**chief** 14:22,23 35:13,15 52:17 56:6 58:24 60:14 68:6,8,24

**chiefs** 69:9

**citizen** 15:15

**citizenship** 15:17 16:4

**clarification** 7:3

**clarify** 21:2,24 27:23 39:25 45:4 53:4 57:23

**clear** 6:19 29:17

**Clerks** 12:12

**clinic** 20:12 21:19 24:4 54:4

**clinical** 59:3,8 60:6

**closely** 24:2

**code** 48:14

**coding** 43:5,20

**coincide** 35:6

**Coleen** 32:25

**collecting** 51:17

**commemoratin g** 67:8

**comments** 59:12,18

**common** 25:16 56:16

**communicate** 22:3,24 23:2 24:10 40:6

**communicated** 22:5 24:7 57:23

**compensated** 29:13,14 33:6 38:22 39:4,7,11, 17,20

**compensation** 67:7,19,24 69:6, 8

**complaint** 5:17 27:6,7,17,24 28:6,16,25

**complaints** 26:24 27:1,3 28:9,14,17 29:3

**complete** 43:4

**completed** 18:19 56:21 59:2 62:8 69:21

**completely** 8:17 62:16

**completes** 52:19

**Concur** 53:20

**confirm** 33:8

**confused** 45:20

**conjunction** 10:8

**connection** 28:5

**consideration** 16:16

**considered** 29:20 34:4 35:24 37:8

**consist** 25:12

**contentious** 26:19,22

**context** 47:24

**control** 42:9

**convicted** 8:19

**coordinate** 22:8

**coordinating** 19:12

**copy** 70:11,12

**corner** 42:20

**correct** 8:23 14:18 15:3,4 21:8 22:9 28:2 31:7 34:12,13 41:22 43:8,12 44:16 46:9,10 47:18 49:3,20 50:15 51:10 55:6,18 57:1 64:13 65:23 67:24,25 70:3

**corrections** 6:8 56:17,22,24

**cost** 33:13 36:10,13,16

**counsel** 7:7,10 10:4,8,9 11:10 17:10

**count** 17:4

**couple** 20:22

**court** 5:2 6:2,13 9:23

**create** 58:17 60:9 62:11

**created** 43:5 44:23 45:1,5,7 53:6 65:22

**criteria** 52:6

**critical** 53:15,16 58:6,13,19

**crossed** 56:13

**Crystal** 5:6,14 33:1 37:11

**curious** 30:18

**current** 13:8,9 15:6 19:6 43:3

**CV** 15:21

———

**D**

**data** 23:18 51:17

**date** 43:7,10 69:21

**dated** 67:15

**David** 14:25

**day** 7:14 11:16

**day-to-day** 37:20

**deal** 39:23

**dealing** 38:10, 14

**December** 67:15 69:21

**decide** 34:16

**decision** 32:8 68:2,20

**decisions** 33:3, 13

**definition** 28:16

**degree** 31:10

**delivered** 19:13

**Delpapa** 69:19

**Denotes** 53:15

**dentist** 47:14 48:24

**dentists** 14:5 29:16,18 30:2 37:21 39:14,15, 24 40:4,5 41:6 47:15,19

**department** 14:21 23:9,10,12 27:20,24 34:16 38:8

**departments** 16:24 17:1 27:19

**depending** 17:16

**DEPONENT** 9:8 10:12,25 17:14, 24 18:7 20:9,11 21:11 26:9,22 28:12 30:15 32:8 33:2 36:1,20 37:3,12 39:3 40:16 42:11 43:20 44:8,22 45:11,13 48:16 52:5 53:1 54:9, 13 55:3 56:20 59:24 60:22 61:3,17,23 64:23 68:16

**deposed** 5:15 8:22

**deposition** 5:3 10:1,17,23 11:9 17:9

**description** 11:25 44:9

**desk** 7:23,25

**detailed** 59:9

**determination** 16:14

**determine** 16:6,

**11** 17:20 32:1 34:23 69:7

**determined** 14:6 29:19 32:16 34:15 57:5 58:9, 19 68:9

**determines** 35:12 53:15 58:13

**determining** 37:5

**dictated** 52:10

**difference** 40:23 41:1

**directive** 30:3,4 32:12,18 57:14

**directly** 18:21 28:23

**director** 35:16 52:15

**disagreement** 25:17

**disbanded** 31:22 32:4,6 67:19 68:19

**disbandment** 67:22

**discern** 46:17

**discrimination** 28:25

**discuss** 10:22 22:1

**discussed** 10:7 11:9 68:20

**discussing** 67:9

**displayed** 41:11

**displaying** 61:9 63:10

**dispositions** 19:12

**dispute** 26:6

**distinct** 11:19

**doctors** 21:21

**document** 41:19 42:1,2,4 48:1,15 49:12, 15,19,20 50:4 55:2,15,17,20 56:2,20,25 59:10 60:9 62:11,15,16 63:6,21 64:8,14 66:20,22 67:1,6 68:10

**documentation** 18:3

**documents** 9:25 10:3,10,15 65:9,22

**dozen** 17:16

**due** 44:18

**duly** 5:7

**duties** 13:2 14:2, 4,21 19:8 43:22, 23 44:2,6 45:6,7

**duty** 44:5

———

**E**

**earlier** 57:23 62:3 67:10

**early** 25:9

**earn** 36:4 40:7,8

**earned** 51:11

**easier** 11:17 33:17

**easiest** 42:10

**East** 58:24

**ECF** 50:6 53:4 54:7 58:16 59:2, 9,10 61:13 64:10,24

**education** 15:18 18:18

**educational** 18:18

**EEO** 5:17 9:2

Atkinson-Baker, a Veritext Company
www.depo.com

27:3,6,8 28:6,25 29:3

**effect** 30:1 32:11

**effective** 43:7, 11 69:21 70:1

**effort** 59:3

**efforts** 21:14

**element** 53:15 57:12 58:5,7 64:25

**elements** 52:10, 18 53:11,16 57:4,5,9 58:2,19 64:10,12,20

**Elements/ achievements** 58:22

**eligible** 16:2 51:5,8,9 69:3

**email** 22:3,4,25

**emphasize** 59:12

**employed** 11:12

**employee** 9:10 40:18,20 45:22 50:10 51:3,8 60:1 62:24

**employee's** 40:13

**employees** 28:9,13 29:12,13 36:17 40:20 47:9 51:18 52:20 61:18,25 65:25

**employment** 35:18 38:17

**end** 15:8 54:7

**ending** 70:14

**engage** 25:25

**enjoy** 26:10,13

**entail** 51:16

**entails** 51:17

**entered** 52:22, 24 53:5

**entire** 13:5 35:17 49:23

**entitled** 7:10,21 49:13 54:23

**equipment** 5:4

**essentially** 13:17

**estimate** 7:22, 24 8:1 17:11,13 22:14 30:25 31:10 32:8 48:8

**etcetera** 58:4 64:25

**evaluate** 57:18

**evaluated** 50:15,22 57:10 58:9 59:5 60:18

**evaluating** 59:17

**evaluation** 60:7 61:20

**exact** 8:2

**EXAMINATION** 5:9

**examined** 5:8

**excellent** 51:4

**exchanged** 10:20

**excuse** 57:2

**executed** 56:25

**executive** 13:7 49:13 50:8

**exhibit** 41:8,9, 22,23,24 49:6,7, 8,19 52:2 55:10, 11,12,16 57:4,5 63:5,7,10,18 66:12,13,16 70:8

**expended** 31:24

**experience** 15:2 47:7 60:23

65:14,16

**expert** 29:21,23

**explain** 6:10 50:6 64:25

**explains** 18:4

**explanation** 64:11

**extent** 10:2 26:8 29:22 30:23 36:18 37:10 40:10 43:16 44:21 52:3 56:19 61:22 62:19 64:21

**F**

**facilities** 16:24 39:11

**facility** 14:6 21:7 27:6 29:21 30:16 35:15 52:13 57:25

**fact** 6:3 8:3 29:24 69:12

**factored** 61:20

**factors** 34:4 37:5 58:13

**fair** 15:1 58:21

**familiar** 19:17 42:23

**familiarity** 29:15 38:22 57:8

**familiarize** 5:20

**feature** 41:9

**federal** 40:9

**fee** 38:17

**Feel** 7:14

**felony** 8:20

**felt** 30:20

**field** 18:22 23:15,17 46:16 47:9,16 49:13

50:8

**fields** 52:22,23

**filed** 28:24 29:3

**files** 19:11

**filing** 28:9

**fill** 14:7

**fills** 51:25

**finalized** 53:8 62:4

**finally** 7:17 54:2

**finish** 6:20

**fiscal** 54:4 59:9 61:12 63:11 64:15

**focus** 38:2 60:3

**focused** 38:4

**follow** 32:19 37:3

**form** 42:18,19 43:4,7 44:1,15, 17,22 45:1,22 46:15,16,20 48:21 51:23 52:1 55:4,8 62:3,7 67:8 68:3

**formal** 28:17 45:9,13

**formatting** 65:24

**forms** 42:24 43:1 45:5 46:21 48:10 51:24 56:17 60:24 65:19

**formula** 33:13

**Fortunately** 59:9

**forward** 35:2

**four-page** 49:12,20

**frame** 22:19 25:8,11

**free** 7:14

**frequently** 22:11 30:5,6,7, 10,25 31:4,11 65:10

**full** 5:12

**full-time** 38:16 40:24

**fully** 56:20,25

**fun** 26:14,20

**functional** 61:3, 6,8

**functions** 37:25 38:6,9,14 43:2

**G**

**Gage** 5:9,11 9:13 10:6,14 11:1,21 16:10,13 17:11,18 18:3,8 20:19 21:4,16 26:10,23 27:2 28:4,13,17 29:6, 12,25 30:13,18, 24 32:5,9 33:4, 11 36:5,24 37:7, 17 38:25 39:6,13 40:21 41:13,18, 23 42:2,6,13 43:25 44:13,25 45:15 48:7,20 49:5,10,21,24 52:7 53:3 54:10, 15,18,23 55:5,9, 14,18 56:23 57:22 59:20 60:2,10,21,23 61:5,19 62:2,12, 18,21,23 63:4, 12,13,16,20 65:2 66:8,11,17,19 68:18

**gain** 19:5

**general** 11:19

**generally** 18:15 44:22 51:3 61:4 69:9

Atkinson-Baker, a Veritext Company
www.depo.com

Index: generated..locality

**generated** 44:15,18 46:14, 21 51:25 52:1

**give** 6:4,6,22 7:24 8:1,7 16:23 17:3 40:8 42:8 48:3 49:14

**glean** 59:3

**global** 58:2

**goals** 54:4,6,11

**Good** 5:10

**governed** 32:18

**grade** 33:12,20, 22 34:11,12 36:6 40:13

**graphics** 20:12 21:19

**great** 6:13 7:13 8:6,19 16:23 66:8

**group** 13:6 20:15 24:25 40:7 68:22,25

**groups** 23:22

**GS** 36:21

**guess** 7:20 21:24 27:2 39:13 48:1,3,6,7,8,19

**H**

**Half** 11:5

**handbook** 30:3, 25 32:9,10,12,22 37:3,4

**handbooks** 32:11

**handling** 38:8

**happy** 7:1

**hard** 14:7 25:13

**hats** 58:23 61:10

**health** 11:13 13:13,15 14:3,4

**22:21 24:12** 27:21,22,23 31:17 38:2 40:9

**Healthcare** 13:9

**held** 5:3

**helped** 19:5 58:17

**high** 18:20,21

**higher** 16:6 32:23 53:19,25 57:15 58:19

**highest** 18:18 34:11 35:23

**highlights** 59:12

**hired** 15:9,10

**Hiring** 14:9 16:19,21 17:16 18:11 35:13

**history** 18:18 19:25 20:2

**hold** 13:22

**hospital** 19:15

**host** 41:14

**hour** 11:5

**hours** 8:10,14 45:18,23 46:8

**HR** 37:24 38:3,6, 7,9,13 43:2 44:10 56:21 62:4,7,23 66:1 68:4 69:18

**Human** 44:9 65:4

**Hunter** 5:2 70:13

**I**

**idea** 7:19 32:5 36:24 49:2 62:10 69:15

**identification** 41:25 49:9 55:13

**63:19 66:14**

**identifies** 65:1

**identify** 63:9

**in-depth** 64:11

**inaccurate** 33:9,16

**inactive** 15:20, 22

**includes** 6:2

**including** 36:6

**increase** 33:23 34:7,9 35:4 68:8, 9,13 69:11,20, 22,24 70:1,5

**increases** 35:6, 8

**information** 10:7,20,21

**initial** 53:20

**Initially** 19:10 34:16

**initials** 59:16 69:13

**innovator** 59:1

**Inpatient** 12:12

**instance** 7:22 58:5 68:22

**instructed** 7:9 48:5

**instructing** 10:4 48:19

**intended** 55:7

**interact** 20:18

**interacted** 19:20 20:3,4,7 22:12 24:17

**interchangeable** 34:18

**interfere** 8:10

**Internal** 18:15

**interrupt** 6:16

**interviewed** 27:25 28:5

**intricacies** 58:8

**introduce** 49:6

**investigation** 26:24 27:7,25 28:6

**involve** 38:20

**involved** 26:23 28:8 40:1 51:12, 14,21,22

**involvement** 21:23 40:11

**irregular** 33:13 37:8,12,18

**irrelevant** 30:12

**issue** 9:11 25:15

**issues** 22:1 28:23 38:11

**J**

**January** 69:20, 22

**job** 12:5 13:1,8,9 14:2,4 19:3 44:5, 24 45:6,7 46:18, 25 47:4

**jobs** 47:5

**judgment** 16:11

**jump** 6:18 65:2

**jury** 6:9

**K**

**Keeler** 5:6,10,14 17:8 41:19 42:9 54:19 55:19 63:21 66:19

**kind** 5:17 18:2 21:16 25:22 27:7,24

**knowledge** 8:3 17:20 18:2 21:10

**28:7 31:11 40:17** 48:4,9,10,14 60:11 63:2

**L**

**laid** 64:9,20

**large** 16:25

**largely** 14:14

**largest** 24:5,8

**laughed** 30:19

**law** 6:2

**lead** 13:4 65:20

**leader** 59:1

**leading** 43:19 58:6,7

**left-hand** 42:20

**level** 25:18 32:17 52:23,24 53:19,25 57:15, 18,19 58:2,8,10, 13,15

**license** 15:19, 22,25

**licensure** 16:5

**limit** 34:8

**limiting** 40:19

**lines** 17:25 18:9

**link** 40:8

**list** 15:22 17:6 33:6

**listed** 43:8 45:2 52:6 53:12 60:19 63:6

**lists** 46:5 57:3 60:24

**living** 33:13 36:10,13,16

**local** 30:16 32:11,13,14 57:18 58:9,15

**locality** 36:22

Atkinson-Baker, a Veritext Company
www.depo.com

**location** 36:21 50:17 52:15 56:12

**locations** 24:1,3

**long** 7:23,25 9:14,17,19 11:4 12:13 18:24 22:18 42:7

**longer** 26:18 51:9

**longevity** 33:23

**looked** 52:1

**lot** 20:3,12 26:14

**— M —**

**M.D.** 54:3

**made** 14:22 27:8,24 68:7

**majority** 38:13

**make** 6:8,9,11, 20 7:2,4,8,11 8:3 11:23 16:14 17:5 35:13 55:22 56:21,24 62:4,25

**makes** 33:2 38:21 47:19 53:9 62:2 66:2 70:7

**making** 51:9 65:21

**management** 19:14 23:18 24:15,18 28:10

**manager** 14:10 16:19 18:11 21:5 25:24 35:13 39:8,17 43:24 46:12 50:14,22 54:3,14,16,20 55:3 56:8 58:24 60:15 63:12 64:15

**managers** 16:21 17:16 39:10 58:18

**managing** 19:11

**manually** 53:5,6

**March** 12:4

**mark** 41:8 63:7

**marked** 41:24 49:8 55:12 63:10,18 66:12, 13

**market** 33:12,25 34:1,14,24,25 35:3,4,12 36:6 37:4,15 68:8

**markings** 62:4, 25 69:12

**marks** 62:5,15

**Martinez** 20:25 21:3,6 23:12,20 24:4,11 39:8 46:12 50:17 54:4 56:8,14 58:25 60:16

**matter** 9:16 29:20

**means** 5:25 45:21 48:2 57:9

**measures** 20:13 52:16 57:12,24

**mediator** 24:23 25:1,19 26:1,11, 13 27:11

**medical** 12:12 13:16,17 14:13 15:18 19:3,9 20:11 21:15 26:16 65:13

**medication** 8:9

**medicine** 18:15

**meet** 11:2,4 16:3 21:25 31:21

**meeting** 25:14 51:18 68:19

**meetings** 11:7 19:22 68:5,12,13

**meets** 16:15

**members** 21:14, 17,25 23:2,6 67:4,23 68:20,21

**Mental** 27:21,22, 23

**mention** 26:7

**mentioned** 67:18

**met** 10:22

**middle** 65:3

**military** 18:23, 24,25 19:2

**mind** 6:16

**minutes** 42:6 49:14 66:23

**misconduct** 28:18

**missed** 21:20

**misspeaking** 51:19

**moment** 64:2

**months** 37:23

**morning** 5:10

**mouse** 49:22

**multiple** 19:23

**— N —**

**names** 26:8

**naming** 9:6

**national** 30:15 32:10,16,18 57:15,19,24 58:8,12

**naturally** 6:18

**nature** 21:22 36:14 40:10 43:13

**NCHCS** 56:12

**necessarily** 44:12

**negative** 16:1

**Neurosurgery** 18:16

**Nicole** 5:10

**nodding** 6:24

**non-clinical** 59:7,8 60:4,6

**non-competitive** 46:24

**non-physician** 47:13

**noncritical** 58:14

**Northern** 11:13 13:10

**notes** 17:5 21:21

**notice** 15:22

**number** 16:23, 24,25 17:25 18:5,12,14 46:5 63:12

**numbers** 66:16

**Nursing** 12:8,21 13:7,12 25:7 65:15

**— O —**

**oath** 5:25

**objection** 9:6 10:2 11:18 16:9, 12 17:7,22 18:6 20:8 21:2,9 26:7, 21,25 28:3,11,15 29:5,10,22 30:11,22,23 32:7,24 35:25 36:18 37:1,9 38:23 39:12 40:15,17 41:21 43:16 44:7,20 45:10 48:5,13,18 52:3,25 54:8,17, 21 56:18 57:21 59:19,22 60:8,20

**negative** ... (continued)

**61:1,15,21 62:9 63:3 64:21 68:15**

**objections** 7:8

**obvious** 59:11

**occasional** 19:22

**occasions** 26:5

**occurred** 69:20, 22

**October** 14:1,2 64:16

**offered** 40:6,12

**office** 7:23,25 24:14,18 28:9

**officer** 12:20 13:11,17 58:25 65:13,15

**opportunities** 14:8

**opportunity** 6:7 42:4 47:5

**opposed** 13:2

**ordered** 70:6

**outcome** 51:2

**outpatient** 19:10 24:4 54:4

**outstanding** 51:4 59:4,10

**oversaw** 20:22 21:7

**— P —**

**pages** 64:3

**paid** 29:19 30:2 35:23 39:5 48:25

**Pamela** 69:19

**panel** 31:25 67:4,7,13,19,23 68:19,20,21 69:3

**panels** 69:6,8

**part** 13:6 64:23

Atkinson-Baker, a Veritext Company
www.depo.com

**part-time** 38:16, 17 40:24 41:2 45:17 46:8

**participants** 68:5,6

**participate** 20:16 69:8

**participated** 69:5

**passes** 52:16

**past** 5:18 8:10 38:25 39:1 59:5 65:10

**patient** 19:11

**patients** 19:12 20:14 21:21

**Pauline** 52:23 54:3

**pay** 29:7,8,10,16 31:20,22 32:16, 18 33:12,13,23, 25 34:1,5,14,24, 25 35:3,4,12,21 36:1,6,8,16,20 37:4,8,12,15,18, 22 38:14,20 39:5,15 44:24 45:18 46:2 47:21,24 48:12, 21,23 49:3 51:22 52:23,24 68:8,13 69:11,20,22,23, 24 70:1,5

**pay-related** 38:11

**payable** 36:2

**payout** 36:10

**Paypal** 31:21

**PD** 44:12 69:13, 17

**pen** 56:17

**penalty** 5:24 6:2

**pending** 7:17

**people** 23:13, 16,23 24:11

25:15 27:18 31:25 32:21,22 57:18 62:24

**percent** 38:12 58:6

**performance** 20:13 36:7 49:13 50:7,8,10,23,25 51:2,5,13,19,20, 21,22 52:5,10,16 53:4,10 56:3 57:12,24 59:4,11 63:11 64:10,15, 19,23,24 65:11

**performing** 19:8

**period** 7:15 31:13 45:18

**periods** 46:2

**perjury** 5:25 6:2

**person** 13:5 19:21,22 21:25 53:24 55:7 59:17 60:18 65:20

**personal** 48:9, 14

**personally** 19:17

**personnel** 10:12 38:15 42:21 43:4,11 44:23 46:23 51:15

**perspective** 59:4

**phone** 22:25

**physician** 29:15 31:20 33:21 34:5,12 38:14 41:2 43:15 46:5, 7 48:24 50:16 51:22 56:7 60:15,18,25 68:16 69:5

**physician's** 39:4 47:4 61:8

**physician-based** 14:14

**physician-related** 38:15

**physicians** 14:5,16 15:2 20:14 29:2,18 30:1 33:5,20 36:11,22 37:21 39:14,15,16,20, 24 40:3,5,18,19, 22,23 41:6 46:22 47:10,15,19 51:7 68:24 69:4

**physicians'** 36:3 58:17

**place** 24:6 25:16 28:1 67:10

**plaintiff** 5:12

**plaintiff's** 41:24 49:8 55:12 63:18 66:13

**Plan** 63:11 64:15,23

**plans** 40:9,12 64:19 65:12

**point** 17:10 30:11 38:23 57:17 67:16

**pointed** 6:9

**policies** 29:8 30:1 32:14

**position** 12:13, 15,16,19,23 13:20,22,23,24 16:7,20 18:13 19:6 20:17 21:5 31:14,16 43:3 44:9 45:23 46:5 50:13,22 54:16, 20 56:5 60:6,14

**positions** 14:6 15:17 36:21 60:17

**positive** 27:8

**preparation**

9:25

**prepare** 10:10

**preserve** 7:8

**President** 70:6

**pretty** 26:19 29:17 36:9

**previous** 14:12

**previously** 51:15 67:18

**prior** 38:9 67:22

**priority** 14:15,22

**privileged** 10:21

**privy** 11:6

**proceed** 25:17

**process** 5:20 15:12 16:5 21:24 28:8 47:13 62:13

**processed** 46:23 47:14

**processing** 51:14

**program** 12:7 43:24 59:1

**proper** 18:12

**properly** 6:23

**prorated** 40:25 41:2

**provide** 17:12, 13 58:4

**provided** 17:10 30:22

**provider** 34:21 42:22

**pull** 7:20

**purview** 21:12 39:21

**put** 61:4

**Q**

**qualification** 16:4

**qualifications** 15:16 16:7

**qualified** 17:21 18:5

**question** 6:17, 20,25 7:2,4,17, 19 17:23 30:23 37:10 39:13 43:17,18 52:4 62:18,21 66:4

**questions** 7:8 22:9 42:5 70:9

**R**

**rank** 16:6

**rated** 60:12 65:1

**rating** 51:4,5 53:20 61:25

**reading** 47:25

**ready** 49:16

**reason** 8:6,16 20:6 35:3

**reasons** 16:1 45:1,2 59:2

**reassignment** 43:14,15,18,20 44:1 45:3

**recall** 6:3,4 8:25 9:10,11 23:1 24:24 25:13 26:9 27:20 31:20,23 33:18 58:16,18 70:4

**receive** 25:2 33:25 34:6,8,14 35:2 40:2 41:5 51:5,10 58:16 65:18

**received** 44:1

Atkinson-Baker, a Veritext Company
www.depo.com

**receives** 51:3
52:16

**receiving** 57:19

**recent** 31:19

**recently** 44:2

**recess** 41:17
66:10

**recognize**
41:19,20 50:4
56:2,3 59:7 64:8
67:1

**recognized**
42:17

**recommendatio**
**n** 35:14

**recommendatio**
**ns** 31:22 51:18
68:7

**record** 5:13 6:19
7:9 10:13 41:16,
18,21 42:21
56:22 66:15

**recorded** 6:23

**recording** 6:14

**records** 19:10

**recruit** 14:7,15

**Recruiter** 13:9,
14 14:3,4 24:13
31:17

**recruiting** 40:5

**recruitment**
37:24 38:3,4

**refer** 11:15,22
14:9 16:17 17:8
42:20 49:3

**reference** 48:17
49:18

**referenced**
35:15 48:15

**references**
17:24 18:9

**referencing**
32:10 69:19

**referral** 16:2

**referred** 16:15,
16

**referring** 20:20,
25 35:22 41:22
49:19 53:24 66:3

**refers** 65:7

**reimbursement**
36:13,16

**related** 9:5

**relation** 9:9 47:9
51:20

**relevant** 58:1

**relinquished**
15:25

**Remarks** 47:21

**remember** 9:4
26:5,8

**remote** 10:15

**remotely** 5:5

**removed** 44:2

**rephrase** 7:1
62:21

**replaced** 56:13

**report** 28:23
59:10

**reporter** 5:1,2,4
6:14 41:16 70:11

**represented**
50:19,21

**representing**
5:11

**required** 17:25
26:17 61:17

**requirements**
15:16 16:5,16

**requires** 18:15,
16

**research** 35:7

**residency** 15:18
18:1,12

**Resolution**
24:14,18 28:10

**resource** 19:14

**Resources**
44:10 65:4

**respond** 6:23
10:5 62:1

**response** 7:10
30:23

**responsibilities**
12:9 44:11,14,19

**responsible**
65:21

**restrictions**
15:24

**result** 43:5
50:25 51:1 69:23

**retain** 35:5

**retaliation**
28:25

**review** 6:7,15
9:25 10:9 15:21
31:21 35:3 37:15
40:9 42:4,6
49:14 53:19,25
54:7 55:20 61:24
64:2 65:18 66:23
67:7,13,24 68:3,
6,25 69:4

**reviewed** 10:3,
8,12 55:1 60:5,
25 68:16

**reviewing** 60:24
68:2

**reviews** 51:19
61:13 67:9 69:20

**role** 12:10 13:2,4
14:17,24 15:6
19:15 26:16
44:11 50:10,14
61:7

**roles** 44:13

**rolls** 13:1,13
14:12

**room** 5:5,24

**rules** 5:20

---

**S**

**sa** 53:4

**Sacramento**
24:9,11 56:13

**salaries** 36:3

**salary** 34:1,2,20
35:1 52:23 69:24

**schedule** 35:9
45:16

**school** 18:20,21

**scope** 60:12

**scoring** 59:8

**screen** 41:15

**scroll** 42:11
47:20 49:16,17
52:8 55:21 61:11
64:3 66:24,25

**scrolling** 52:21

**Section** 53:18

**select** 46:24,25

**selected** 46:12,
15,18,20 47:8,17

**sense** 6:11 7:2,
5,11 8:4 11:23
38:21 47:19 53:9
62:2 66:2 70:7

**separate** 51:23

**September**
64:16

**series** 19:3

**service** 12:8,21
13:5,7,12,16,18
14:13,14,22,23
17:3,15,20,25
18:9 21:15 25:7
26:16 27:21,22,
24 33:21 35:11,
13 56:7 60:14
65:14,21 68:7
69:9

**services** 17:4,6
58:4 65:15

**set** 32:19 58:18

**sets** 52:17

**SF** 41:20 42:20

**share** 41:9,12,15
55:11 66:11

**shared** 65:25

**sharing** 49:6
55:9

**shift** 29:6 47:3

**shoot** 9:9

**sick** 40:8

**side** 62:5

**Siegel** 14:25

**signature** 53:21
67:3

**signed** 59:14
65:24

**signing** 21:21
68:3

**similar** 23:22
44:1 52:1

**simultaneous**
24:21

**sit** 69:3

**site** 21:5 24:5,8,
11 39:7,10,17
46:12 50:13,22
54:3,15,20 55:3
56:8 58:24 60:15
63:11 64:15

**sitting** 8:2

**skills** 19:5

**Smith** 9:6 10:2,
11,24 11:8,18
16:9,12 17:7,22
18:6 20:8,10
21:2,9 26:7,21,
25 28:3,11,15
29:5,10,22
30:11,14,22
32:3,7,24,25

Atkinson-Baker, a Veritext Company
www.depo.com

33:9 35:25 36:18 37:1,9 38:23 39:2,12 40:15,17 41:11,14,21 42:1,3,8 43:16 44:7,20 45:10,12 48:5,13,18 49:18,22 52:3,25 54:8,12,17,21,25 55:16 56:18 57:21 59:19,22 60:8,20 61:1,15, 21 62:9,14,19,22 63:3,9,15,17 64:21 66:7,9,15, 18 68:15 70:10, 12

**sort** 22:8 35:21 67:8

**sounds** 66:8

**speak** 27:5,17

**speaking** 40:18

**special** 47:21,23 48:12,21,23 49:2

**Specialist** 13:16 19:4,9 44:10

**specialists** 22:22 38:7 44:10

**specialties** 18:1

**specialty** 17:16 34:17 37:6

**specific** 9:7 23:15,17 26:7 42:18 48:14 68:22

**specifically** 23:20 27:17 58:3 62:14

**speculate** 7:18

**speculation** 32:24 37:1 44:20 54:17,22 56:18 59:19,22 60:8,20 61:16,21 62:9,17 63:3 68:15

**speculative** 62:20

**speech** 24:21

**spent** 37:21 38:10

**staff** 20:23 21:6, 12 35:15 52:17 58:18 68:6,16,24 69:5

**stamped** 63:13

**standard** 42:19 60:17

**standards** 15:16 18:4

**stands** 48:18

**star** 53:14

**start** 19:10 34:21 42:4

**started** 12:4

**starts** 33:21

**state** 5:12 15:23, 24

**stated** 42:18

**states** 15:19

**step** 33:12,20, 22,23,24 34:7,8, 10,11,12,22 35:1,6,8,22 36:6 40:13

**stepped** 38:5

**steps** 36:2 68:2

**stop** 49:6 55:9

**stopped** 26:15 67:16

**strictly** 37:24

**subject** 5:24 9:15 29:20

**subjective** 16:11

**submit** 28:13 61:18

**submitted** 61:24 65:25

**subspecialty** 17:17

**subtract** 34:23

**supervisor** 9:11 12:12 13:6 21:13 22:21 38:18,19 39:4 50:16 52:19,22,24 53:1,6 59:15,25 60:3 61:8,23 65:24 68:7

**supervisors** 50:12 56:21 59:5

**supervisory** 13:15 43:22,23 50:10,14

**support** 12:11, 12

**supported** 23:12

**supporting** 13:6

**supports** 23:9

**Surgeon** 58:23

**surgery** 20:20 39:5 50:17 58:24

**Surgical** 56:6 60:14

**sworn** 5:5,7

**system** 11:13 13:16 22:21 30:2 68:19 69:7

—————

**T**

**table** 39:5

**tables** 36:20

**takes** 36:22 67:10

**talk** 11:18 18:11, 17

**talking** 23:13,16 38:24

**task** 48:14

**tasks** 25:22

**team** 13:7 20:14, 16,20,21 21:13, 17,25 22:12 23:3,6 53:7 65:23

**Technical** 68:4

**ten** 25:6 31:12

**tenure** 24:18 28:21

**term** 27:1 28:15 29:10 40:18,20

**terminology** 37:13,14

**terms** 16:7 68:1

**testified** 5:8

**testify** 8:11,17 9:22

**testifying** 6:1 29:23,24

**testimony** 6:1, 5,11 8:7

**thin** 7:21

**thing** 5:23 6:13, 22 30:15,16

**things** 6:16 20:13,24 21:21 33:18 38:19 40:10

**thought** 30:20 44:4

**three-page** 42:1,2

**Tier** 68:23 69:3

**time** 7:7,14,15 12:6,7 20:7,22 22:19,25 25:8,11 26:17 27:10 28:4 31:13 33:21 35:10 38:10,23 40:7,8 55:19 67:13,14,16 70:14

**Timekeeping**

12:11

**timely** 21:21

**times** 8:25 15:21 19:23 26:2,3 34:8 65:21

**title** 12:5 13:8,9 46:5 50:13 56:6 60:14 61:3,6,8 64:14 65:11

**titled** 63:11 67:6

**titles** 57:12

**today** 6:5,6 7:18 8:7,17 10:10 25:3

**today's** 10:1,22 11:9

**top** 49:14 52:21 56:6 64:17

**total** 34:1,20 35:1 69:24

**tough** 31:19

**trained** 24:23 25:1

**training** 15:18 25:2,12

**transcript** 6:7, 15

**trial** 6:6

**trouble** 66:2

**type** 23:18 28:14

**types** 12:9 19:8 20:23 36:8 40:1 42:23 65:9 68:2

**typical** 46:15 54:6 61:13 62:12 64:19 67:12,17 68:13

**typically** 47:16 59:20 60:24 62:24

—————

**U**

**U.S.** 15:14,17

Atkinson-Baker, a Veritext Company
www.depo.com

Index: U.S.A...zoom

16:4

**U.S.A.** 46:25 47:4

**U.S.C.** 47:22

**unable** 17:12

**underneath** 53:21

**understand** 6:25 7:4 17:23 37:9,10 45:15 52:4 69:10

**understanding** 21:4 23:11 29:7, 17 32:23 33:4,8, 11,14 35:20 37:18 39:7,16,19 40:2 41:4 43:14, 17 47:23 48:11 54:16,19 55:2,6 60:5 65:6 66:3

**understood** 23:7

**unexpected** 37:15

**update** 31:23 69:23

**updated** 30:4,6, 8,9,20,21 31:1,7, 12

**updates** 31:14, 18

**upper** 42:19

**USA000572** 66:17

**USA005938** 63:13

**V**

**VA** 11:13,16,19, 20,22,24,25 12:3,4 13:10 14:12 15:9 16:25 23:23 24:1,4,19, 24 25:20 28:21 29:3,8 30:7,15

32:12,23 33:3,6 34:17 35:18 41:5 52:11 53:12 57:6,15

**vac** 19:12

**vacancies** 14:5

**vacation** 40:7

**Vague** 39:12 52:3 61:15

**Valerie** 70:11

**VAMC** 56:13

**variety** 59:1

**vascular** 20:20 39:5 50:17 58:23

**vast** 59:6 60:4

**Velez** 10:13 19:18,19 21:5 22:24 23:12 28:24 38:22 45:22 52:23 54:3 58:23 68:22 69:2

**Velez's** 22:12

**venues** 47:6

**verbal** 6:22

**verify** 15:14 18:11

**version** 64:9

**versus** 40:24 58:13

**vet** 14:7,11

**vetting** 15:2,13 17:19 18:13

**videoconferenc e** 5:3

**view** 30:11

**visible** 10:16

**VISN-LEVEL** 58:25

**volunteer** 25:23

**volunteered** 25:23

**W**

**wait** 7:16

**wanted** 38:2 53:3

**Wayne** 5:1

**ways** 22:5 29:13 32:20 33:5,7

**wears** 58:23 61:10

**week** 22:16,17 46:1

**weeks** 46:1,2,3, 8

**Welch** 11:8

**wondering** 60:16

**word** 32:3

**words** 34:18 48:21

**work** 11:25 16:22 19:11 21:13,16 23:18, 22 24:2 39:14 41:10 43:2 45:16

**worked** 13:15 15:20,23 20:12, 15 21:7 23:17 27:10,18,23 65:10,17

**working** 12:2 14:12 17:4 19:25 20:2,23 23:13 37:21 45:22 46:8 65:14,16

**workplace** 28:18

**works** 59:21

**wow** 25:13

**write** 61:13

**writing** 56:17,24 59:25

**writings** 62:11,

16

**written** 54:11 59:18 63:1

**wrote** 56:8 60:15

**Y**

**year** 12:22 15:6, 7 19:23 25:2 50:11 54:4 57:11,13 59:2,10 61:12 63:11 64:15

**year's** 59:9

**years** 9:18,20 12:15,24 13:19 17:25 18:5,12, 14,15 19:1 20:4 21:18 25:4,6 27:15 31:3,4,12, 23 33:24 34:7 38:25 39:1 58:20 59:4 67:21 68:17

**Yesterday** 11:3

**Z**

**zoom** 42:9 63:23,24